LAFAYETTE & KUMAGAI LLP
GARY T. LAFAYETTE (SBN 88666)
Email: glafayette@lkclaw.com
BRIAN H. CHUN (SBN 215417)
Email: bchun@lkclaw.com
1300 Clay Street, Suite 810
Oakland, California 94612
Telephone: (415) 357-4600
Facsimile: (415) 357-4605

Attorneys for Defendant
SAFEWAY INC.

UNITED STATES DISTRICT COUT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBRA HORN,<br><br>              Plaintiff,<br><br>vs.<br><br>SAFEWAY INC. and Does 1-50,<br><br>              Defendants. | Case No. 3:19-cv-02488-JCS<br><br>**DECLARATION OF BRIAN H. CHUN IN SUPPORT OF DEFENDANT SAFEWAY INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        April 30, 2021<br>Time:        9:00 a.m.<br>Courtroom:  Courtroom F, 15th Floor<br>Judge:      Hon. Joseph C. Spero<br><br>Action Filed: March 11, 2019<br>Notice of Removal Filed: May 8, 2019<br>Trial Date: September 27, 2021 |

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
1300 CLAY STREET, SUITE 810
OAKLAND, CALIFORNIA 94612
(415) 357-4600
FAX (415) 357-4605

DECLARATION OF BRIAN H. CHUN IN SUPPORT OF DEFENDANT
SAFEWAY INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
(Case No. 3:19-cv-02488-JCS)

1

I, BRIAN H. CHUN, declare:

1.      I am a partner at the law firm of Lafayette & Kumagai LLP, attorneys of record for Defendant Safeway Inc. ("Defendant") in this action, and am admitted to practice in good standing in this State.  I make this declaration in support of Defendant Safeway Inc.'s Motion for Partial Summary Judgment.  I make this declaration of my own personal knowledge and if called as a witness to testify regarding the matters stated in this declaration I would and could testify under oath competently thereto.

2.      Attached hereto as **Exhibit A** are true and correct copies of the witness oath and excerpts from the transcript of the deposition of Debra Horn, taken on August 21, 2020 (Volume 1).

3.      Attached hereto as **Exhibit B** are true and correct copies of the witness oath, excerpts and exhibits from the transcript of the deposition of Debra Horn, taken on August 27, 2020 (Volume 2).

4.      Attached hereto as **Exhibit C** are true and correct copies of the witness oath, excerpts and exhibits from the transcript of the deposition of Debra Horn, taken on February 16, 2021 (Volume 3).

5.      Attached hereto as **Exhibit D** is a true and correct copy of Plaintiff's Verified Complaint for Damages and Injunctive Relief, filed on March 11, 2019.

6.      Attached hereto as **Exhibit E** is a true and correct copy of Plaintiff's Responses to Defendant Safeway Inc.'s Interrogatories, Set One, dated August 12, 2019.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 26th day of February, 2021 in Albany, California.

*/s/ Brian H. Chun*
BRIAN H. CHUN

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
1300 CLAY STREET, SUITE 810
OAKLAND, CALIFORNIA 94612
(415) 357-4600
FAX (415) 357-4605

DECLARATION OF BRIAN H. CHUN IN SUPPORT OF DEFENDANT
SAFEWAY INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
(Case No. 3:19-cv-02488-JCS)

2

# EXHIBIT "A"

Atkinson-Baker, Inc.
www.depo.com

1            UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4    DEBRA HORN,                  **CERTIFIED COPY**
          Plaintiff,
5
     Vs.                         Case No. 3:19-cv-02488-JCS
6
     SAFEWAY, INC., AND
7    DOES 1-50,
          Defendants.
8    _____/
9
10
11        VIDEOTAPED DEPOSITION OF DEBRA HORN
                    VIA ZOOM
12            VOLUME 1, PAGE 1 TO 109
              FRIDAY, AUGUST 21, 2020
13
14
15
16
17
18
19   ATKINSON-BAKER, INC.
     800-288-3376
20   www.depo.com
21   REPORTED BY:  DEBRA L. ACEVEDO-RAMIREZ, CSR. 7692
                   Arizona 50807
22
     FILE NO:  AE0576E
23
24
25

| | | |
|---|---|---|
| 1 | Siegel, Yee, Brunner and Metha.  I represent Miss | 09:47:02 |
| 2 | Debra Horn and with me today appearing is Katie | 09:47:06 |
| 3 | Teriocha -- sorry if I mispronounce that.  She is my | 09:47:13 |
| 4 | paralegal. | 09:47:18 |
| 5 | COURT REPORTER:  If the witness can | 09:47:28 |
| 6 | raise your right hand. | 09:47:28 |
| 7 | Miss Horn. | 09:47:28 |
| 8 | DEBRA HORN, | 09:47:28 |
| 9 | was sworn to tell the truth, | 09:47:28 |
| 10 | testified as follows: | 09:47:29 |
| 11 | THE WITNESS:  I do. | 09:47:29 |
| 12 | COURT REPORTER:  Thank you. | 09:47:34 |
| 13 | EXAMINATION | 09:47:34 |
| 14 | BY MR. LAFAYETTE: | 09:47:34 |
| 15 | Q.   Good morning, Miss Horn.  Can you see me | 09:47:37 |
| 16 | there? | 09:47:39 |
| 17 | A.   Good morning.  I see myself.  I don't | 09:47:40 |
| 18 | see anybody else, but I can hear everybody. | 09:47:43 |
| 19 | Q.   All right.  Well, I'm Gary Lafayette and | 09:47:46 |
| 20 | I represent Safeway in this matter.  Okay? | 09:47:51 |
| 21 | A.   Okay. | 09:47:55 |
| 22 | Q.   Okay.  Have you ever had your deposition | 09:47:56 |
| 23 | taken before? | 09:48:00 |
| 24 | A.   Yes, I have. | 09:48:01 |
| 25 | Q.   On how many different occasions? | 09:48:03 |

| | | |
|---|---|---|
| 1 | Q.    Okay.  So he hadn't been there very long | 10:09:18 |
| 2 | when you got terminated, right? | 10:09:21 |
| 3 | A.    He was there approximately about a year. | 10:09:23 |
| 4 | Q.    About a year.  Okay. | 10:09:31 |
| 5 | A.    Yeah. | 10:09:32 |
| 6 | Q.    And before him who did you have? | 10:09:33 |
| 7 | A.    Amadeo Olivera. | 10:09:35 |
| 8 | Q.    And before Amadeo? | 10:09:42 |
| 9 | A.    I don't remember who came between him | 10:09:44 |
| 10 | and Brian.  It was like a temporary manager.  I | 10:09:47 |
| 11 | don't remember who it was.  I was out, probably -- I | 10:09:50 |
| 12 | was out on a... | 10:09:54 |
| 13 | Q.    Leave? | 10:09:56 |
| 14 | A.    An injury.  I was out on a surgery. | 10:09:57 |
| 15 | Yeah, I was out. | 10:09:57 |
| 16 | Q.    And so -- and how long was Brian | 10:10:03 |
| 17 | Sullivan there? | 10:10:06 |
| 18 | A.    Oh, at least from -- from what I can | 10:10:07 |
| 19 | recall two thousand -- the end of 2008 until '14. | 10:10:18 |
| 20 | Maybe right up to Olivera, '15.  From '08 to '14. | 10:10:28 |
| 21 | Q.    It was a long time? | 10:10:34 |
| 22 | A.    Right. | 10:10:36 |
| 23 | Q.    How did you get along with Brian | 10:10:36 |
| 24 | Sullivan? | 10:10:39 |
| 25 | A.    How did I get along with him?  I didn't | 10:10:39 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | report to him directly.  I was day stocking at the | 10:10:45 |
| 2 | time.  I got along with him fine. | 10:10:49 |
| 3 | Q.    Okay.  And how about Amadeo? | 10:10:50 |
| 4 | A.    Yes. | 10:10:55 |
| 5 | Q.    How did you get along with him? | 10:10:56 |
| 6 | A.    I didn't report to him.  I reported at | 10:10:58 |
| 7 | that time to the front end.  I got along with him | 10:11:00 |
| 8 | fine. | 10:11:03 |
| 9 | Q.    Okay.  And then Michael Vasquez, how did | 10:11:04 |
| 10 | you get along with him? | 10:11:10 |
| 11 | A.    I got along with him fine. | 10:11:11 |
| 12 | Q.    Okay.  Do you know if any of them have | 10:11:16 |
| 13 | biases against disabilities? | 10:11:22 |
| 14 | MR. KIM:  Objection.  Speculation. | 10:11:25 |
| 15 | MR. LAFAYETTE:  And who was it that you | 10:11:35 |
| 16 | understand had a bias against people with | 10:11:37 |
| 17 | disabilities? | 10:11:39 |
| 18 | THE WITNESS:  I'm sorry.  You were | 10:11:40 |
| 19 | cutting out at the very end. | 10:11:46 |
| 20 | BY MR. LAFAYETTE: | 10:11:47 |
| 21 | Q.    That's all right.  Who was it that you | 10:11:47 |
| 22 | understood had a bias against people with | 10:11:49 |
| 23 | disabilities?  Are you there? | 10:11:51 |
| 24 | A.    I didn't hear.  Yes.  Am I?  Am I able | 10:12:02 |
| 25 | to answer that?  Yes, can I answer the question? | 10:12:09 |

Atkinson-Baker, Inc.
www.depo.com

```
1    STATE OF CALIFORNIA         )

2                                )     ss.

3    COUNTY OF SAN FRANCISCO   )

4

5

6            I, DEBRA L. ACEVEDO-RAMIREZ, hereby

7    certify:

8            That I am a Certified Shorthand Reporter of

9    the State of California;

10           That in pursuance of my duties as such, I

11   attended the proceedings in the foregoing matter and

12   reported all of the proceedings and testimony taken

13   therein;

14           That the foregoing is a full, true and

15   correct transcript of my shorthand notes so taken.

16           Dated:  August 31, 2020

17           Ms. Horn requests to read and sign.

18

19

20

21

22   _____
     DEBRA L. ACEVEDO-RAMIREZ, RPR, CSR 7692
23

24

25
```

# EXHIBIT "B"

Atkinson-Baker, Inc.
www.depo.com

1           UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4   DEBRA HORN,                **CERTIFIED COPY**
        Plaintiff,
5
    Vs.                    Case No. 3:19-cv-02488-JCS
6
    SAFEWAY, INC., AND
7   DOES 1-50,
        Defendants.
8   _____/
9
10
11        VIDEOTAPED DEPOSITION OF DEBRA HORN
                    VIA ZOOM
12            VOLUME 2, PAGES 110 TO 300
              THURSDAY, AUGUST 27, 2020
13
14
15
16
17
18
19   ATKINSON-BAKER, INC.
     800-288-3376
20   www.depo.com
21   REPORTED BY:  DEBRA L. ACEVEDO-RAMIREZ, CSR. 7692
                   Arizona 50807
22
     FILE NO:  AE05D8B
23
24
25

Atkinson-Baker, Inc.
www.depo.com

1          MR. KIM:  Good morning.  My name is Chan          10:26:00

2   Kim.  I'm with Siegel, Yee, Brunner and Mehta.  I          10:26:05

3   represent Miss Horn and making an appearance later          10:26:09

4   on today is my paralegal.  She will be on around          10:26:13

5   11:00.  Her name is Katie Teriocha.          10:26:18

6          THE VIDEOGRAPHER:  The court reporter          10:26:22

7   please make her statement for the record and then          10:26:24

8   please swear the witness.          10:26:27

9          COURT REPORTER:  Miss Horn, please raise          10:26:27

10   your right hand.          10:26:29

11                    DEBRA HORN,          10:26:29

12         was sworn to tell the truth,          10:26:29

13     remotely by the court reporter through Zoom,          10:26:29

14              testified as follows:          10:26:41

15          THE WITNESS:  Yes, I do.          10:26:41

16          MR. LAFAYETTE:  All right.  Can I get          10:26:43

17   started?          10:26:45

18          THE VIDEOGRAPHER:  Yes, sir.          10:26:46

19          MR. LAFAYETTE:  Thank you.  Good          10:26:47

20   morning.          10:26:49

21                    EXAMINATION          10:26:49

22   BY MR. LAFAYETTE:          10:26:49

23       Q.   Miss Horn, nice to see you again.          10:26:49

24       A.   Good morning.          10:26:51

25       Q.   Okay.  We're going to continue with the          10:26:52

| | | |
|---|---|---|
| 1 | these two African-American women in your store? | 10:58:10 |
| 2 | MR. KIM:  Objection.  Irrelevant. | 10:58:15 |
| 3 | THE WITNESS:  Oh, I don't know how many | 10:58:16 |
| 4 | minutes. | 10:58:26 |
| 5 | BY MR. LAFAYETTE: | 10:58:26 |
| 6 | Q.    Just give me an approximation. | 10:58:27 |
| 7 | A.    Possibly -- possibly three to five. | 10:58:29 |
| 8 | Q.    Okay.  And why did you start watching | 10:58:40 |
| 9 | them in the first instance? | 10:58:43 |
| 10 | A.    Because the -- I manage the | 10:58:44 |
| 11 | self-checkout lane and there is no other check | 10:58:54 |
| 12 | stands from that point on towards the -- where the | 10:58:57 |
| 13 | direction where the customers were at and they were | 10:59:02 |
| 14 | heading towards the door with the bag of items. | 10:59:05 |
| 15 | Q.    So -- and so the fact that they were | 10:59:09 |
| 16 | walking towards the door with a bag of items made | 10:59:11 |
| 17 | you suspicious of them, right? | 10:59:16 |
| 18 | MR. KIM:  Objection.  It misstates | 10:59:19 |
| 19 | testimony. | 10:59:20 |
| 20 | THE WITNESS:  No.  Also, there was | 10:59:24 |
| 21 | other -- other factors involved.  I asked anybody | 10:59:29 |
| 22 | else if they had rung these customers up and they | 10:59:32 |
| 23 | had said no. | 10:59:36 |
| 24 | BY MR. LAFAYETTE: | 10:59:36 |
| 25 | Q.    So, but what about you made you decide | 10:59:38 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | question, so let me go back. | 12:36:59 |
| 2 | From 2012 to the present -- from 2012 to | 12:37:03 |
| 3 | the present, there has been some restriction related | 12:37:06 |
| 4 | to your foot; is that true? | 12:37:12 |
| 5 | A. Yes. | 12:37:14 |
| 6 | Q. And that restriction related to your | 12:37:17 |
| 7 | foot throughout that time period has been that you | 12:37:20 |
| 8 | can't stand for more than two hours, right? | 12:37:24 |
| 9 | A. It's more specific, but that is part of | 12:37:29 |
| 10 | it, yes. | 12:37:36 |
| 11 | Q. So what else has it been from 2012 to | 12:37:37 |
| 12 | the present? | 12:37:40 |
| 13 | A. Regarding my foot? | 12:37:41 |
| 14 | Q. Yes. | 12:37:45 |
| 15 | A. It's always been the same. | 12:37:46 |
| 16 | Q. You can't stand for more than two hours, | 12:37:48 |
| 17 | right? | 12:37:52 |
| 18 | A. I can't stand in place for more than two | 12:37:52 |
| 19 | hours the first four hours of my shift and cannot | 12:37:55 |
| 20 | stand for more than two hours the second four hours | 12:37:58 |
| 21 | of my shift. | 12:38:01 |
| 22 | Q. Okay. I got it. Okay. So that's been | 12:38:01 |
| 23 | the restriction with regard to your foot all along, | 12:38:06 |
| 24 | right? | 12:38:10 |
| 25 | A. Yes. | 12:38:10 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | work? | 13:02:29 |
| 2 | Q.   I want to know if you are saying that | 13:02:29 |
| 3 | you didn't get it. | 13:02:31 |
| 4 | A.   I would have to look at all documents | 13:02:32 |
| 5 | that were attached to this actual letter to be able | 13:02:34 |
| 6 | to recall. | 13:02:38 |
| 7 | Q.   Are you saying right now as you sit here | 13:02:39 |
| 8 | you don't know one way or the other; is that what | 13:02:41 |
| 9 | you're telling me? | 13:02:43 |
| 10 | A.   No.  I'm telling you I would have to see | 13:02:44 |
| 11 | all documents to know what -- what was attached to | 13:02:47 |
| 12 | this letter. | 13:02:52 |
| 13 | Q.   I understand that, but I'm just saying | 13:02:53 |
| 14 | looking at that letter alone, you're unable to tell | 13:02:55 |
| 15 | me if you received it, right? | 13:02:58 |
| 16 | A.   I believe I most likely received it. | 13:03:00 |
| 17 | It's addressed to me. | 13:03:03 |
| 18 | Q.   Let's take a look at another document. | 13:03:04 |
| 19 | Okay.  Exhibit 68.  Do you recognize this document? | 13:03:06 |
| 20 | A.   Yes. | 13:03:22 |
| 21 | Q.   What is this? | 13:03:41 |
| 22 | A.   This is an offer of modified or | 13:03:41 |
| 23 | alternative work. | 13:03:49 |
| 24 | Q.   Did you accept this? | 13:03:51 |
| 25 | A.   I can't see the -- I can't see the | 13:03:53 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | writing. | 13:03:56 |
| 2 | Q.   As you sit here today do you have a | 13:03:57 |
| 3 | recollection of accepting this? | 13:03:59 |
| 4 | A.   I could have.  I don't see where... | 13:04:01 |
| 5 | Q.   Sitting here today do you have a | 13:04:04 |
| 6 | recollection of accepting this? | 13:04:06 |
| 7 | A.   I do not without seeing my signature. | 13:04:07 |
| 8 | Q.   Take a look.  Do you recognize your | 13:04:21 |
| 9 | signature? | 13:04:25 |
| 10 | A.   Yes.  What was the second?  Can I see | 13:04:26 |
| 11 | the second page? | 13:04:30 |
| 12 | Q.   First, do you recognize your signature? | 13:04:30 |
| 13 | A.   That's my signature, yes. | 13:04:34 |
| 14 | Q.   Your signature date is September 6, | 13:04:36 |
| 15 | 2012? | 13:04:39 |
| 16 | A.   Yes. | 13:04:39 |
| 17 | Q.   Okay.  Let's look through this document | 13:04:44 |
| 18 | some.  Okay.  So this is a document that was sent to | 13:04:52 |
| 19 | you, date of offer, do you see that, was August 15, | 13:04:56 |
| 20 | 2012? | 13:05:03 |
| 21 | A.   Yes. | 13:05:03 |
| 22 | Q.   Date job starts it says August 12, 2012? | 13:05:05 |
| 23 | A.   Yes. | 13:05:08 |
| 24 | Q.   Okay.  Then we have here date of injury, | 13:05:12 |
| 25 | June 7, 2005, right? | 13:05:18 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.   Yes. | 13:05:19 |
| 2 | Q.   Then it has down here modified work or | 13:05:22 |
| 3 | -- it says modified work, not alternative work. | 13:05:25 |
| 4 | Does it? | 13:05:27 |
| 5 | A.   Yes. | 13:05:28 |
| 6 | Q.   So then it lists your position at the | 13:05:31 |
| 7 | time of full time full clerk, right? | 13:05:33 |
| 8 | A.   Yes. | 13:05:36 |
| 9 | Q.   Here's your wages.  Then it goes on to | 13:05:38 |
| 10 | say here, "Physical requirements for performing work | 13:05:40 |
| 11 | activities."  Do you see that? | 13:05:46 |
| 12 | A.   Yes. | 13:05:47 |
| 13 | Q.   It says "She will continue doing her | 13:05:50 |
| 14 | normal job."  Right? | 13:05:52 |
| 15 | A.   Yes, I see that. | 13:05:55 |
| 16 | Q.   "She is best if she checks no more than | 13:06:00 |
| 17 | two hours at a time, four hours total per day," | 13:06:03 |
| 18 | right? | 13:06:07 |
| 19 | A.   That's what it's printed, yes. | 13:06:07 |
| 20 | Q.   It simply says "Two hours at a time, no | 13:06:12 |
| 21 | more than four hours a day checking," right? | 13:06:15 |
| 22 | A.   Yes. | 13:06:17 |
| 23 | Q.   What did you understand you were | 13:06:21 |
| 24 | supposed to do the other hours, your normal duties, | 13:06:22 |
| 25 | right? | 13:06:27 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.   Yes. | 13:06:27 |
| 2 | Q.   Okay.  "We understand that you further | 13:06:30 |
| 3 | requested a stool to be in the check stand." | 13:06:34 |
| 4 | Correct? | 13:06:37 |
| 5 | A.   That's what it states, yes. | 13:06:37 |
| 6 | Q.   "A stool will be available to be | 13:06:44 |
| 7 | utilized on as-needed basis, right? | 13:06:46 |
| 8 | A.   Yes. | 13:06:49 |
| 9 | Q.   So it says "as-needed basis," right? | 13:06:50 |
| 10 | A.   Yes. | 13:06:52 |
| 11 | Q.   It doesn't say every time you use the | 13:06:54 |
| 12 | check stand, does it? | 13:06:56 |
| 13 | A.   It doesn't describe either way.  It | 13:06:57 |
| 14 | doesn't. | 13:07:07 |
| 15 | Q.   It says as needed, but it doesn't say | 13:07:09 |
| 16 | every time you use the check stand, does it? | 13:07:11 |
| 17 | A.   It doesn't describe anything.  It's just | 13:07:16 |
| 18 | very vague. | 13:07:20 |
| 19 | Q.   Listen to my question.  It doesn't say | 13:07:21 |
| 20 | every time you use the check stand, does it? | 13:07:24 |
| 21 | A.   No, it does not. | 13:07:28 |
| 22 | Q.   And you signed off in accepting this, | 13:07:29 |
| 23 | didn't you? | 13:07:31 |
| 24 | A.   Yes. | 13:07:32 |
| 25 | Q.   Okay.  Are you aware of any other | 13:07:35 |

| | | |
|---|---|---|
| 1 | Q.    The day you wrote this did anybody | 14:35:23 |
| 2 | whatsoever talk to you? | 14:35:25 |
| 3 | A.    No. | 14:35:26 |
| 4 | Q.    Okay.  Did you get your stool that day? | 14:35:28 |
| 5 | A.    It wasn't available.  If I'm writing the | 14:35:31 |
| 6 | note at the end of the -- no, I wouldn't -- I would | 14:35:36 |
| 7 | have stated it, I'm sure.  If I would have got my | 14:35:41 |
| 8 | stool I would have stated it. | 14:35:44 |
| 9 | Q.    Did you -- that day, did you get any | 14:35:45 |
| 10 | kind of a stool? | 14:35:48 |
| 11 | A.    No, because that's the only stool that | 14:35:50 |
| 12 | was available in the store was mine. | 14:35:52 |
| 13 | Q.    Listen to me for a second, okay, ma'am. | 14:35:54 |
| 14 | On that day did you have any stool whatsoever to | 14:35:57 |
| 15 | use, including your stool, do you know? | 14:36:01 |
| 16 | A.    I do not know. | 14:36:04 |
| 17 | Q.    Thank you. | 14:36:06 |
| 18 | Okay.  So that was September 6, 2016, | 14:36:09 |
| 19 | right?  Let's take a look.  How did you get along | 14:36:18 |
| 20 | with Michael Vasquez? | 14:36:33 |
| 21 | A.    Fine.  He was a great assistant manager | 14:36:35 |
| 22 | and then he came back as our store -- store manager | 14:36:39 |
| 23 | and he didn't find a way to accommodate me. | 14:36:43 |
| 24 | Q.    So -- | 14:36:47 |
| 25 | A.    And that's when -- excuse me? | 14:36:47 |

Mon 09/10/12 09:58AM (PT)

**State of California**
**Division of Workers' Compensation**
**Retraining and Return to Work Unit**



**NOTICE OF OFFER OF MODIFIED OR ALTERNATIVE WORK**
**For injuries occurring on or after 1/1/04**
**DWC - AD 10133.53**

THIS SECTION COMPLETED BY CLAIMS ADMINISTRATOR (All information in this section must be completed):

Claims Administrator Type: (Please Choose One)

☐ Insurance Company ☐ Third Party Administrator ☑ Employer

SAFEWAY
Employer (name of firm)

is offering you DEBRA HORN
(Employee name)

the position of a FULL-TIME FOOD CLERK
Name of Job

You may contact MARYANN WEATHERS

concerning this offer. Phone No.: (925) 469-7508     Date of offer: 08/15/2012     Date job starts: 08/12/2012
                                                                       MM/DD/YYYY                          MM/DD/YYYY

SAFEWAY INC
Claims Administrator

2500534140
Claim Number :

NOTICE TO EMPLOYEE (All information in this section must be completed)

Name of employee: DEBRA                              HORN
                              First Name                    Last Name

(Choose only one)

☑ a specific injury on   06/07/2005
                              MM/DD/YYYY

☐ a cumulative trauma injury which began on _____ and ended on _____
                                            (START DATE: MM/DD/YYYY)        (END DATE: MM/DD/YYYY)

Date offer received: _____                    Date of Birth: 06/04/1964
                         MM/DD/YYYY                                            MM/DD/YYYY

You have 30 calendar days from receipt to accept or reject the attached offer of modified or alternative work. Regardless of whether you accept or reject this offer, the remainder of your permanent disability payments may be decreased by 15%. However, if you fail to respond in 30 days or reject this job offer, you will not be entitled to the supplemental job displacement benefit unless:

Modified Work ☑ or Alternative Work ☐

A. You cannot perform the essential functions of the job; or
B. The job is not a regular position lasting at least 12 months; or
C. Wages and compensation offered are less than 85% paid at the time of injury; or
D. The job is beyond a reasonable commuting distance from residence at time of injury.

**EXHIBIT**
tabbies®
68

DWC-AD form 10133.53 (SJDB) Rev: 11/2008 - Page 1                              AD10133.53

**DEF 000047**

Mon 09/10/12 09:58AM (PT)

**POSITION REQUIREMENTS (All information in this section must be completed)**

Actual job title: FULL-TIME FOOD CLERK

Wages: $ 21.13                           Per hour [✓]   Week [ ]   Month [ ]

Is salary of modified/alternative work the same as pre-injury job?       Yes [✓]   No [ ]

Is salary of modified/alternative work at least 85% of pre-injury job?   Yes [✓]   No [ ]

Will job last at least 12 months?                                        Yes [✓]   No [ ]

Is the job a regular position required by the employer's business?       Yes [✓]   No [ ]

Work location: SAFEWAY STORE #1953 7499 DUBLIN BLVD DUBLIN, CA 94568 925-556-4034

Duties required of the position:

SEE ATTACHED JOB ANALYSIS (JA) CHECKER

Description of activities to be performed (if not stated in job description):

SEE ATTACHED JA.

AD10133.53

DEF 000048

Physical requirements for performing work activities (include modifications to usual and customary job):

"SHE WILL CONTINUE DOING HER NORMAL JOB. SHE IS BEST IF SHE CHECKS NO MORE THAN 2 HOURS AT A TIME, 4 HOURS TOTAL PER DAY."

WE UNDERSTAND THAT YOU FURTHER REQUESTED A STOOL TO BE IN THE CHECKSTAND. A STOOL WILL BE AVAILABLE TO BE UTILIZED ON AN AS NEEDED BASIS.

Name of doctor who approved job restrictions (optional):

DR SUBOTNICK

Date of report: 05/18/2012
MM/DD/YYYY

Date of last payment of Temporary Total Disability: 09/24/2006
MM/DD/YYYY

Preparer's Name: MARYANN WEATHERS

Preparer's Signature:

Date: 8/15/2012
MM/DD/YYYY

THIS SECTION TO BE COMPLETED BY EMPLOYEE (All information in this section must be completed)

[X] I accept this offer of Modified or Alternative work.

[ ] I reject this offer of Modified or Alternative work and understand that I am not entitled to the Supplemental Job Displacement Benefit.

I understand that if I voluntarily quit prior to working in this position for 12 months, I may not be entitled to the Supplemental Job Displacement Benefit.

Signature: _____  Date: 9/6/12
MM/DD/YYYY

I feel I cannot accept this offer because:

DWC-AD form 10133.53(SJDB) Rev. 11/2008 - Page 3

AD10133.53

DEF 000049

```
 1   STATE OF CALIFORNIA        )

 2                              )      ss.

 3   COUNTY OF SAN FRANCISCO    )

 4

 5

 6          I, DEBRA L. ACEVEDO-RAMIREZ, hereby

 7   certify:

 8          That I am a Certified Shorthand Reporter of

 9   the State of California;

10          That in pursuance of my duties as such, I

11   attended the proceedings in the foregoing matter and

12   reported all of the proceedings and testimony taken

13   therein;

14          That the foregoing is a full, true and

15   correct transcript of my shorthand notes so taken.

16          Dated:  August 30, 2020

17          Ms. Horn requests to read and sign.

18

19

20

21

22   _____

23          DEBRA L. ACEVEDO-RAMIREZ, RPR, CSR 7692

24

25
```

# EXHIBIT "C"

Atkinson-Baker, Inc.
www.depo.com

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4   DEBRA HORN,                    )
                                   )
5                                  )
                   Plaintiff,      )
6                                  )
        vs.                        )
7                                  )        CASE NUMBER
                                   )     3:19-cv-02488-JCS
8   SAFEWAY, INC. AND DOES 1-50,   )
                                   )
9                                  )
                   Defendants.     )
10  _____ )

11

12

13

14

               VOLUME III

15

           DEPOSITION OF DEBRA HORN

16

             DUBLIN, CALIFORNIA

17

           TUESDAY, FEBRUARY 16, 2021

18

19

20

21

22  ATKINSON-BAKER, INC.
    Www.depo.com
23  (800) 288-3376

24  REPORTED BY:  VALERIE E. JENSEN HARRIS, CSR NO. 4401

25  FILE NO.:  AF00FB3

CERTIFIED COPY

Atkinson-Baker, Inc.
www.depo.com

| 1 | DEBRA HORN, | |
|---|---|---|
| 2 | having been sworn to tell the truth, the whole truth | |
| 3 | and nothing but the truth, under penalty of perjury, | |
| 4 | testified as is hereinafter set forth. | |
| 5 | EXAMINATION | 10:05:32 |
| 6 | Q.    BY MR. LAFAYETTE:  Good morning, Ms. Horn. | 10:05:34 |
| 7 | How are you? | 10:05:36 |
| 8 | A.    Good morning. | 10:05:38 |
| 9 | Q.    How are you? | 10:05:40 |
| 10 | A.    Good.  How are you? | 10:05:42 |
| 11 | Q.    I'm good.  Thank you. | 10:05:42 |
| 12 | Ms. Horn, I'm continuing with your deposition | 10:05:46 |
| 13 | today pursuant to the court's order.  And I have a few | 10:05:50 |
| 14 | questions I'd like to start out with. | 10:05:54 |
| 15 | First, do you recall the admonitions I gave | 10:05:56 |
| 16 | you at the beginning when we first started taking your | 10:05:58 |
| 17 | deposition? | 10:06:02 |
| 18 | A.    Go ahead and repeat it.  I have no -- | 10:06:04 |
| 19 | Q.    Okay.  You realize you've been sworn and | 10:06:08 |
| 20 | placed under oath? | 10:06:08 |
| 21 | A.    That's what the reporters have said, yes. | 10:06:12 |
| 22 | Q.    You understand that the testimony that you | 10:06:14 |
| 23 | give today should bear the same gravity if you were | 10:06:18 |
| 24 | actually testifying in a court of law? | 10:06:20 |
| 25 | A.    Yes. | 10:06:20 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | that was done to you at work that you thought was | 10:12:20 |
| 2 | offensive. | 10:12:22 |
| 3 | A.   Oh.   So, I mean, do we have -- we have three | 10:12:26 |
| 4 | hours to go through this?   Okay.   I can get my notes | 10:12:30 |
| 5 | out.   2016, May. | 10:12:36 |
| 6 | Q.   May of 2017.   Do you have a specific | 10:12:40 |
| 7 | recollection of anything that was to -- | 10:12:42 |
| 8 | A.   Well, May of 2017 I wasn't even in the store. | 10:12:44 |
| 9 | So there would be no recollection because I wasn't even | 10:12:48 |
| 10 | in -- I wasn't even -- I was on suspension.   There's no | 10:12:52 |
| 11 | way of having anything inside the store.   Nothing inside | 10:12:58 |
| 12 | the store. | 10:12:58 |
| 13 | Q.   So it would be accurate that, between May of | 10:13:02 |
| 14 | 2016 and May of 2017, you don't have a recollection of | 10:13:06 |
| 15 | anyone doing anything to you that was offensive in this | 10:13:12 |
| 16 | case? | 10:13:12 |
| 17 | A.   No, I have not -- I have several | 10:13:16 |
| 18 | recollections of people doing offensive things to me. | 10:13:22 |
| 19 | Q.   Okay.   What's the first offensive thing that | 10:13:26 |
| 20 | you recall during that time period? | 10:13:40 |
| 21 | A.   The first thing that is the strongest, not | 10:13:44 |
| 22 | the first -- it's not in "chronical" order, but the most | 10:13:50 |
| 23 | offensive was when Michael Vasquez told me I couldn't | 10:13:54 |
| 24 | have my vacations and told me to write something down | 10:13:58 |
| 25 | and get out of his office. | 10:14:00 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   Okay.  All right.  And do you have a specific | 10:14:04 |
| 2 | recollection as to when that occurred? | 10:14:08 |
| 3 | A.   That would have been on March 22 or March -- | 10:14:14 |
| 4 | March 2 because my union rep was present. | 10:14:18 |
| 5 | Q.   And what year was that? | 10:14:20 |
| 6 | A.   2016 -- '17, March. | 10:14:24 |
| 7 | Q.   All right.  And -- so you had asked for | 10:14:28 |
| 8 | vacation.  Is that accurate? | 10:14:32 |
| 9 | A.   No, I had submitted -- I didn't ask for | 10:14:34 |
| 10 | vacation.  I had submitted according to the union | 10:14:36 |
| 11 | contract rules based on my seniority. | 10:14:42 |
| 12 | Q.   Okay.  Do you recall anything else that you | 10:14:46 |
| 13 | have a specific recollection -- do you have a specific | 10:14:48 |
| 14 | recollection of anything else happening during that time | 10:14:50 |
| 15 | period that you thought was offensive? | 10:14:52 |
| 16 | A.   Yes.  During the month of November, he | 10:14:56 |
| 17 | brought me into the office, Michael Vasquez, and told | 10:15:00 |
| 18 | me that he doesn't think -- he has no position for me | 10:15:04 |
| 19 | at the store; that I should find another job. | 10:15:06 |
| 20 | Q.   And that was in 2016, ma'am? | 10:15:12 |
| 21 | A.   Yes. | 10:15:16 |
| 22 | Q.   Okay.  Anything else?  Another -- do you have | 10:15:16 |
| 23 | any other specific recollections? | 10:15:20 |
| 24 | A.   Yes, he -- there were several occasions where | 10:15:22 |
| 25 | there -- he had written me up for customer service when | 10:15:28 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | I -- when I hadn't done anything. | 10:15:36 |
| 2 | Q.   Do you recall when that took place? | 10:15:40 |
| 3 | A.   In the month of October, November. | 10:15:52 |
| 4 | Q.   Okay.  Any other specific recollections? | 10:15:56 |
| 5 | A.   Yes.  During the...  During May -- May of | 10:16:04 |
| 6 | 2016? | 10:16:06 |
| 7 | Q.   Yes. | 10:16:06 |
| 8 | A.   May '16 or '17 I was denied funeral leave for | 10:16:10 |
| 9 | my grandmother. | 10:16:20 |
| 10 | Q.   Anything else that you have a specific | 10:16:24 |
| 11 | recollection of? | 10:16:26 |
| 12 | A.   During the whole month of -- from May till -- | 10:16:32 |
| 13 | that whole year, employee -- I was -- I was taken out | 10:16:36 |
| 14 | of my position and put into a position that I had to | 10:16:40 |
| 15 | work in to a check-out lane and taken away from my job, | 10:16:44 |
| 16 | and someone else took over my job. | 10:16:48 |
| 17 | And that was beyond what I could possibly | 10:16:50 |
| 18 | do, according to my work accommodation.  And I made | 10:16:54 |
| 19 | it a point that I was in a lot of pain, and I was still | 10:16:56 |
| 20 | asked by all management -- Michael, any management team | 10:17:02 |
| 21 | that was there, any person in charge -- that I need to | 10:17:06 |
| 22 | do what they told me to do, which was to further injure | 10:17:08 |
| 23 | myself and hurt myself. | 10:17:10 |
| 24 | And I told them I was hurting, and I'd | 10:17:12 |
| 25 | already done what I can do, but yet I was still asked | 10:17:16 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | to go beyond my accommodations all through that whole | 10:17:20 |
| 2 | year. | 10:17:22 |
| 3 | Q.   All?  Everyday? | 10:17:24 |
| 4 | A.   Everyday something happened. | 10:17:26 |
| 5 | Q.   I'm talking about this one thing. | 10:17:28 |
| 6 | Everyday -- | 10:17:32 |
| 7 | A.   Everyday something happened. | 10:17:32 |
| 8 | Q.   No, ma'am.  Let me ask my question, please. | 10:17:36 |
| 9 | That's not what I'm asking you. | 10:17:40 |
| 10 | Are you telling me, under penalty of perjury, | 10:17:42 |
| 11 | that everyday someone took you out of your position? | 10:17:54 |
| 12 | A.   That -- that's not what the -- I was making | 10:17:56 |
| 13 | a comment, and that's...  It... | 10:18:06 |
| 14 | Q.   It's a "yes" or "no" answer, ma'am. | 10:18:08 |
| 15 | A.   No, I'd like to elaborate. | 10:18:10 |
| 16 | Q.   I want to first -- listen to me, ma'am. | 10:18:14 |
| 17 | Okay?  I'm entitled to take a deposition to ask my | 10:18:16 |
| 18 | questions and to have that you give answers to my | 10:18:18 |
| 19 | questions, not simply telling me what you want to | 10:18:24 |
| 20 | tell me.  Your lawyer can ask you questions, and | 10:18:26 |
| 21 | then you can say anything you want to say, but right | 10:18:28 |
| 22 | now, it's my opportunity to ask my questions.  Okay? | 10:18:32 |
| 23 | So, are you telling me, under penalty of | 10:18:34 |
| 24 | perjury, that everyday that you worked in 2016, some | 10:18:40 |
| 25 | manager took you out of your position? | 10:18:46 |

| | | |
|---|---|---|
| 1 | MR. LAFAYETTE:  Objection.  Misstates | 10:18:48 |
| 2 | testimony. | 10:19:02 |
| 3 | THE WITNESS:  No.  No. | 10:19:04 |
| 4 | Q.   BY MR. LAFAYETTE:  Thank you.  As you sit | 10:19:10 |
| 5 | here today, do you have a recollection of the dates in | 10:19:16 |
| 6 | which that occurred? | 10:19:26 |
| 7 | A.   This is year 2021.  We're talking five | 10:19:34 |
| 8 | years ago.  These are incidents that happened on several | 10:19:38 |
| 9 | occasions, not on an exact daily basis every day, but | 10:19:44 |
| 10 | something happened every day regarding my accommodation, | 10:19:48 |
| 11 | whether it be taken out of my position or not giving | 10:19:52 |
| 12 | me my break or not getting out on time, any of those, | 10:19:56 |
| 13 | or having my stool, I...  It would be impossible. | 10:20:02 |
| 14 | I can go through my notes.  They're so | 10:20:04 |
| 15 | detailed that it's gonna -- it'll take me three hours | 10:20:08 |
| 16 | to go through my notes, and this deposition would be | 10:20:10 |
| 17 | over. | 10:20:10 |
| 18 | Q.   Let me tell you what's going on happen, | 10:20:12 |
| 19 | ma'am.  I've already gone to court and said that I | 10:20:14 |
| 20 | needed more time to take your deposition.  The more | 10:20:18 |
| 21 | you don't answer my questions directly, the more I'm | 10:20:20 |
| 22 | going to wind up going back to court and have you | 10:20:24 |
| 23 | sit for longer.  That's just what's gonna happen. | 10:20:28 |
| 24 | I'm trying my best to ask you | 10:20:30 |
| 25 | straightforward questions, and I would appreciate | 10:20:32 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | straightforward answers.  All right? | 10:20:36 |
| 2 | And please -- if I'm not asking you | 10:20:38 |
| 3 | something, don't tell me.  I'm not asking for that. | 10:20:44 |
| 4 | Okay? | 10:20:44 |
| 5 | I'll ask you again.  Do you have a specific | 10:20:48 |
| 6 | recollection, as you sit here today, of the dates on | 10:20:54 |
| 7 | which you claim someone took you out of your position | 10:20:56 |
| 8 | in 2016? | 10:21:00 |
| 9 | MR. KIM:  Objection.  Asked and answered.. | 10:21:16 |
| 10 | You may answer, Debra anytime I object, | 10:21:18 |
| 11 | unless I -- | 10:21:20 |
| 12 | THE WITNESS:  I'm sorry.  Okay.  I didn't | 10:21:22 |
| 13 | understand.  Okay. | 10:21:22 |
| 14 | Yeah, I have a specific date.  I have | 10:21:34 |
| 15 | November 23rd, Thanksgiving, 2016. | 10:21:42 |
| 16 | Q.   BY MR. LAFAYETTE:  Are you looking at | 10:21:42 |
| 17 | something? | 10:21:44 |
| 18 | A.   No, I'm not. | 10:21:46 |
| 19 | Q.   Are you looking at -- | 10:21:48 |
| 20 | A.   I have nothing -- no, I have nothing to look | 10:21:50 |
| 21 | at 'cause I haven't reviewed anything. | 10:21:52 |
| 22 | Q.   So you said November 23rd, 2016? | 10:21:56 |
| 23 | A.   Yes. | 10:21:58 |
| 24 | Q.   What happened on that day? | 10:22:00 |
| 25 | A.   I slipped and fell. | 10:22:04 |

| | | |
|---|---|---|
| 1 | Q. Okay. And it happened on that day? | 10:22:08 |
| 2 | A. Yes. I slipped and fell, and I asked for | 10:22:10 |
| 3 | assistance from the management team, and nobody helped | 10:22:12 |
| 4 | me. And that was offensive. | 10:22:16 |
| 5 | Q. Okay. Do you have any other incidences, | 10:22:22 |
| 6 | specific recollections of someone taking you out of | 10:22:24 |
| 7 | your position in 2016? | 10:22:38 |
| 8 | A. No, I can't -- I have lots of recollections, | 10:22:42 |
| 9 | but I can't give you the specific dates. | 10:22:44 |
| 10 | Q. Okay. | 10:22:46 |
| 11 | A. I have a lot. I know... They're there; I | 10:22:52 |
| 12 | just don't have them. | 10:22:54 |
| 13 | Q. Okay. Now, the position that you had in | 10:23:00 |
| 14 | 2016, do you know if there were some notes from your | 10:23:08 |
| 15 | doctor or anything that indicated what you could and | 10:23:10 |
| 16 | could not do? | 10:23:14 |
| 17 | A. Yes. | 10:23:14 |
| 18 | Q. Okay. So let's just focus on 2016, not some | 10:23:18 |
| 19 | time period before that. Okay? | 10:23:22 |
| 20 | So, in 2016, was there a restriction on | 10:23:26 |
| 21 | where you could work in the store? | 10:23:32 |
| 22 | A. Was there a restriction where? | 10:23:34 |
| 23 | Q. As to where you could be assigned to work | 10:23:36 |
| 24 | in the store. | 10:23:38 |
| 25 | A. My restriction -- it's based on the company, | 10:23:42 |

| | | |
|---|---|---|
| 1 | where they want to put me. | 10:23:44 |
| 2 | Q.   Okay.  So the company could put you wherever | 10:23:46 |
| 3 | they wanted to put you.  Correct? | 10:23:50 |
| 4 | A.   If they -- if that's a job duty that I can | 10:23:54 |
| 5 | do. | 10:23:54 |
| 6 | No, it's not correct.  It has to be a job | 10:23:58 |
| 7 | to do -- that I'm physically able and capable to do with | 10:24:00 |
| 8 | my restrictions. | 10:24:02 |
| 9 | Q.   Okay.  I'm trying to ask you that, ma'am. | 10:24:04 |
| 10 | That's all I'm trying to get to. | 10:24:06 |
| 11 | A.   That's not what you -- | 10:24:06 |
| 12 | Q.   I asked you before what your restrictions | 10:24:08 |
| 13 | were.  Okay? | 10:24:12 |
| 14 | A.   You want to -- | 10:24:12 |
| 15 | Q.   Let me ask my question, please. | 10:24:14 |
| 16 | Is there someone else with you, ma'am? | 10:24:26 |
| 17 | A.   Yes, it's -- I'm on my Bluetooth so nobody | 10:24:30 |
| 18 | can hear my conversation. | 10:24:32 |
| 19 | Q.   Okay.  So now let's go to your restrictions. | 10:24:38 |
| 20 | Were you restricted to performing only certain functions | 10:24:42 |
| 21 | in the store? | 10:24:44 |
| 22 | A.   Yes. | 10:24:44 |
| 23 | Q.   What were the functions you were restricted | 10:24:46 |
| 24 | to perform? | 10:24:50 |
| 25 | A.   I could not stand in the checkstand for more | 10:24:52 |

| | | |
|---|---|---|
| 1 | than two hours at a time. | 10:24:54 |
| 2 | Q.   So you can be assigned to work in a | 10:25:00 |
| 3 | checkstand.  Is that accurate? | 10:25:06 |
| 4 | A.   No, it's not.  I can only -- | 10:25:10 |
| 5 | Q.   I thought you just told me you couldn't be | 10:25:12 |
| 6 | assigned to work for more than two hours, but if it | 10:25:16 |
| 7 | was less than two hours, you could be assigned to work | 10:25:18 |
| 8 | in a checkstand.  Would that be accurate? | 10:25:28 |
| 9 | A.   For two hours, the first four hours of my | 10:25:30 |
| 10 | shift, yes. | 10:25:32 |
| 11 | Q.   So let's see if I can get this straight. | 10:25:36 |
| 12 | You could be assigned to work in a | 10:25:38 |
| 13 | checkstand.  There might just be some limitations on | 10:25:42 |
| 14 | the amount of time you could work there at any one | 10:25:46 |
| 15 | point in time.  Would that be accurate? | 10:25:52 |
| 16 | A.   I don't understand the question. | 10:25:56 |
| 17 | Q.   Okay.  In the first instance, you could be | 10:25:58 |
| 18 | assigned to work in a checkstand for less than two hours | 10:26:02 |
| 19 | at a time.  Correct? | 10:26:10 |
| 20 | A.   No. | 10:26:12 |
| 21 | Q.   So you could never ever, under any | 10:26:16 |
| 22 | circumstances whatsoever, regardless of if it was | 10:26:18 |
| 23 | five minutes, be assigned to work in a checkstand. | 10:26:22 |
| 24 | Correct? | 10:26:24 |
| 25 | A.   No. | 10:26:26 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   So could you be assigned to work for five | 10:26:28 |
| 2 | minutes in a checkstand? | 10:26:32 |
| 3 | A.   Five minutes, yes. | 10:26:34 |
| 4 | Q.   10 minutes? | 10:26:38 |
| 5 | A.   Yes. | 10:26:40 |
| 6 | Q.   Half an hour? | 10:26:42 |
| 7 | A.   Yes. | 10:26:44 |
| 8 | Q.   An hour? | 10:26:46 |
| 9 | A.   Yes. | 10:26:48 |
| 10 | Q.   An hour and a half? | 10:26:50 |
| 11 | A.   Yes. | 10:26:50 |
| 12 | Q.   An hour and 15 minutes? | 10:26:54 |
| 13 | A.   Yes. | 10:26:54 |
| 14 | Q.   An hour and 59 minutes? | 10:27:00 |
| 15 | A.   Yes. | 10:27:04 |
| 16 | Q.   I'm confused, ma'am.  I just said before | 10:27:06 |
| 17 | you could be assigned to work at a checkstand, just not | 10:27:10 |
| 18 | more than two hours, and you said, "No" to that.  Why? | 10:27:14 |
| 19 | A.   If you repeat -- if you go back and listen | 10:27:18 |
| 20 | to the words you used, you asked at any given time, and | 10:27:22 |
| 21 | you...  And I can only check from -- two hours the first | 10:27:28 |
| 22 | four hours of our employment, so I answered the question | 10:27:32 |
| 23 | correctly. | 10:27:32 |
| 24 | Q.   Just so I understand it, you could be | 10:27:34 |
| 25 | assigned to work at a checkstand for up to two hours | 10:27:40 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | the first hours of your shift.  Correct? | 10:27:46 |
| 2 | MR. KIM:  Misstates testimony? | 10:27:46 |
| 3 | THE WITNESS:  It's -- no. | 10:27:52 |
| 4 | Q.   BY MR. LAFAYETTE:  No? | 10:27:54 |
| 5 | A.   No. | 10:27:54 |
| 6 | Q.   So they couldn't assign you to work less | 10:27:56 |
| 7 | than two hours at the beginning of your shift at the | 10:28:00 |
| 8 | checkstand.  Correct? | 10:28:04 |
| 9 | A.   Can you repeat the question? | 10:28:06 |
| 10 | Q.   They couldn't assign you to work up to two | 10:28:08 |
| 11 | hours of the beginning of your shift at a checkstand. | 10:28:12 |
| 12 | Correct? | 10:28:12 |
| 13 | A.   No. | 10:28:16 |
| 14 | Q.   When could they assign you to work at a | 10:28:18 |
| 15 | checkstand, ma'am? | 10:28:26 |
| 16 | A.   I can work two hours the first four hours | 10:28:30 |
| 17 | of my shift.  Then I have to have a break.  Then I come | 10:28:34 |
| 18 | back, and I can work two hours.  That's what I can be | 10:28:38 |
| 19 | assigned. | 10:28:38 |
| 20 | Q.   So let's see if I think I understand it. | 10:28:40 |
| 21 | When you show up, they can assign you to work | 10:28:44 |
| 22 | two hours at a checkstand.  Correct?  Correct? | 10:28:50 |
| 23 | A.   Yes.  Yes. | 10:28:52 |
| 24 | Q.   And then you would be entitled to a break. | 10:28:54 |
| 25 | Correct? | 10:28:56 |

Atkinson-Baker, Inc.
www.depo.com

```
 1        A.    15-minute break.                          10:28:58
 2        Q.    And then they could assign you to work    10:29:00
 3   another two hours at a checkstand.  Correct?         10:29:04
 4        A.    Not until the second half of my shift.    10:29:08
 5        Q.    So that can --                            10:29:10
 6        A.    I have --                                 10:29:12
 7        Q.    Go ahead.                                 10:29:14
 8        A.    I can only work two hours in the checkstand 10:29:18
 9   the first four hours of my work shift.  After my    10:29:22
10   one-hour lunch --                                    10:29:26
11        Q.    Do you --                                 10:29:26
12        A.    Am I answering the question?              10:29:28
13        Q.    Go ahead.                                 10:29:28
14        A.    After my one-hour lunch, I come back.  I can 10:29:32
15   only check for a total of two hours that four hours of 10:29:36
16   my eight-hour shift.                                 10:29:38
17        Q.    Okay.  Thank you for that.                10:29:40
18              So now you told me that there was something 10:29:44
19   about people taking you off your shift.  Do you recall 10:29:48
20   in 2016, from May 2016 to May -- May 9, 2016 to May 9, 10:29:58
21   2017 -- you've got the time period in place.  Ma'am? 10:30:04
22        A.    Yes.                                      10:30:04
23        Q.    Do you recall anyone doing anything else  10:30:08
24   that was offensive to you during that time period?   10:30:14
25        A.    Yes.  There was notes put up in the       10:30:16
```

| | | |
|---|---|---|
| 1 | breakroom regarding my... my job, me not...  People | 10:30:28 |
| 2 | were taking me out of my position from what I was | 10:30:34 |
| 3 | doing and... my stool not being available.  My... | 10:30:42 |
| 4 | My employee file being brought out to the sales floor | 10:30:48 |
| 5 | in front of the customers. | 10:30:54 |
| 6 | Not getting relieved out of the register | 10:31:04 |
| 7 | after two hours and asking to get out because I'm in | 10:31:10 |
| 8 | pain.  I have to get out and get my foot and elevate | 10:31:12 |
| 9 | it and ice it. | 10:31:14 |
| 10 | Not having my stool.  It being locked up. | 10:31:20 |
| 11 | It not being available.  Somebody being on it. | 10:31:26 |
| 12 | Umm...  All checkers commenting and talking | 10:31:28 |
| 13 | about me in front of the customers and talking to the | 10:31:30 |
| 14 | customers regarding my condition.  Me addressing this | 10:31:36 |
| 15 | to management and not -- not taking care of it and it | 10:31:40 |
| 16 | continuing.  Management talking about my condition to | 10:31:42 |
| 17 | each other.  Uh... | 10:31:52 |
| 18 | Q.   Ma'am -- it seems like you're looking at | 10:31:54 |
| 19 | something, ma'am.  Are you looking at a computer screen | 10:31:58 |
| 20 | or something?  Because it really looks to me like you | 10:32:00 |
| 21 | are looking at something.  What are you looking at? | 10:32:04 |
| 22 | A.   I'm -- I'm writing down on a piece of paper | 10:32:06 |
| 23 | "2016 to 2017" (indicating) right here. | 10:32:10 |
| 24 | Q.   All right.  Thank you. | 10:32:12 |
| 25 | A.   That's what... | 10:32:16 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.    Okay. | 10:32:18 |
| 2 | A.    That's what I'm writing down. | 10:32:20 |
| 3 | Q.    Anything else that you can recall? | 10:32:30 |
| 4 | A.    I can recall being written up for customer | 10:32:34 |
| 5 | service that I didn't -- I didn't do.  I've been | 10:32:42 |
| 6 | suspended. | 10:32:46 |
| 7 | Q.    Anything else? | 10:32:54 |
| 8 | A.    I'm -- there's more, but -- that's what I | 10:32:56 |
| 9 | can recall right now. | 10:32:58 |
| 10 | Q.    Thank you. | 10:32:58 |
| 11 | Let's talk about this written up -- okay? -- | 10:33:04 |
| 12 | and getting suspended.  Do you have an understanding | 10:33:06 |
| 13 | as to whether or not that was preceded by a customer | 10:33:12 |
| 14 | complaining about you? | 10:33:16 |
| 15 | MR. KIM:  Vague as to time. | 10:33:22 |
| 16 | THE WITNESS:  I -- I didn't hear the | 10:33:24 |
| 17 | question all the way, and I didn't hear the comment. | 10:33:30 |
| 18 | Q.    BY MR. LAFAYETTE:  You say between May of | 10:33:32 |
| 19 | 2009 and -- May of 2016 and May of 2017, you got written | 10:33:42 |
| 20 | up for suspensions.  Did you say that? | 10:33:44 |
| 21 | A.    Yes. | 10:33:44 |
| 22 | Q.    Do you know if, prior to that, a customer had | 10:33:50 |
| 23 | complained about you? | 10:33:54 |
| 24 | A.    Oh...  Prior to what -- I don't know. | 10:34:00 |
| 25 | Q.    Prior to you getting written up.  Okay? | 10:34:04 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.   Okay.  When the third time occurred, did | 10:38:18 |
| 2 | anyone in any way whatsoever tell you that a customer | 10:38:22 |
| 3 | had complained about you? | 10:38:26 |
| 4 | A.   I...  I don't -- I can't recall all three | 10:38:28 |
| 5 | incidents.  I can't recall. | 10:38:30 |
| 6 | Q.   Okay.  So the third incident, did it relate | 10:38:38 |
| 7 | to customer treatment? | 10:38:42 |
| 8 | A.   I don't recall. | 10:38:46 |
| 9 | Q.   Okay.  So now...  Do you recall any | 10:38:58 |
| 10 | incidences that occurred -- you said something about | 10:39:04 |
| 11 | your stool.  Correct? | 10:39:16 |
| 12 | A.   I...  I haven't -- | 10:39:18 |
| 13 | Q.   The availability -- let me see if I think I | 10:39:22 |
| 14 | understand.  At some point in time, did Safeway agree | 10:39:26 |
| 15 | that you would be provided a stool? | 10:39:28 |
| 16 | A.   Yes. | 10:39:30 |
| 17 | Q.   Okay.  Did Safeway ever countermand that? | 10:39:38 |
| 18 | A.   Did they ever what? | 10:39:40 |
| 19 | Q.   Did they ever say -- did Safeway ever say | 10:39:44 |
| 20 | you no longer needed a stool? | 10:39:46 |
| 21 | A.   No. | 10:39:48 |
| 22 | Q.   Okay.  So what was your normal shift in 2016 | 10:39:54 |
| 23 | through 2017?  Which shift did you work? | 10:39:58 |
| 24 | A.   2:00 to 11:00. | 10:40:02 |
| 25 | Q.   Two p.m. to 11 p.m. | 10:40:04 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Q.    Okay.  Have you looked at those pieces of | 10:44:06 |
| 2 | paper, ma'am? | 10:44:08 |
| 3 | A.    Have I?  No, not for a while.  No, not | 10:44:12 |
| 4 | since I -- | 10:44:14 |
| 5 | Q.    When was the last time you looked at them? | 10:44:16 |
| 6 | A.    Well, probably... A couple years because I... | 10:44:26 |
| 7 | I continued to write more papers. | 10:44:32 |
| 8 | Q.    I'm only asking about that time period, | 10:44:34 |
| 9 | ma'am.  Really, I'm only asking about that time period. | 10:44:38 |
| 10 | Okay? | 10:44:42 |
| 11 | A.    Okay. | 10:44:42 |
| 12 | Q.    So now, when you say the stool wasn't where | 10:44:46 |
| 13 | you thought it should be, did you have an understanding | 10:44:50 |
| 14 | as to where the stool was supposed to be? | 10:45:04 |
| 15 | A.    Can you repeat the question the first time? | 10:45:08 |
| 16 | Q.    Did you have -- | 10:45:10 |
| 17 | A.    I'm -- | 10:45:12 |
| 18 | Q.    You have to do this.  Okay?  If I'm talking, | 10:45:14 |
| 19 | try not to talk to when I'm talking, and I'll try not | 10:45:18 |
| 20 | to talk when you're talking because it's difficult for | 10:45:20 |
| 21 | the court reporter, ma'am.  Okay? | 10:45:24 |
| 22 | A.    Can the court reporter record -- | 10:45:26 |
| 23 | Q.    I'll ask my question, ma'am.  Okay? | 10:45:32 |
| 24 | Did you have an understanding in 2016 | 10:45:38 |
| 25 | through '17 where the stool was supposed to be? | 10:45:44 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.   I -- yes, I did have an understanding.  I | 10:45:46 |
| 2 | knew where it was supposed to be kept. | 10:45:48 |
| 3 | Q.   And where did you understand the stool was | 10:45:50 |
| 4 | supposed to be? | 10:45:52 |
| 5 | A.   In the office, locked. | 10:45:54 |
| 6 | Q.   In the office, locked.  And when did it | 10:45:56 |
| 7 | start being -- and when was it, your best understanding, | 10:46:00 |
| 8 | as to when it was supposed to start being in the office, | 10:46:04 |
| 9 | locked? | 10:46:06 |
| 10 | A.   The day I received it -- February 13, 2013 -- | 10:46:10 |
| 11 | from Dana Wards, the HR manager. | 10:46:12 |
| 12 | Q.   All right.  So, as I understand it, you're | 10:46:18 |
| 13 | saying that there were times when you would show up, | 10:46:20 |
| 14 | and it wouldn't be in the office, locked.  Right? | 10:46:24 |
| 15 | A.   Yes. | 10:46:24 |
| 16 | Q.   Did you ever see any manager take it out of | 10:46:28 |
| 17 | that office and put it someplace? | 10:46:34 |
| 18 | A.   No. | 10:46:34 |
| 19 | Q.   Okay.  Did you ever hear any manager say | 10:46:38 |
| 20 | they weren't going to make sure that it was in that | 10:46:42 |
| 21 | office, locked? | 10:46:50 |
| 22 | A.   I heard -- no, but I -- not managers -- | 10:46:56 |
| 23 | Q.   Thank you? | 10:46:56 |
| 24 | A.   -- management. | 10:46:58 |
| 25 | Q.   So now let me see if I think I understand it. | 10:47:02 |

| | | |
|---|---|---|
| 1 | Okay? | 10:47:02 |
| 2 | Do you have -- as you sit here today, do | 10:47:04 |
| 3 | you know the identity of anybody whom you think took | 10:47:08 |
| 4 | your chair, your stool, out of that locked office? | 10:47:14 |
| 5 | A.   Do I have any identity of who? | 10:47:18 |
| 6 | Q.   Yes. | 10:47:20 |
| 7 | A.   Everybody did because it wasn't in there. | 10:47:22 |
| 8 | Q.   I'm asking you for a specific person, ma'am. | 10:47:32 |
| 9 | A.   I know the bookkeeper, Kelly Snow, would | 10:47:36 |
| 10 | have -- would move it.  She didn't want it in the | 10:47:38 |
| 11 | office.  It was in her way. | 10:47:40 |
| 12 | Q.   Okay.  So how do you know she moved it? | 10:47:48 |
| 13 | A.   Because she would have courtesy clerks move | 10:47:50 |
| 14 | it for her to other places. | 10:47:52 |
| 15 | Q.   Did you ever see her move it? | 10:47:56 |
| 16 | A.   No, it would be done before I get there. | 10:47:58 |
| 17 | Q.   Did you ever see her tell a courtesy clerk | 10:48:02 |
| 18 | to move it? | 10:48:06 |
| 19 | A.   No. | 10:48:12 |
| 20 | Q.   So why is it that you believe that she would | 10:48:16 |
| 21 | tell a courtesy clerk to move it? | 10:48:22 |
| 22 | A.   Because I trust -- the courtesy clerks tell | 10:48:24 |
| 23 | me the truth.  That's how it had gotten to another area, | 10:48:28 |
| 24 | and that's exactly where I found it. | 10:48:30 |
| 25 | Q.   Who was the courtesy clerk that told you | 10:48:32 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | you showed up, wasn't he? | 10:53:06 |
| 2 | A.    No. | 10:53:06 |
| 3 | MR. KIM:  Misstates testimony. | 10:53:08 |
| 4 | Q.    BY MR. LAFAYETTE:  How often was he not | 10:53:08 |
| 5 | there, ma'am? | 10:53:10 |
| 6 | A.    I -- I don't know. | 10:53:14 |
| 7 | Q.    Okay.  So now the courtesy clerks told | 10:53:18 |
| 8 | you that they moved the stool to another locked room. | 10:53:24 |
| 9 | Correct? | 10:53:28 |
| 10 | A.    Yes. | 10:53:28 |
| 11 | Q.    Did they ever tell you that the stool had | 10:53:30 |
| 12 | been moved someplace else? | 10:53:34 |
| 13 | A.    Yes. | 10:53:36 |
| 14 | Q.    Where else did they say they moved -- the | 10:53:38 |
| 15 | stool had been moved to? | 10:53:40 |
| 16 | A.    They had been told to move it to the | 10:53:42 |
| 17 | service counter.  They had been told to move it to the | 10:53:46 |
| 18 | breakroom. | 10:53:50 |
| 19 | Q.    We talked about -- so the breakroom.  Did | 10:53:54 |
| 20 | you ever see anybody tell them to move the stool? | 10:54:00 |
| 21 | A.    Can you repeat the question? | 10:54:06 |
| 22 | Q.    Did you ever see them -- see anyone tell | 10:54:06 |
| 23 | them to move the stool? | 10:54:10 |
| 24 | A.    No, it happened before I came to work. | 10:54:14 |
| 25 | Q.    Did you ever hear anyone tell them to move | 10:54:16 |

| | | |
|---|---|---|
| 1 | Q.    Do you have -- | 11:03:10 |
| 2 | A.    I -- | 11:03:10 |
| 3 | Q.    Do you have anything that indicates how | 11:03:16 |
| 4 | many days between May of 2009 -- May 9, 2016 and May 9, | 11:03:22 |
| 5 | 2017 that your stool could not be located? | 11:03:34 |
| 6 | A.    Can you repeat the question?  It's... | 11:03:38 |
| 7 | Q.    Do you have anything which reflects how many | 11:03:42 |
| 8 | times, during that time period, the stool could not be | 11:03:44 |
| 9 | located? | 11:03:48 |
| 10 | A.    Oh.  Lots of times.  I mean... | 11:03:54 |
| 11 | Q.    Do you have something in writing? | 11:03:58 |
| 12 | A.    Yes, I have it in writing.  I've given it to | 11:04:00 |
| 13 | my lawyer, and they supplied it with you. | 11:04:04 |
| 14 | Q.    I looked at your -- all of your writings, | 11:04:06 |
| 15 | ma'am, and I only see one time when your stool could | 11:04:20 |
| 16 | not be located during that time period, and that was, | 11:04:26 |
| 17 | ma'am, on October 9, 2016. | 11:04:32 |
| 18 | So, other than October 9, 2016, do you have | 11:04:36 |
| 19 | any other writings that reflect that your stool could | 11:04:42 |
| 20 | not be located on any particular day when you went to | 11:04:44 |
| 21 | work? | 11:04:48 |
| 22 | A.    I don't know if I have any writings, no. | 11:04:50 |
| 23 | Q.    Thank you. | 11:04:52 |
| 24 | Do you have any witnesses who can testify | 11:04:54 |
| 25 | that your stool could not be located on any particular | 11:04:58 |

| | | |
|---|---|---|
| 1 | day when you reported to work during that time period? | 11:05:04 |
| 2 | A.   No.  No one would testify.  They're... | 11:05:10 |
| 3 | Q.   Is it your best recollection, as you sit | 11:05:12 |
| 4 | here today, that it was one time during that time | 11:05:20 |
| 5 | period when your stool -- when you could walk through | 11:05:26 |
| 6 | the door, and your stool was there everyday? | 11:05:36 |
| 7 | You see, when you answer my question before | 11:05:40 |
| 8 | I ask you, we don't know what you're answering.  So | 11:05:44 |
| 9 | please let me ask my questions.  Okay? | 11:05:48 |
| 10 | So, as you're sitting here today, you can | 11:05:52 |
| 11 | identify one specific instance, during that time period, | 11:05:56 |
| 12 | when your stool was not available at all.  Correct? | 11:06:04 |
| 13 | A.   I...  I can't be specific any of it.  I know | 11:06:08 |
| 14 | it happened, but I don't know what date and when.  It's | 11:06:12 |
| 15 | during that year -- | 11:06:14 |
| 16 | THE REPORTER:  You said "I...  I can't be | |
| 17 | specific any of it.  I know it happened, but I don't | |
| 18 | know what date and when.  It's during that year --" | |
| 19 | Repeat that.  I'm not getting everything | 11:06:20 |
| 20 | you just said because it's reverberating.  Please | 11:06:24 |
| 21 | repeat. | 11:06:38 |
| 22 | THE WITNESS:  That's all.  During that time | 11:06:40 |
| 23 | period, May '16 -- May 9, 2016. | 11:06:48 |
| 24 | Q.   BY MR. LAFAYETTE:  So, during that time | 11:06:48 |
| 25 | period, as you sit here today, you can only recall one | 11:06:52 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | have talked about them now.  So, given what you said, | 13:37:50 |
| 2 | what was your normal workday like, supposed to be, | 13:37:56 |
| 3 | as you understood it?  What was your normal workday | 13:37:58 |
| 4 | supposed to be like? | 13:38:02 |
| 5 | A.    As far as what? | 13:38:04 |
| 6 | Q.    What were you supposed to do when you | 13:38:06 |
| 7 | showed up, and then how long were you supposed to do | 13:38:08 |
| 8 | that, what were you next supposed to do, so on and so | 13:38:14 |
| 9 | forth?  That's what I'm trying to figure out, what you | 13:38:16 |
| 10 | understood you were supposed to do. | 13:38:18 |
| 11 | A.    During this one-year period of working for | 13:38:20 |
| 12 | Safeway? | 13:38:20 |
| 13 | Q.    Let's say from May 9, 2016 until November 20, | 13:38:34 |
| 14 | 2016.  Let's make it very simple, during that time | 13:38:40 |
| 15 | period. | 13:38:46 |
| 16 | A.    Can you repeat the question?  Now I think | 13:38:48 |
| 17 | you've said the second accommodation, so I'm not sure | 13:38:50 |
| 18 | regarding the date. | 13:38:54 |
| 19 | Q.    I absolutely did because we're going to deal | 13:38:56 |
| 20 | with that separately.  Okay? | 13:38:58 |
| 21 | So I'm only focused on  the time period | 13:39:00 |
| 22 | now from May 9, 2016 until November 20, 2016.  Okay? | 13:39:08 |
| 23 | What did you understand your work schedule was supposed | 13:39:10 |
| 24 | to be like when you showed up? | 13:39:14 |
| 25 | A.    My -- I was scheduled as a self-checkout | 13:39:16 |

| | | |
|---|---|---|
| 1 | cashier, and that was my job. | 13:39:22 |
| 2 | Q.    So tell me what you were supposed to do. | 13:39:26 |
| 3 | Just tell me your work for the day.  Go ahead. | 13:39:30 |
| 4 | A.    I'd run the self-checkout lane.  I was | 13:39:34 |
| 5 | put there in 2013 with a stool provided for me | 13:39:40 |
| 6 | because all my other accommodations were never being | 13:39:46 |
| 7 | accommodated.  So they put me where they could half | 13:39:50 |
| 8 | accommodate me, and I could use my stool there. | 13:39:52 |
| 9 | I had been there since that time. | 13:39:54 |
| 10 | Q.    That's not what I'm asking you, ma'am. | 13:39:56 |
| 11 | It's really not what I'm asking you. | 13:39:58 |
| 12 | Let's say you showed up to work during that | 13:40:00 |
| 13 | time period, and you would show up to work, and you | 13:40:04 |
| 14 | would go to the self-checkout counter.  Is that what you | 13:40:08 |
| 15 | would do? | 13:40:08 |
| 16 | THE REPORTER:  She started to answer, and | 13:40:18 |
| 17 | I couldn't hear her. | 13:40:18 |
| 18 | MR. LAFAYETTE:  Okay.  Go ahead, ma'am. | 13:40:20 |
| 19 | THE WITNESS:  I didn't want to interrupt him. | 13:40:22 |
| 20 | MR. LAFAYETTE:  I'm waiting.  Go ahead. | 13:40:28 |
| 21 | THE WITNESS:  I -- I don't even know -- I | 13:40:24 |
| 22 | don't know how much you said in the question, because | 13:40:32 |
| 23 | you added more, so I started answering, but -- so I | 13:40:38 |
| 24 | don't know what -- I can't remember what's there so | 13:40:40 |
| 25 | far of the question. | 13:40:42 |

| | | |
|---|---|---|
| 1 | Q.  BY MR. LAFAYETTE:  During that time period | 13:40:42 |
| 2 | when you were supposed to show up for work, what were | 13:40:50 |
| 3 | you supposed to do when you originally got there during | 13:40:54 |
| 4 | that time period? | 13:40:54 |
| 5 | A.  Just -- you start to do your job.  You | 13:40:58 |
| 6 | start it -- you report to your job area, which is | 13:41:02 |
| 7 | self-checkout. | 13:41:02 |
| 8 | Q.  Okay.  So you report to self-checkout. | 13:41:06 |
| 9 | And how long would you work at self-checkout? | 13:41:10 |
| 10 | A.  It would depend if they would have me | 13:41:12 |
| 11 | scheduled as a cashier or not.  Sometimes -- | 13:41:18 |
| 12 | Q.  Okay? | 13:41:18 |
| 13 | A.  -- even if they did have me scheduled | 13:41:20 |
| 14 | as a cashier, I would still be at self-check.  It | 13:41:24 |
| 15 | depended on who I was relieving at self-checkout. | 13:41:26 |
| 16 | Everything was on a daily basis.  You don't know | 13:41:28 |
| 17 | until you go there. | 13:41:30 |
| 18 | Q.  So you were supposed to show up at self | 13:41:32 |
| 19 | checkout.  Is that correct? | 13:41:34 |
| 20 | A.  That's what -- that's what the call sheet | 13:41:38 |
| 21 | said, yeah. | 13:41:40 |
| 22 | Q.  And you were supposed to work at self | 13:41:42 |
| 23 | checkout until someone told you to go work someplace | 13:41:44 |
| 24 | else.  Is that correct? | 13:41:48 |
| 25 | A.  Or they -- or the -- yeah. | 13:41:54 |

| | | |
|---|---|---|
| 1 | Q.   They can ask you to go -- when they would | 13:41:58 |
| 2 | ask you to go do something else, what would they ask | 13:42:00 |
| 3 | you?  What are the range of things that they would ask | 13:42:04 |
| 4 | you to go do? | 13:42:06 |
| 5 | A.   Are you talking about different job duties or | 13:42:08 |
| 6 | just job duties within my -- my job? | 13:42:14 |
| 7 | Q.   I don't know the difference there, ma'am. | 13:42:16 |
| 8 | I'm just asking you -- | 13:42:18 |
| 9 | A.   Okay. | 13:42:20 |
| 10 | Q.   So, once you showed up at the self-check, | 13:42:22 |
| 11 | you work the self-check.  And then I think you said | 13:42:24 |
| 12 | someone might come and ask you to do something else. | 13:42:28 |
| 13 | Right? | 13:42:36 |
| 14 | A.   If I'm -- if I'm at self-checkout, and | 13:42:38 |
| 15 | that's my job, and if I have -- if I have to check, | 13:42:42 |
| 16 | then they tell me to go check if I'm scheduled, if | 13:42:46 |
| 17 | I'm relief check.  Sometimes I'm just a lunch relay. | 13:42:50 |
| 18 | Sometimes I don't check at all.  Even | 13:42:52 |
| 19 | though the call sheet shows me scheduled, possibly, | 13:42:54 |
| 20 | for only the two hours, I -- I don't usually check. | 13:43:00 |
| 21 | It just depends on that day and when I come in and | 13:43:04 |
| 22 | who's doing what, what I do that day, what they have | 13:43:12 |
| 23 | Q.   So, sometimes you might have to go to a | 13:43:16 |
| 24 | checkstand?  Is that what you're saying? | 13:43:18 |
| 25 | A.   Yes. | 13:43:20 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | That's a checkout stand.  Right? | 13:44:34 |
| 2 |     A.   Yes.  So is self-checkout, but self-checkout | 13:44:38 |
| 3 | you're doing it yourself.  So, yeah.  It's a cashier | 13:44:42 |
| 4 | standing there, ringing you up. | 13:44:44 |
| 5 |     Q.   Okay.  So a checkstand is where the cashier | 13:44:46 |
| 6 | is ringing you up, and a self-check is when there's no | 13:44:50 |
| 7 | cashier ringing you up? | 13:44:54 |
| 8 |     A.   Yes. | 13:44:54 |
| 9 |     Q.   Okay.  And so -- and so was there a | 13:44:58 |
| 10 | restriction on how much time you could spend at a | 13:45:02 |
| 11 | self checkstand? | 13:45:04 |
| 12 |     A.   No, because I had my stool.  I can sit on | 13:45:08 |
| 13 | my stool. | 13:45:08 |
| 14 |     Q.   Thank you. | 13:45:10 |
| 15 |         MR. KIM:  I had a request for a break. | 13:45:14 |
| 16 |         MR. LAFAYETTE: Yes.  How long do you need? | 13:45:16 |
| 17 |         MR. KIM:  Just five minutes -- or 10 minutes. | 13:45:18 |
| 18 |         MR. LAFAYETTE:  We'll take a 10-minute break. | 13:45:20 |
| 19 |         We'll take a 10-minute break. | 13:45:22 |
| 20 |         MR. KIM:  Okay.  Thank you. | 13:45:24 |
| 21 |         THE VIDEOGRAPHER:  We are going off the | 13:45:24 |
| 22 | record.  The time is 1:45 p.m. | 13:45:28 |
| 23 |         (Recess taken) | 13:56:02 |
| 24 |         THE VIDEOGRAPHER:  We are going back on | 13:56:16 |
| 25 | the record.  The time is 1:56 p.m. | 13:56:20 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Is that accurate? | 13:57:44 |
| 2 | A.    No. | 13:57:46 |
| 3 | Q.    That's not accurate? | 13:57:48 |
| 4 | A.    No, it's not.  That's not my restriction. | 13:57:50 |
| 5 | My restriction is I cannot work for more | 13:57:52 |
| 6 | than two hours the first four hours of my shift in a | 13:57:58 |
| 7 | checkstand, in a confined space, and then no more than | 13:58:00 |
| 8 | two hours the second four hours of my shift.  That's how | 13:58:04 |
| 9 | it is.  It hasn't changed. | 13:58:16 |
| 10 | Q.    So I'm only focused on the checkstand | 13:58:18 |
| 11 | activity -- ma'am -- okay? -- because that's what we | 13:58:22 |
| 12 | have been talking about before, not the self-check, the | 13:58:26 |
| 13 | regular checkstand. | 13:58:28 |
| 14 | A.    (Nods head). | 13:58:28 |
| 15 | Q.    Just the regular checkstand.  Okay? | 13:58:32 |
| 16 | So, during the time period of May 9, | 13:58:36 |
| 17 | 2016 through November 20, 2016, you couldn't work in | 13:58:42 |
| 18 | a regular checkstand at the beginning -- just hear me | 13:58:48 |
| 19 | out.  This is only part of what I'm going to ask you. | 13:58:50 |
| 20 | First of all, for no more than two hours | 13:58:52 |
| 21 | at a time.  Correct? | 13:59:02 |
| 22 | A.    I guess, yes.  If I'm hearing it correctly. | 13:59:06 |
| 23 | I don't understand the question, but... | 13:59:08 |
| 24 | Q.    Well, if you -- I'll ask it again. | 13:59:14 |
| 25 | From the time period of May 9, 2016 to | 13:59:20 |

| | | |
|---|---|---|
| 1 | Q.   Okay.  I'm going to show you a document, | 14:01:06 |
| 2 | and I want you to tell me what this is I'm looking at. | 14:01:10 |
| 3 | Okay? | 14:01:10 |
| 4 | Well, first of all...  So, in terms of your | 14:01:16 |
| 5 | accommodations, was there any accommodation that said | 14:01:20 |
| 6 | anything about how long your breaks needed to be? | 14:01:26 |
| 7 | A.   Yes. | 14:01:28 |
| 8 | Q.   Where did that come from? | 14:01:30 |
| 9 | A.   From the doctors.  It had to be 15 minutes. | 14:01:34 |
| 10 | Q.   Which year was that? | 14:01:38 |
| 11 | A.   It would go back to 2009 -- | 14:01:42 |
| 12 | Q.   Okay. | 14:01:42 |
| 13 | A.   -- at least 2009. | 14:01:46 |
| 14 | THE REPORTER:  Excuse me.  I think the | 14:01:48 |
| 15 | gardeners are here.  So I have to go out.  I'm sorry. | 14:01:50 |
| 16 | MR. LAFAYETTE:   Okay. | 14:01:56 |
| 17 | THE VIDEOGRAPHER:  We are going off the | 14:02:04 |
| 18 | record.  The time is 2:02 p.m.) | 14:02:08 |
| 19 | (Recess taken) | 14:04:58 |
| 20 | THE VIDEOGRAPHER:  We are going back on the | 14:05:12 |
| 21 | record.  The time is 2:05 p.m. | 14:05:18 |
| 22 | Q.   BY MR. LAFAYETTE:  Okay.  Ms. Horn, are you | 14:05:24 |
| 23 | still there? | 14:05:24 |
| 24 | A.   Yes. | 14:05:26 |
| 25 | Q.   At anytime after August of 2012, did you | 14:05:32 |

| | | |
|---|---|---|
| 1 | enter into any agreement relating to the accommodations | 14:05:38 |
| 2 | that you should be provided? | 14:05:48 |
| 3 | A.   I could have. | 14:05:50 |
| 4 | Q.   I'm asking, do you have a specific | 14:05:52 |
| 5 | recollection of having done it? | 14:05:54 |
| 6 | A.   I have recollected having to fill out lots | 14:05:58 |
| 7 | of forms for accommodation.  It doesn't mean it was | 14:06:02 |
| 8 | accommodated.  It was a request. | 14:06:04 |
| 9 | Q.   My question is not that.  That's not what | 14:06:06 |
| 10 | I'm asking you. | 14:06:08 |
| 11 | A.   Okay. | 14:06:08 |
| 12 | Q.   As you sit here today, do you have a | 14:06:10 |
| 13 | specific recollection of entering into any agreement | 14:06:16 |
| 14 | with Safeway relating to your accommodations after | 14:06:20 |
| 15 | August 30, 2012? | 14:06:30 |
| 16 | A.   Yes, I do. | 14:06:32 |
| 17 | Q.   When did you enter into it? | 14:06:36 |
| 18 | A.   I don't know.  I know that I -- like I | 14:06:40 |
| 19 | tried to answer earlier, I filled out a lot of requests | 14:06:44 |
| 20 | because I came back from a surgery, and I had to fill | 14:06:48 |
| 21 | out another request form. | 14:06:52 |
| 22 | Q.   I'm not asking about requests.  I'm asking | 14:06:52 |
| 23 | about agreements, ma'am. | 14:07:02 |
| 24 | A.   Any? | 14:07:04 |
| 25 | My accommodations has not changed.  Since | 14:07:06 |

| | | |
|---|---|---|
| 1 | 2005, it's the same.  So, if there's any agreement, | 14:07:10 |
| 2 | it -- that I signed, it... that doesn't recollect what | 14:07:18 |
| 3 | the doctors say I cannot do. | 14:07:20 |
| 4 | My accommodation has not changed from day | 14:07:24 |
| 5 | one.  So, whether or not there was something I signed -- | 14:07:30 |
| 6 | there was a lot of things that I signed, but I know | 14:07:34 |
| 7 | that my restriction has not changed. | 14:07:36 |
| 8 | Q.    What did you think I asked you? | 14:07:44 |
| 9 | A.    Have I signed something regarding an | 14:07:48 |
| 10 | accommodation. | 14:07:48 |
| 11 | Q.    No, that's not what I asked you, ma'am. | 14:07:52 |
| 12 | I asked you, do you have a specific recollection of | 14:07:56 |
| 13 | signing an agreement with Safeway relating to your | 14:08:00 |
| 14 | accommodations that you signed on or after August 30, | 14:08:06 |
| 15 | 2012?  Do you have a specific recollection of signing | 14:08:12 |
| 16 | an agreement with Safeway? | 14:08:18 |
| 17 | A.    I... I don't tell -- I don't know.  I | 14:08:20 |
| 18 | signed a lot of things. | 14:08:22 |
| 19 | Q.    I'm asking you -- if you're telling me you | 14:08:26 |
| 20 | don't know if you signed an agreement, I'll take that. | 14:08:30 |
| 21 | A.    That's correct.  I don't know. | 14:08:32 |
| 22 | Q.    Thank you. | 14:08:32 |
| 23 | I'm going to show you a document that we | 14:08:34 |
| 24 | previously marked, I think, at the last deposition, | 14:08:36 |
| 25 | as Exhibit 168.  Do you see this document, ma'am? | 14:09:28 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.    You showed this to me earlier in the | 14:09:30 |
| 2 | deposition. | 14:09:30 |
| 3 | Q.    I want you to take look at it.  It's | 14:09:34 |
| 4 | Exhibit 68, Notice of Offer of Modified or Alternative | 14:09:38 |
| 5 | Work.  Do you see that? | 14:09:38 |
| 6 | A.    Yes. | 14:09:44 |
| 7 | Q.    Do you see it? | 14:09:48 |
| 8 | A.    Yes, I do. | 14:09:48 |
| 9 | Q.    Okay.  Now, do you see your signature? | 14:10:00 |
| 10 | A.    This -- you already showed this to me earlier | 14:10:02 |
| 11 | in the deposition. | 14:10:02 |
| 12 | Q.    Do you see your signature? | 14:10:06 |
| 13 | A.    Yes, I do.  Again, I see my signature. | 14:10:08 |
| 14 | Q.    It says here "August 15, 2012."  Right? | 14:10:16 |
| 15 | A.    Yes. | 14:10:18 |
| 16 | Q.    And you write down here -- there's a check | 14:10:20 |
| 17 | mark.  "I sent this offer of modified or alternative | 14:10:24 |
| 18 | work."  Did I read that accurately? | 14:10:26 |
| 19 | A.    That's what I checked. | 14:10:28 |
| 20 | Q.    Okay.  Now, do you see where it says | 14:10:36 |
| 21 | "Physical requirements for performing work activities"? | 14:10:42 |
| 22 | A.    Yes. | 14:10:44 |
| 23 | Q.    It says, quote, she will continue to go her | 14:10:46 |
| 24 | normal job.  She is best if she checks no more than two | 14:10:50 |
| 25 | hours at a time, four hours total per day. | 14:10:56 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Did I read that accurately? | 14:11:02 |
| 2 | A.   That's what it states. | 14:11:02 |
| 3 | Q.   It doesn't say she can only work two hours | 14:11:08 |
| 4 | at a time, does it? | 14:11:24 |
| 5 | A.   It says "She will continue doing her normal | 14:11:26 |
| 6 | job.  She is best if she checks no more than two hours | 14:11:30 |
| 7 | at a time." | 14:11:32 |
| 8 | Q.   It doesn't say "Only work two hours at a | 14:11:34 |
| 9 | time," does it? | 14:11:34 |
| 10 | A.   No.  And it also says that. | 14:11:38 |
| 11 | Q.   I want to make sure it doesn't say "only." | 14:11:40 |
| 12 | That's all I'm trying to get to, ma'am.  Does it say | 14:11:44 |
| 13 | "only"? | 14:11:54 |
| 14 | Ma'am? | 14:11:58 |
| 15 | A.   Yes, it does -- it doesn't say that.  No, it | 14:12:00 |
| 16 | does not.  It's not stated there. | 14:12:04 |
| 17 | Q.   Thank you. | 14:12:06 |
| 18 | So then it goes on to say "We understand that | 14:12:10 |
| 19 | you further requested a stool to be in the echeckstand. | 14:12:14 |
| 20 | A stool will be available to be utilized on an as-needed | 14:12:18 |
| 21 | basis." | 14:12:18 |
| 22 | Did I read that accurately? | 14:12:20 |
| 23 | A.   That's what it states. | 14:12:22 |
| 24 | Q.   It doesn't say "always had to be there." | 14:12:26 |
| 25 | It says it will be there "on an as-needed basis."  Am | 14:12:30 |

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q.   Okay.  So you can't tell me anything more      14:55:12
 2   than what you already told me.  Correct?  That's all     14:55:16
 3   I'm asking.                                              14:55:16
 4        A.   Oh, you want -- what period do you want?       14:55:18
 5   Do you want the last year?                               14:55:20
 6        Q.   I'll tell you the last year.                   14:55:22
 7        A.   Speaking of the 15-minute break, that's       14:55:24
 8   another thing --                                         14:55:24
 9        Q.   Debra, listen to your lawyer.  Okay?           14:55:30
10   Listen to your lawyer.  Okay?                            14:55:32
11             (Interruption)                                 14:55:48
12             MR. LAFAYETTE:  Let me take a break and see    14:55:54
13   where I am.                                              14:55:56
14             MR. KIM:  Okay.                                14:55:58
15             THE VIDEOGRAPHER:  Okay.  We are going off     14:56:04
16   the record.  The time is 2:56 p.m.                       14:56:06
17             (Recess taken)                                 15:04:02
18             THE VIDEOGRAPHER:  We are going back on the    15:04:14
19   record.  The time is 3:04 p.m.                           15:04:16
20        Q.   BY MR. LAFAYETTE:  Ms. Horn, are you ready?    15:04:22
21        A.   Yes, I am.                                     15:04:24
22        Q.   Do you know someone named A M A D E O          15:04:36
23   Olivira, O L I V I R A?                                  15:04:42
24        A.   "Amadero," yes.                                15:04:44
25        Q.   And who is that?                               15:04:46
```

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.   Store manager. | 15:04:50 |
| 2 | Q.   From when to when? | 15:04:52 |
| 3 | A.   I don't know. | 15:04:54 |
| 4 | Q.   Do you know when he stopped being a store | 15:04:58 |
| 5 | manager? | 15:04:58 |
| 6 | A.   He stopped and then Brian -- or Michael came | 15:05:02 |
| 7 | to our store. | 15:05:02 |
| 8 | Q.   Michael who? | 15:05:06 |
| 9 | A.   Michael Vasquez. | 15:05:08 |
| 10 | Q.   Michael Vasquez.  And so whenever he | 15:05:14 |
| 11 | started -- whenever he was there -- would it be | 15:05:20 |
| 12 | accurate that you very seldom had any issues with | 15:05:24 |
| 13 | regard to your accommodation while Amadeo was the | 15:05:30 |
| 14 | store manager? | 15:05:32 |
| 15 | A.   Yes, he was great. | 15:05:32 |
| 16 | Q.   He was great.  So he was the store manager | 15:05:36 |
| 17 | throughout 2015, wasn't he? | 15:05:42 |
| 18 | A.   I don't know what time again, the time | 15:05:44 |
| 19 | period.  It was, like, maybe less than two years, I | 15:05:50 |
| 20 | would assume. | 15:05:50 |
| 21 | Q.   You said, in your interrogatory responses | 15:05:52 |
| 22 | 2015, ma'am -- | 15:06:00 |
| 23 | A.   It -- can you repeat the question? | 15:06:00 |
| 24 | Q.   You said, in your sworn interrogatory | 15:06:04 |
| 25 | responses, "2015."  Was he the store manager in 2015? | 15:06:10 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | MR. KIM:  If you don't remember, you don't | 15:06:14 |
| 2 | remember, Debra. | 15:06:14 |
| 3 | MR. LAFAYETTE:  That's coaching.  Please | 15:06:18 |
| 4 | don't do that.  Okay? | 15:06:20 |
| 5 | Q.   BY MR. LAFAYETTE:  I'm going to ask you now. | 15:06:22 |
| 6 | Why would you put a sworn statement, under penalty of | 15:06:26 |
| 7 | perjury, in your interrogatory responses, saying he was | 15:06:28 |
| 8 | the store manager?  Why did you do that? | 15:06:36 |
| 9 | MR. KIM:  Counsel, I'm just saying if she | 15:06:38 |
| 10 | doesn't remember -- | 15:06:40 |
| 11 | MR. LAFAYETTE:  If it's an objection, make | 15:06:42 |
| 12 | the objection, but no coaching? | 15:06:44 |
| 13 | Q.   BY MR. LAFAYETTE:  Why did you put, under | 15:06:46 |
| 14 | penalty of perjury, that Amadeo was your store manager | 15:06:50 |
| 15 | in 2015? | 15:06:54 |
| 16 | A.   He was the only store manager that I know | 15:06:56 |
| 17 | during that period. | 15:06:58 |
| 18 | Q.   Thank you. | 15:06:58 |
| 19 | And he was the store manager throughout 2015, | 15:07:02 |
| 20 | wasn't he? | 15:07:04 |
| 21 | A.   I do not know when he left. | 15:07:12 |
| 22 | Q.   He was great, as you just said, wasn't he? | 15:07:12 |
| 23 | A.   Yes. | 15:07:12 |
| 24 | Q.   And you didn't have any issues with your | 15:07:14 |
| 25 | accommodations while he was there, did you? | 15:07:20 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | A.    Not that I recall. | 15:07:22 |
| 2 | Q.    Okay.  And he was there for a full two | 15:07:24 |
| 3 | years.  Right? | 15:07:26 |
| 4 | A.    I don't remember, as I said. | 15:07:30 |
| 5 | Q.    Did you not just say he was there about | 15:07:32 |
| 6 | two years? | 15:07:34 |
| 7 | MR. KIM:  Misstates testimony. | 15:07:34 |
| 8 | Q.    BY MR. LAFAYETTE:  I'm just asking. | 15:07:36 |
| 9 | Ma'am, didn't you just say that under penalty of | 15:07:40 |
| 10 | perjury? | 15:07:48 |
| 11 | A.    I don't know how long he was there.  I don't | 15:07:50 |
| 12 | know. | 15:07:50 |
| 13 | Q.    Did it seem to you like it was about two | 15:07:54 |
| 14 | years? | 15:07:56 |
| 15 | A.    I don't know.  I can't recall. | 15:07:56 |
| 16 | Q.    So why did you say that a couple minutes | 15:08:02 |
| 17 | ago? | 15:08:04 |
| 18 | A.    I'm -- I don't know how long.  A year or | 15:08:10 |
| 19 | two.  Yeah, I don't know the time period, what part of | 15:08:14 |
| 20 | the year.  I don't -- I don't recall. | 15:08:16 |
| 21 | Q.    Okay.  And whatever the time period was | 15:08:18 |
| 22 | when he was there, as you said, it was great.  Right? | 15:08:22 |
| 23 | MR. KIM:  Asked and answered. | 15:08:24 |
| 24 | THE WITNESS:  Yes. | 15:08:26 |
| 25 | Q.    BY MR. LAFAYETTE:  And then Michael Vasquez | 15:08:28 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | There's two other stools in there for other | 15:09:44 |
| 2 | employees now that -- Safeway has to supply stools for | 15:09:48 |
| 3 | cashiers now, but they're -- my stool is one of two | 15:09:52 |
| 4 | others.  There are three stools in there, and any | 15:09:56 |
| 5 | checker at anytime can use those stools, except mine. | 15:10:00 |
| 6 | Q.    Does yours have a name on it? | 15:10:04 |
| 7 | A.    No. | 15:10:04 |
| 8 | Q.    Does yours have anything that indicates that | 15:10:06 |
| 9 | it's yours? | 15:10:08 |
| 10 | A.    It's my -- my stool is different than the | 15:10:14 |
| 11 | others. | |
| 12 | Q.    I'd like to show you two documents, ma'am, | 15:10:20 |
| 13 | if I can.  Okay? | 15:10:32 |
| 14 | Do you recognize this document dated | 15:11:16 |
| 15 | February 11, 2019, ma'am? | 15:11:34 |
| 16 | A.    I... I don't know.  Is it addressed to me? | 15:11:42 |
| 17 | I don't know.  It says "UFCW." | 15:11:44 |
| 18 | Q.    It's the Arbitrator's Opinion and Decision | 15:11:48 |
| 19 | relating to your grievance.  Okay? | 15:11:52 |
| 20 | Do you remember filing a grievance, ma'am? | 15:11:56 |
| 21 | A.    Did I -- I can't -- I didn't hear you. | 15:12:02 |
| 22 | Q.    Do you remember filing a grievance with | 15:12:04 |
| 23 | your union? | 15:12:04 |
| 24 | A.    Yes. | 15:12:06 |
| 25 | Q.    And do you recognize this as the decision? | 15:12:14 |

| | | |
|---|---|---|
| 1 | A.   Well, I don't -- I can read it.  I can | 15:12:16 |
| 2 | read the whole thing.  It's not addressed to me, so I | 15:12:20 |
| 3 | don't -- I can't say I recognize something that's -- | 15:12:22 |
| 4 | that's not in my possession. | 15:12:24 |
| 5 | Q.   Did you get a copy of it? | 15:12:28 |
| 6 | A.   I don't know.  There's 34 pages.  I'm not | 15:12:30 |
| 7 | sure if this is what I got, if this is what I received. | 15:12:38 |
| 8 | Q.   Did you get a copy of the Arbitrator's | 15:12:40 |
| 9 | decision? | 15:12:46 |
| 10 | A.   I did get a copy of the arbitrator's | 15:12:48 |
| 11 | decision. | 15:12:50 |
| 12 | Q.   Did you read anything in there where the | 15:12:52 |
| 13 | arbitrator indicated that you had been untruthful? | 15:12:58 |
| 14 | A.   Did I read anything in there regarding what? | 15:13:00 |
| 15 | Q.   Indicating that you had been untruthful. | 15:13:04 |
| 16 | MR. KIM:  Assumes facts.  Lacks foundation. | 15:13:18 |
| 17 | MR. LAFAYETTE:  I'm listening. | 15:13:20 |
| 18 | THE WITNESS:  I don't know.  I'd have to | 15:13:20 |
| 19 | read -- I'd have to read the whole document again. | 15:13:24 |
| 20 | If it's 34 pages, I'm going to have to read it again. | 15:13:26 |
| 21 | Q.   BY MR. LAFAYETTE:  I'm just asking you, | 15:13:28 |
| 22 | do you have a recollection of any kind or reading | 15:13:32 |
| 23 | something where the arbitrator decided that you had | 15:13:36 |
| 24 | been untruthful? | 15:13:40 |
| 25 | A.   I don't -- I don't remember. | 15:13:44 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | to get -- | 15:21:28 |
| 2 | MR. KIM:  Can I just ask how much longer | 15:21:34 |
| 3 | you think you're going? | 15:21:34 |
| 4 | MR. LAFAYETTE:  I'm really close.  I'm | 15:21:36 |
| 5 | really close. | 15:21:38 |
| 6 | MR. KIM:  Okay. | 15:21:38 |
| 7 | MR. LAFAYETTE:  I'm trying to get this... | 15:21:42 |
| 8 | Too many digital things. | 15:21:46 |
| 9 | MR. KIM:  Yeah. | 15:21:46 |
| 10 | Q.   BY MR. LAFAYETTE:  Do you see the second | 15:22:00 |
| 11 | paragraph where it says "Nonetheless, significant | 15:22:02 |
| 12 | inconsistencies and contradictions and/or omissions | 15:22:06 |
| 13 | in grievant's account described in great detail below | 15:22:08 |
| 14 | provide convincing reasons for finding that she was less | 15:22:12 |
| 15 | than truthful in describing what actually happened that | 15:22:14 |
| 16 | evening"?  Do you see that? | 15:22:16 |
| 17 | A.   Yes. | 15:22:16 |
| 18 | Q.   Is this the first time you've read that? | 15:22:24 |
| 19 | A.   Umm...  Is this part of...  It's a paper. | 15:22:30 |
| 20 | What -- what is this from? | 15:22:34 |
| 21 | MR. KIM:  I object to the question.  It's | 15:22:36 |
| 22 | overbroad. | 15:22:36 |
| 23 | Q.   BY MR. LAFAYETTE:  This is Exhibit 167, | 15:22:38 |
| 24 | and it's the arbitrator's decision in your grievance. | 15:22:42 |
| 25 | Okay? | 15:22:44 |

| | | |
|---|---|---|
| 1 | Now, does this -- is this the first time | 15:22:48 |
| 2 | you've seen that? | 15:22:50 |
| 3 | A.   If it's -- if it was sent to me, then no. | 15:22:56 |
| 4 | Then it's not the first time I've seen it, no. | 15:22:58 |
| 5 | Q.   So you understand that there has been at | 15:23:02 |
| 6 | least one decisionmaker who concluded that your | 15:23:08 |
| 7 | testimony doesn't ring truthful.  Right? | 15:23:12 |
| 8 | MR. KIM:  Lacks foundation. | 15:23:18 |
| 9 | THE WITNESS:  I -- I don't know.  I don't | 15:23:20 |
| 10 | know who -- I -- it's one paragraph.  I don't know who | 15:23:24 |
| 11 | is stating it, and I don't know... | 15:23:32 |
| 12 | Q.   BY MR. LAFAYETTE:  So let's look at -- | 15:23:34 |
| 13 | above the word "award," it says "Grievant's lack of | 15:23:40 |
| 14 | candor throughout this process and particularly at | 15:23:42 |
| 15 | the hearing unnecessarily aggravated severity and | 15:23:46 |
| 16 | that it indicates grievant's lack of awareness why | 15:23:50 |
| 17 | her behavior was inappropriate or problematic and | 15:23:54 |
| 18 | her failure to accept full responsibility for it." | 15:23:56 |
| 19 | Do you see that? | 15:23:58 |
| 20 | A.   Yes, I see that. | 15:24:00 |
| 21 | Q.   Do you know what those words mean? | 15:24:04 |
| 22 | A.   Yes. | 15:24:04 |
| 23 | Q.   What do they mean? | 15:24:08 |
| 24 | A.   Just what it says.  It says lack of candor | 15:24:12 |
| 25 | throughout the process aggravated severity and make | 15:24:18 |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | the grievant's lack of awareness why her behavior | 15:24:20 |
| 2 | was    inappropriate or problematic and her failure | 15:24:24 |
| 3 | to accept full responsibility.  Exactly what it states. | 15:24:28 |
| 4 | Q.   Okay.  Now, do you have, at this point, | 15:24:38 |
| 5 | a point in time in which you intend to stop work? | 15:24:44 |
| 6 | A.   I didn't understand the last part of the | 15:24:46 |
| 7 | question. | 15:24:48 |
| 8 | Q.   Have you -- | 15:24:48 |
| 9 | A.   I didn't hear it. | 15:24:50 |
| 10 | Q.   Have you made a decision as to when you | 15:24:52 |
| 11 | intend to stop working at Safeway? | 15:24:54 |
| 12 | A.   No, I have not. | 15:24:56 |
| 13 | Q.   Okay.  Is it your intent -- how long do you | 15:25:00 |
| 14 | intend to work? | 15:25:04 |
| 15 | A.   I'm not sure. | 15:25:06 |
| 16 | Q.   As you sit here today, you don't have a | 15:25:08 |
| 17 | decisions in mind.  Right? | 15:25:10 |
| 18 | MR. KIM:  Asked and answered. | 15:25:10 |
| 19 | THE WITNESS:  Correct.  I answered. | 15:25:16 |
| 20 | Q.   BY MR. LAFAYETTE:  Mr. Kim, let me take a | 15:25:18 |
| 21 | second, take a quick break, and I'll come back.  We'll | 15:25:22 |
| 22 | probably be done. | 15:25:22 |
| 23 | MR. KIM:  Okay. | 15:25:22 |
| 24 | MR. LAFAYETTE:  Thanks. | 15:25:24 |
| 25 | THE VIDEOGRAPHER:  We are going off the | 15:25:30 |

EXHIBIT

167

**MATTHEW GOLDBERG**
ARBITRATOR•MEDIATOR•ATTORNEY AT LAW

130 CAPRICORN AVENUE
OAKLAND, CALIFORNIA 94611
(510) 504-4955
(510) 654-2388 FAX
arbmgoldb@comcast.net

February 11, 2019

Elizabeth P. Lind
Atkinson, Andelson, Loya, Ruud & Romo
5075 Hopyard Road, Suite 210
Pleasanton, California 94588

David Rosenfeld
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

      Re:  UFCW 5 and Safeway
          (Horn Grievance, WRR144729)

Dear Counsel:

    Enclosed please find my Awards in the above cases.  I have also enclosed an invoice for my services in this maatter.

    I appreciated the opportunity to serve as Arbitrator in these matters as well as the courtesies which you have extended.

                        Very truly yours,

                        MATTHEW GOLDBERG

Enc.

## MATTHEW GOLDBERG
ARBITRATOR•MEDIATOR•ATTORNEY AT LAW

130 CAPRICORN AVENUE
OAKLAND, CALIFORNIA 94611
(510) 504-4955
(510) 654-2388 FAX
arbmgoldb@comcast.net

February 11, 2019

Elizabeth P. Lind
Atkinson, Andelson, Loya, Ruud & Romo
5075 Hopyard Road, Suite 210
Pleasanton, California 94588

David Rosenfeld
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

> Re:  UFCW 5 and Safeway
>      (Horn Grievance, WRR144729)

For Arbitration Services:

Fees:

Hearing, 7/18, 8/6 and 9/21/18 –
    3 days @$2,500 per day:                    $ 7,500.00
Decision Drafting –
    7 days @$2,500 per day:                      17,500.00

Expenses:

Mileage –
    114 miles @ $.60/mi.:                    ___68.40___
                              Total:         $25,068.40

Balance Due per Agreement (50% per Party):   $12,534.20

Fed. Tax I.D. 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

MATTHEW GOLDBERG
Arbitrator ◆ Mediator ◆ Attorney at Law
130 Capricorn Avenue
Oakland, California 94611

## IN ARBITRATION PROCEEDINGS PURSUANT TO

## AGREEMENT BETWEEN THE PARTIES

| | |
|---|---|
| In the Matter of a Controversy between: | ) |
| | ) |
| UNITED FOOD AND COMMERCIAL | ) |
| WORKERS, LOCAL 5, | ) |
| | ) ARBITRATOR'S |
| Union, | ) OPINION AND AWARD |
| | ) |
| and | ) |
| | ) |
| SAFEWAY, | ) |
| | ) |
| Employer. | ) |
| _____ | ) |
| | ) |
| Re: Debra Horn Discharge | ) |
| _____ | ) |

This arbitration arises pursuant to a Collective Bargaining Agreement between **UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 5,** (referred to below as "Union"), and **SAFEWAY**, (referred to below as "Employer" or "Company"). Under its terms, **MATTHEW GOLDBERG** was selected to serve as neutral Arbitrator and to render a final and binding decision.

A hearing in this matter was conducted on July 18, August 6, and September 21, 2018 in Hayward, California. All parties had full opportunity to examine and cross-examine witnesses, and to submit evidence and argument. Posthearing briefs were received on or about November 29, 2018.

APPEARANCES:

On behalf of the Union:

**DAVID A. ROSENFELD**, Esq. of **WEINBERG, ROGER & ROSENFELD**, 1001 Marina Village Parkway, Suite 200, Alameda, California 94501-1091

On behalf of the Employer:

**ELIZABETH P. LIND**, Esq. of **ATKINSON, ADELSON, LOYA, RUUD & ROMO**, 5075 Hopyard Road, Suite 210, Pleasanton, California 94588

## THE ISSUE

Did the discharge of the grievant Debra Horn violate the Collective Bargaining

Agreement; and, if so, what should be the appropriate remedy?

## RELEVANT CONTRACT SECTIONS

### SECTION 3:  DISCHARGES AND LAYOFFS

**3.3**   **WORK PERFORMANCE:** The Employer shall have the right to discharge any employee for just cause. If the employee feels he has been unjustly discharged, he shall have the right of appeal, in writing, to be submitted to the Employer through action of the Union within ten (10) business days after the date of said discharge.

Before a regular employee is discharged, suspended, or demoted for incompetence or failure to perform work as required, he shall receive a written warning (with a copy to the Union) and be given an opportunity to improve his work.

Notices and warnings shall become null and void after six (6) months from date of issue. Written warnings need not be processed beyond the union filing a grievance in order to preserve the union's right to challenge the warning if it is used as progressive discipline in the future.

**3.3.2**   Upon severance of employment of any employee, the Employer shall, within seven (7) calendar days thereafter, notify the Union of such resignation, layoff or discharge. If the discharge is for cause, the Employer agrees to submit the reasons for discharge, upon request from the Union, as soon as practicable, but no later than three (3) days prior to a duly convened Board of Adjustment.

## CALIFORNIA LABOR CODE SECTION 1102.5

(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to

2

another employee who has authority to investigate, discover, or correct the violation or noncompliance, . . . , if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, . . ., if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

## FACTS

### A. Background

Grievant was first hired by the Employer January 20, 2003. She was terminated effective June 28, 2017 for the stated reason of "violation of company policy and/or procedures." At the time of her discharge, grievant occupied the classification of journeyman food clerk at Store 1953 in Dublin, California. Grievant was terminated following an incident on March 25, 2017, in which she reported two African-American customers whom she suspected of shoplifting to the police.

When hired, grievant signed an acknowledgment that she had received a copy of the Employer's Store Policies and Procedures for New Hires. She also signed a more specific acknowledgment of the receipt of the Shoplifting Policy on that date  Grievant reconfirmed receipt of that 2003 Shoplifting Policy in 2012. The policy provides:

I understand that Safeway's basic policy with regard to shoplifting is deterrence and this can best be accomplished by cheerfully greeting customers, as shoplifters do not like to be recognized and will avoid stores with friendly, attentive employees.

I understand that I am not to assist in making detentions of suspected shoplifters unless I have been designated to do so **in writing.**

I understand that no employee is permitted to pursue a shoplifter who flees. (Emphasis in original.)

The policy was revised at some later point and entitled Company "Shoplifting Deterrence Policy." Although the revision is available on line, the Company was unable to produce a similar any documentation from grievant acknowledging that it too was received. The revision recites:

Safeway's basic policy with regard to shoplifting is deterrence and this can best

3

be accomplished by cheerfully greeting customers, as shoplifters do not like to be recognized and will avoid stores with friendly, attentive employees.

- Employees are not to assist in making detentions of suspected shoplifters unless they have received all necessary training and have been designated to do so in writing.
- No employee is permitted to pursue a shoplifter who flees.
- Force is not to be used in connection with a shoplifting detention except, and only to the extent necessary, for legitimate purposes of self-defense.

The Employer's Employee Conduct and Manners policy which grievant got when hired states:

● Use of disrespectful or overly familiar language, names or demeanor toward customers and other employees will not be condoned. Jokes, slurs, innuendoes and/or inferences of any kind particularly of a racist, religious, color, national origin, sexist/sexual, physical or mental handicap, and age connotation are not permitted.

● Employees shall fully and completely perform their job duties in a friendly, courteous and satisfactory manner at all times.

● Employees shall follow all local, state and Federal laws at all times in both their personal life and in the performance of their job duties in such a manner as not to bring discredit to the Company or themselves.

● All employees are to maintain a strictly neutral position concerning any subject which may be construed as controversial and which may lead to arguments or altercations with Management, other employees and/or customers.

## B. Prior Counseling/Discipline

In January 2016, grievant was the subject of a complaint from an African-American customer who reported that grievant had falsely accused her of shoplifting.[1]  Kettle reviewed video of the customer's transaction, verified that the customer had paid for all her items, and then spoke with grievant about it.  Kettle testified that

I went over the policy with her again about what is a detention, . . ., that she was

_____

[1]In the complaint itself, the customer wrote that after paying at the deli for the items she purchased, she left the store and was walking towards her car when she and her daughter noticed "a lady was outside the store "streaming" [sic] with her cell phone in her hand.  As she was backing out of her parking stall a "Dublin PD pulled up behind me with flashing lights," got out of his patrol car "with his hand on his gun" and directed her to pull back into the stall.  She was "petrified," her daughter saying "are they going to shoot us."  The police officer told her that "the lady in the store (Deborah) said that I had stolen some liquor."  She showed him a receipt, and the officer went into the store to make inquiries. The statement further recites that the officer returned and apologized after reporting that "the lady known as Deborah self-checkout clerk approach his vehicle flagging him down saying that they had stolen liquor and stuff."  The customer added that they were embarrassed and humiliated, and felt that their lives were put in danger as a result of these false accusations.

4

not authorized to detain, that she had not followed the policy in regards to seeing something happen, seeing an item be selected. . ., seeing it not be paid for and seeing it go out the door, but even if she hadn't, she wasn't authorized to detain someone. She was only authorized to give customer service to deter shoplifting and then to report to store management. I recall going into further detail with her that even though she hadn't, herself, made the detention by calling the police, she had them make the detention on her behalf, and that was against policy because you are, in fact, detaining a customer when you didn't have the authority to do that, and you didn't follow policy to make sure all the elements of a crime had occurred.

In that instance, grievant repeatedly asked the customer to show a receipt for her items. When the customer declined, grievant either called the police or flagged down some officers she saw in the parking lot. Kettle also told grievant that she was not supposed to ask customers for their receipts.

Kettle acknowledged that her view of the Employer's shoplifting policies was in part informed by a June 8, 1995 policy that was never issued to grievant. Rather, the policy was set forth in a memo circulated to Division and Retail Operations Managers, as well as Division Security, H.R., and Risk Management Directors. The memo itself outlines approaches and talking points to implement a shoplifting deterrence program at the stores, emphasizing a prohibition against chasing fleeing suspects. It states that "those authorized to make detentions will be trained by security personnel" or those who are so designated. It includes directions for the "authorized employee" which consist of a set of conditions to be met before "a detention is made or law enforcement is summoned to make an arrest of a suspected shoplifter"; specifies those who are authorized to make "detentions"; suggests that store employees acknowledge in writing that their only responsibilities would be to "deter, observe and report" unless they receive training and are "designated"; and otherwise "not assist" in making detentions.

Grievant claimed that when she spoke with Kettle about this matter, Kettle only told her that she could not ask for a receipt. She denied being advised it was wrong to call the police, being shown a redacted email containing the customer's complaint, and further denied that the customer complained they were being racially profiled. Grievant testified that her assistant manager Jacob asked her at the self-check station ("SCO" below) if a particular customer carrying a brown paper sack had gone through the self-checkout lane. She told him that the customer and her companion had not. Jacob directed her to keep her eye out and let him know if the customers went through. He also asked her to let him know if she could verify that the customers had a receipt.

Store security cameras recording the events that day did not show grievant engaging in conversation with the store manager. Grievant's contemporaneous written statement failed to mention that Jacob asked her to keep an eye on the customers or said anything to her about the customers.[2]   She wrote "I noticed two women going out the doors with a bag of merchandise, I was noticing that none of our checkers up front rang her up." Seeing the two by the door, grievant asked if they had a receipt. They did not acknowledge her. She repeated the

---

[2]Surveillance footage of the incident does not show grievant having any conversation with the Assistant Manager.

receipt request three or four more times. The customers left the store without responding. Grievant decided to call the police, who arrived five to ten minutes later. In her testimony, she agreed that Kettle told her she was not allowed to ask customers for receipts, but denied that Kettle mentioned that it was wrong for her to call the police.

Within six months of the discharge itself, grievant received a written warning and a suspension which was to reduced to a written warning under certain circumstances. As per the Agreement, these two disciplinary actions remained active for purposes of corrective discipline. On November 14, 2016, grievant was issued a written warning for poor work performance. The notice recites that management has spoken to her in the past about "inappropriate service to customers." Nonetheless, it received subsequent "feedback" about that issue, which included complaints about "being rude and short with customers and not providing them with basic customer service." Grievant refused to sign the warning, maintaining its allegations were not accurate.

She testified that a customer came through the self checkout lane with groceries and gift cards. After ringing up part of the grocery order, the customer tried to process a gift card. A prompt on the register alerts the customer that a transaction of this type is not allowed at the SCO. Grievant explained the policy to the patron and offered to ring up the gift card when the patron was finished paying for her groceries. After responding okay, the customer asked "Where does it say that?" Grievant pointed to a sign. Grievant stated that while the customer later alleged that she did not stay in the area to help her, she had in fact been very close to the customer when she finished, and that the customer could easily have asked her to ring up the gift cards. Grievant maintained that the customer left after she finished her order and "never addressed" her.

Grievant denied being counseled about an additional incident involving her around that same time which provided a supplemental basis for this warning notice. A customer complained that when a customer asked for help at the SCO, rather then walking up to him/her, she remained seated and shouted at them. The customer ended up leaving the SCO to get assistance at a regular checkstand. Grievant claimed that she did not "know where shouting is involved."[3] She had been helping four customers at once which she could not do if she were not speaking to them from her station, providing service from her monitor.

On November 23, 2016 grievant was issued a three day suspension for work performance as the result of a conversation a manager had with a customer who rated the store poorly. The customer alleged that grievant had been "rude and unfriendly" when she was asked for assistance at the SCO. The disciplinary notice reiterates that she had been spoken to about this issue "on several occasions" and that she has had a number of documented customer complaints.

Grievant explained that on this occasion, the customer in question came through the SCO right before Thanksgiving when the store was extremely busy. He had only a sandwich and asked her for help. When he mentioned he wanted the "meal deal," which included a drink, cookies and chips, she informed him that he needed to select the other items in order ring it up.

_____

[3]A manager's written description of the complaint is attached to the warning notice.

6

Grievant maintained that she waited for him with her checkstand open, but it seemed that he never returned.

However, about twenty minutes later, he came back through SCO with a basket full of groceries. She did not realize this was the same individual. After scanning his items, he placed them back in the black store basket he had used while shopping. The store has a policy which does not permit patrons to take these baskets out of the store. She explained the policy to him and offered to get him a shopping cart or to sell him a bag. He answered, "I know that, I know the rules," to which she responded "Okay, thank you." Some additional minutes thereafter, according to grievant, the customer came up from behind where she was seated and threw the black basket on the ground, stating "See, I told you I knew the store rules. I wasn't going to take it out of the store."

The customer accused her of being rude and unhelpful and let her know that had just made a negative survey report about her. Grievant denied that she challenged him to describe how she had been rude. She testified that she told him

> I have done everything I could possibly have done. I held that check stand open for you until you came back, for about eight, ten minutes and then I never saw you, so I had no idea you changed your mind on the sandwich. I don't even know what he bought when he came back and bought the groceries, and that's all it was. I – my assistant store director never let me explain my situation.

After the Union filed a grievance over the suspension, the parties agreed to reduce it to a written warning. Labor Relations Manager Lora Silva[4] was present at the Board of Adjustment on the grievance. Grievant stated at the Board, according to Silva, that she asked the customer specifically

> Sir, I don't know why you think I'm rude. Can you tell me specifically what I did for you to call me rude? Which infuriated him more and he started to walk away and he had a black hand basket for his items and he started to walk toward the sitting area. . . where customers can eat their food, and so she called to him and said, sir, you can't take that basket with you, and he was offended by that as though she was accusing him of taking something, and by her description he tossed the basket towards her, and says "I don't want your basket" and went off to go eat his food.

When Silva tried to point out to grievant what it was that might have caused the customer to be offended, grievant appeared not to understand, and asked Silva to specify what there was about her behavior. As a consequence, the parties agreed that grievant would meet with the store manager who would provide her with details based on his daily observations what he believed was off-putting about her interactions with customers. Silva subsequently spoke with the store manager and determined that these discussions had taken place.

---

[4]Silva had been a food clerk. She then became a head clerk, then second assistant, first assistant then HR manager.

At that Board, the parties executed a settlement agreement which provided:

The Employer agrees to reduce the suspension to a written warning of record, effective six months after date of suspension, issued on or near 11/23/16, if no other violations of a similar type occur before the effective date, as a result of the Grievant's violation of Company Policy and Procedure relating to work performance/customer service.

## C. The Alleged Shoplifting Incident of March 25

Dublin Police Department records show that there were numerous calls to the police about shoplifting at the store in the year preceding grievant's discharge. Grievant estimated that prior to March 25, she reported potential shoplifting activity to a manager "on any given day, once to twice a day."[5] Checker Cynthia Cornejo substantiated that shoplifting goes on "all day every day" at the store.

Similarly, 7-8 year Checker Travis Raymore noticed shoplifting occurring five to six times each night from his vantage point near the main entrance at the self checkout station. Raymore added that Store Manager Michael Vasquez told him that if he saw any customers stealing or anything that looked suspicious, he should call the police. He has never done it, but also stated that he was never instructed that he was not allowed to do so. Raymore confirmed seeing grievant, Cornejo, and two other employees call the police prior to March 25, and identified grievant and Cornejo as the most frequent callers. He estimated that the police came to the store for suspected shoplifting calls three to four times per night.

Checker Rachel Castro, who has worked at the store for fourteen years, testified that Vasquez told her to call the police if she witnessed customers stealing a significant amount of items, but not to do so if they were just stealing a sandwich. She herself called the police twice in the year before grievant's termination, and witnessed several other employees do so as well. Liquor Manager Medrith Moxley testified that liquor is stolen from the store on a daily basis. Like others, she was aware of several employees, including grievant and Cornejo, calling the police on a regular basis. Vasquez authorized her to call the police if he saw an instance of blatant shoplifting. After grievant was terminated, she was told that only managers were allowed to call the police.

On March 25 grievant was assigned to the SCO for the 2:00 to 11:00 p.m shift. As she described, the assignment entailed a number of duties beyond assisting customers at the station. These included being responsible for maintaining the front lobby, assisting at the service counter, helping cashiers bag, and returning carts and baskets to the door. Union Representative Jami Moore[6] testified that grievant was also responsible for helping customers at the customer service desk, which is typically not staffed during the evening shift, and for

---

[5]In those reports from January 2016 to March 26, 2017, grievant was involved in two and the reporting party in eight others.

[6]Moore worked for Lucky Stores for 20 years, but has never worked for Safeway. She is aware of what goes on in the store both from the standpoint of a Union representative and also as a customer, visiting the store about twice a week.

"monitoring the whole front end and lobby area," which necessitated that she move throughout the length of the front end. Raymore, who is often assigned to the SCO, agreed that the self checkout employee commonly helps with bagging, is at the customer service booth, manages the lines, and returns carts and baskets left at the terminals.

Between 7:00 and 8:00 p.m., grievant noticed a female African-American customer coming into the store with a blue wagon which contained the box it was sold and/or shipped in. The wagon itself was collapsible, three feet wide, and four feet long, with large wheels. Grievant thought the wagon and the box "very suspicious."[7] Around the same time, Cornejo also noticed the customer. She likewise found it odd and suspicious that the customers would shop with a wagon instead of a grocery cart.

Grievant testified that Cornejo approached her and suggested that grievant call the police.[8] She replied she would not and did not want to get involved, and that she did not even have her phone with her.[9] Grievant asserted that prior to that moment, she had not left the SCO area to follow the patron to get an idea what she might have been doing. She was with a customer. Cornejo handed her Cornejo's own phone from behind, without saying anything, and then "went back to the liquor aisle to — to pursue the customer." The phone had already been dialed. Grievant assumed it was the police.

In contrast, Cornejo maintained that grievant began keeping an eye on the customer after they came into the store, and wandered away from the self checkout station to monitor her to a spot where Cornejo could no longer see her. When grievant returned to her station, she was still pre-occupied with the customer. Cornejo helped with others at the SCO while grievant was so engaged. After a few minutes observing grievant's distraction, she told grievant that "If it bothered her so bad, why doesn't she just call the police so we can do our job, and they can do theirs." Cornejo was aware that only management was allowed to call the police. Nonetheless, she acknowledged that the police had been called on multiple occasions by grievant and other non-management employees in the year before this incident. She was also aware that she was not supposed to have her cell phone on her person while working.[10]

_____

[7]There is no store rule against bringing wagons into the store.

[8]In a statement which grievant prepared for the Union dated April 28, recites that Cornejo was standing behind her at the SCO when Cornejo noticed the customer with the wagon come in.

> The person proceeded to the liquor aisle. Cindy then noticed the person loaded the box that was still inside the wagon with alcohol. Cindy says to me "You need to call the police," I tell Cindy "No, I am not getting involved, . . . . I continued to help my customers," I turned and Cindy handed her phone to me and left towards the liquor aisle. . . . I let the police know what was going on to the best of my knowledge of what Cindy was telling me.

Cornejo testified that grievant mentioned to her at some point later that a deli employee had seen one of the customers putting liquor in the box. Conrnejo further maintained that she did not personally see this or the customers putting anything in the box that evening.

[9]Grievant kept her phone in her locker, because, she maintained, checkers are not allowed to have phones in the checkout area.

[10]Cornejo did not receive any discipline as a result of the incident.

As grievant said she did not have her phone, Cornejo offered to let grievant use hers, which she then handed to grievant. She does not recall whether or not she dialed the police department before handing over the phone, though she has the non-emergency number for the Dublin Police Department on her speed dial. Cornejo added that grievant walked away from the SCO once she began speaking to the dispatcher.

Grievant maintained she was helping a customer at the SCO when the call began. She did not want to hang up because she had been told that she was never supposed to hang up on 911. When the dispatcher answered,[11] grievant identified the store and reported that a customer had come in with a blue wagon with a box inside which she was filling up with liquor in the liquor aisle. She tells the dispatcher "I have a customer that came in with a wagon . . . and she's down the liquor aisle and she's filling the box that the wagon came in . . . with liquor." The liquor aisle, aisle 17, is not visible from the SCO. While she omitted this information from any of her post-incident written statements, in her testimony grievant acknowledged walking away from the SCO to aisle 17, and personally witnessing the customer putting liquor in the box. The vantage point from the deli[12] is about 40-50 feet from the SCO kiosk.[13]

Grievant describes the customer to the dispatcher, reports that she is talking to someone on her phone, and speculates that the customer might have a lookout. The dispatcher advises grievant to stay on the phone and let her know if the customer leaves the store. Grievant tells the dispatcher that the customer is loading up the box in the freezer aisle.[14] She also mentions that she "looked on our shelf to make sure we don't sell those" wagons. Grievant explained she was able to make that verification from the SCO, later adding that the shelf she referred to was directly in front of those registers. Dispatch announces officers are being sent to the store, and again asks grievant to stay on the line.

---

[11]Transcripts as well as the recording were admitted into evidence.

[12]Cornejo noted that while the manager might ask the clerk in the SCO to help face or bag if it were slow, "they usually stayed in the vicinity and had no reason to be over by the deli counter unless they were getting food for lunch." The deli counter faces directly down the liquor aisle.

[13]During grievant's cross-examination, the following exchange occurred:

Q: (By Ms. Lind): If you are standing in the self checkout kiosk when [the phone] is handed to you, how do you know what's happening on Aisle 17?
A: (By grievant): Because Cindy left and pursued the customer and came back and told me.
Q: So before the phone call started Cindy had told you they were on there filling it with liquor?
A: No. No. She left and saw it.
Q: But. . . literally that's the first line that you say to the dispatcher and a few moments ago you talked about how she handed it to you from behind as you were standing at that kiosk, right?
A: I wasn't standing at the kiosk. I was at the checkout lane at one of the stations. I wasn't standing right there. I assumed Cindy had left, because I was at one of the stations.
Q: So how did you know at that moment when it's been handed to you, how did you know that the customer was on the liquor aisle filling it with liquor?
A: It . . . wasn't right away when the police were – Cindy did that. It wasn't right away. She. . . was having this conversation with me for like three to five minutes that, Debbie, you need to call the police like, no, I'm not getting involved. It... the police weren't called as soon as the customer walked into the store.

[14]The freezer aisle(s) are 14, 15, and 16. It is not possible to look up these aisles and see any activity from the SCO.

Grievant advises dispatch that there is a dark-skinned man with the woman now pushing the wagon, and the customers appeared to be "stalling" in the freezer aisle. Grievant cannot tell if the box inside the wagon was full. Grievant asserted that she was able to determine from the recording that she was at the SCO at that moment because she can hear the particular beep these registers make. While on the phone, grievant is heard asking Cornejo if she had seen the customers "cross." The dispatcher notifies grievant there is an officer outside the store and for grievant to stay on the phone. Grievant tells the dispatcher she has someone "watching the back end of the store to see if they cross," adding, "maybe they went back to alcohol, I'll go back over alcohol."

Grievant maintained that she did not ask Cornejo to observe the customers, but that Cornejo was doing so on her own. Throughout the call, Cornejo was "pursuing and giving me updates continuously [and] coming up to self check." Nevertheless, Cornejo claimed that she continued to do her job as a cashier while grievant was on the phone, and did not walk around the store to observe, either at grievant's request or on her own initiative. Checkstand records for Cornejo during that time frame show that she did not process any transactions at a register from 7:46 until 8:11, the period during which the phone call took place, when she handled a small order at the SCO.

The dispatch recording reflects that grievant "just watched them fill the box," they were coming up aisle 15 by the deli side, and she was "gonna let them . . go out the door." She then states "they [the customers] know what I look like so I just let someone else take a second eye so I don't want them to go out the door." Grievant next reports

> They're stalling. . . . They're halfway down the aisle still, they're just sittin' there and stalling, see, what they'll do is they get close to the deli, . . ., and then they'll look to see if it's clear, if there's no employees, then they'll go out. . . . They've been stalling since they got the alcohol, 'cause they wanna try to see if anybody's watching them. Well I just back off totally; I'm back at self-check.

Grievant continues describing that they are in aisle 15, "checking it out to see if it's clear or not." When the dispatcher asks if they are still in the store, grievant replies

> Yeah, oh now they've got the whole wagon, ok they've ditched the box and they've got all kinds of items in the wagon. And they got rid of the whole box that was inside it, the box or the wagon. Now they're down by the formula.[15] I see what they're doing now.

Grievant is heard telling Cornejo that the two got rid of the box in order to fit more items.[16] At this point, both she and Cornejo are in the SCO area. Grievant informs dispatch that she is now going to try to find the box and openly speculates where they might have put it as she discusses with dispatch whether she should stay on the line. She also learns that there is an

---

[15]Baby formula and alcohol are among the items that are most commonly shoplifted.

[16]Grievant's written statement prepared for the Board of Adjustment recites that Cornejo told her the customers ditched the box.

11

officer outside the door.

> So they're just going to continue shopping. I hate to keep the officers, but they're going to do that and just probably go out another door. I'm gonna go see if I can find the box. . . . I just hate for them to wait out there if they're gonna continue shopping for another 20 minutes and I'm stalling your officers and you guys have other things. . . .[17]

In her testimony, grievant states that once the customers ditched the box, she no longer believed that they were going to try to steal from the store as they were getting rid of the items they intended to steal, and essentially it would be all right if the officers left. When asked if she saw them dispose of the items, grievant stated

> Well, they got rid of the box and the alcohol was in the box. So, I did not see it. No. Cindy brought the box. . . . I did see them put liquor in the box. All I saw was Cindy bringing the box up to self checkout empty. I don't know where the alcohol went. I know it went into the box and then later it was out of the box.[18]

As the call continues, grievant suggests she could call the dispatcher back when she saw the customers heading out the door, again saying that she does not want to make the officers wait.

> I hate for them to wait out there. . . . I doubt they'll leave their wagon, they must've paid, on no, they've look, they didn't pay for it, they stole that too. (laughter). They might leave the whole wagon, that's right. It's not lost on their part (laughter). . . . Oh yeah, now they are getting ready to come up aisle 2.[19]

Grievant tells dispatch that the couple are "gonna try to go out on the produce side so I'm just gonna back off and see if they do," later adding "they're getting pretty clever they know their carts won't lock up."[20] She says "I gotta let 'em go out the door! Because we don't have any cameras." After the dispatcher tells grievant there are several officers on scene, she replies "I know! Yeah, that's fine." Grievant wonders out loud whether the pair have left the store, stating "They're just waiting for it to be clear." Grievant sees the officers waiting outside, and tells the dispatcher "they have a visual on them so I'm just gonna let them go out. . . . The customers haven't left yet. Yeah, it's ok now." She and the dispatcher decide to terminate the call. The call lasted about 15 minutes, ending at 8:11 p.m.

---

[17]Grievant stated at the Board of Adjustment that when she told the dispatcher the customers were "stalling," she was intending to convey that the customers were aborting their planned theft and that there should be no further police activity. She testified that by saying the word "stalling," she was trying to communicate that the officers were no longer needed.

[18]Cornejo found the box in the promotional section, sitting on top of a shopping cart with candy that needed to be restocked. Cornejo did not see any liquor near it.

[19]Aisle 2 and the produce department is on the opposite side of the front end from SCO.

[20]The regular shopping carts have a locking mechanism on their wheels which prevents them from being removed from the store parking lot.

12

Shortly thereafter, two officers entered the store and told grievant while Cornejo was standing nearby that they were there to "assess the situation." One of the officers looked at the address label on the box,[21] whereupon the officers announced that they were going to go speak to the customers. They approached them as they were in a check-out line to pay for their groceries. The Police Event Register indicates that the officers first contacted the customers at 8:22 p.m.

Grievant was not assisting customers during the call, though she maintained she was at the SCO through some portion of it. Grievant maintained that the beeps from the SCO registers were audible enough to show when she was there. The beeps are absent for about 7 minutes on the tape, when grievant is looking down the liquor and freezer aisles, resuming after grievant is heard to say she is back at SCO. Is going to look for the box. in December of 2008, directs checkers not to "leave checkstand without Management Approval (not even to bag)." The "checker commitment" policy, which grievant also received, states that

[i]f scheduled in the checkstand—stay close to your designated checkstand. Resist the temptation to stock freight out of eyesight of your checkstand during a lull – a lull is always followed by increased foot traffic at the checkstand and the wait and line length is compounded when the designated staff is not at their register during their designated time.

As she testified, while the call was in progress, grievant walked 40 to 50 feet away from her station to speak with co-worker Blake Cappa at the deli counter because the dispatcher asked her what the customers were doing. She saw the customers putting liquor in the box in the liquor aisle, and also asked Cappa if he could see the customers placing items in the box. She testified that he confirmed that he could.

In contrast, Cornejo maintained that after the phone call with the dispatcher began, grievant "was wandering throughout the store." Cornejo did not recall talking to grievant while grievant was on the phone. As indicated above, grievant claimed that it was Cornejo who was walking around the store, keeping tabs on the customers with the wagon, and periodically returning to give her updates. Grievant further asserted that she did not see Cornejo check out any customers during the entirety of the call.

Food Clerk Zaine Caddell serves as the person-in-charge ("PIC") for most of his shifts. He worked at Store 1953 for six years before transferring to Petaluma. Prior to March of 2017, he personally received five or six complaints as the PIC from customers that grievant's service was rude, unhelpful, or forceful. In each case, he referred the complaints to the Store Manager.

Caddell was working as the PIC for the night shift on March 25, 2017. At some point between 7:30 and 8:00 p.m., Caddell noticed grievant had vacated the self-checkout area, and had been replaced by Cornejo. When he asked where grievant was, Cornejo replied that

---

[21]The label had a "Ruby Hill" address. Ruby Hill is a gated, up-scale community near the store. Cornejo overheard part of the conversation between grievant and the officers, in which grievant stated, according to Cornejo, that the customers did not look like they were "Ruby Hills people." In preparation for this hearing but not within the initial investigation, Labor Relations Manager Lora Silva determined that the wagon was actually addressed to the two customers at that residence.

grievant had seen some customers that she thought were stealing, and she was keeping an eye on them. He went back to stocking the shelves, feeling frustrated because grievant had frequently given him erroneous warnings about shoplifters. He also did not want to get involved.

Shortly thereafter, Caddell went outside to take a break, and saw a police car. A day shift stockers came outside to tell him that a police officer wanted to speak to him. In their conversation at the customer service desk, he learned that an employee called the police about suspected shoplifters whom she saw "stashing items." It appeared that the suspicions were a mistake. The customers were still in the store and had not yet checked out when an officer[22] went to speak with them.

As Caddell was speaking with the police, the female customer arrived "berating" the officer about stopping her inside the store. She asked Caddell if it was store policy to call the police on customers while they are in the store. Caddell explained that it was not store policy, attempted to calm her down, and gave her the names of the store managers and the corporate phone number. The individual who was accompanying her came out of the checkstand and told her that they would deal with the matter later. The pair left, with their groceries in the blue canvas wagon. While Caddell thought the wagon unusual, he did not consider it a red flag or a reason for concern. Customers frequently brought their own metal wheelie-carts. These individuals explained that they were shopping for a third party who had mobility issues. After they left, grievant commented, according to Caddell, that the customers had likely stolen the box as she examined the mailing address.[23]

Cappa works in the deli at Store 1953. As he was cleaning the sandwich bar that evening, grievant came up and told him there was a customer who had a blue wagon with a box inside. She was pretty sure that the customer was in the liquor aisle, and asked him check to see if the customer was taking anything and putting it in the box. Cappa could see the customer put something in the wagon, but could not see what it was, as there were some people in his line of sight and they were some distance away.[24] On the other hand, grievant testified that Cappa told her that he could see the customers putting bottles in the box.

At the time, Cappa was not entirely sure how he was supposed to handle suspected shoplifters. He knew he should inform a manager, but was uncertain whether or not he was authorized to call the police. He had been told he was not permitted to follow customers out of the store. A day or two later, grievant mentioned to him where the shipping was addressed, and suggested that the two might have stolen the wagon.[25]

Checker Joey Rivas rang the two up. Though they had a "fairly large" order of mostly grocery items, he did not recall the whether there was any alcohol. Silva, in preparation for the

---

[22]Several officers had apparently responded to the scene.

[23]More specifically, Caddell testified that grievant said the customers "should be ashamed because they probably took it off somebody's door step. Grievant denied making this comment, stating "I never speak to Zaine."

[24]Cappa also stated this to Kettle during their interview.

[25]As with the comment to Caddell, grievant denied saying this to Cappa.

hearing, was able to find a record of what she believed was the customers' order.[26] The customers were classified as "super-elite," meaning they had purchased a large amount from Safeway stores over time. On March 25, they did not purchase any alcohol, but did buy five loaves of bread, which is shelved in the same aisle as the liquor aisle.

## D. The Employer's Investigation

About two weeks thereafter, Store Director Michael Vasquez asked Kettle to look into the matter. Vasquez informed her that he received another complaint that grievant called the police on customers whom she erroneously accused of shoplifting. Kettle began her investigation at the store the same day. Vasquez also forwarded her an email from the customers' attorney.[27] Before the letter was received, the incident went unreported, and there was no investigation at store level.

Kettle interviewed grievant twice, and also spoke with Cornejo, Caddell, Cappa and a few other employees who had been working in the store at the time. The customers were not interviewed. Kettle was told by grievant during the first interview that Cornejo suspected them of stealing alcohol, and handed grievant a phone as she told her to call the police to report the shoplifting. Kettle's investigative report reflects that grievant "stated that she watched the couple in the store and saw them go down the liquor aisle"; was told by Cappa that he "also saw the couple putting liquor in the box"; that she told dispatch "to have the police leave" and "told the dispatcher a few times to cancel the call because the couple was stalling"; and "blamed [Cornejo] for calling the police and said she did not want to be involved."

Grievant provided a written statement after the interview which recites

A cashier handed me her phone after calling Dublin Police, Cindy (the cashier) said a customer was filling an empty wagon box with alcohol on alcohol aisle, I simply let the police know the situation, from what Cindy had told me. I was asked to call police and I told Cindy no, I am not getting involved. As I was helping my customers, I turned back towards her and she handed me her phone. . . and walked away. I spoke to the police because once you call police, you should never hang up without letting them know the purpose of the call.

During her interview, Cornejo mentioned that she and grievant were both suspicious of the pair when they came into the store because of the blue wagon. Asked if she had told grievant to call the police, Cornejo asserted that if grievant thought they were stealing, she should call the police. Kettle did not recall telling Cornejo that doing so was in violation of Company policy, and, in point of fact, Cornejo claimed at that point not to be aware of any policy prohibiting cashiers from calling the police. Cornejo reported that grievant said she did not have a phone, so she took out her phone and handed it to grievant. Cornejo denied directing grievant

---

[26]Silva was unable to find any transactions associated with the club cards in the customers' names. However, she found did find one on a club card of someone who had a similar name and a Pleasanton address associated with the account. The transaction concluded at 8:38 p.m. Cornejo clocked out at 8:32. She rang up only two orders from 7:35 p.m. until the end of her shift.

[27]The Employer ultimately reached a financial settlement with the customers.

to call or dialing the number herself. Cornejo also told her that the box the customers had brought with them had been left empty in the back of the store. In their interview, Cornejo denied seeing them putting alcohol in the box, or telling grievant that she had.

Cornejo's submitted a written statement which notes that her suspicions were aroused by the wagon. She continued with her cashier duties while grievant was "still keeping an eye on them." The statement supports her assertion that she suggested that grievant just call the police and they "would be there to do their job so we could get back to ours." It makes no mention of her handing grievant the phone. It states that "we later found" the empty box. After the officers came inside, she noticed the couple in the produce section with the officer "just spectating." Before the end of her shift she happened to walk by the officers, who asked her opinion of the situation. She told them "red flags were raised because of the wagon and the box," although she never saw them steal. Cornejo added that grievant related to her that she asked dispatch to tell the officers to leave because the couple was "stalling," and that "someone from the deli told her they saw the couple putting alcohol into the wagon box."

Kettle re-interviewed grievant after speaking with the other witnesses. After being informed that some witnesses gave statements which were inconsistent with her account, grievant stuck by her original responses. She did mention she was hesitant initially to speak to the police because she did not want to get in trouble. She tried to tell the dispatcher exactly what the customers were doing, and intended to notify the dispatcher when they left with the stolen merchandise. She gave up when the customers lingered in the store, and told the dispatcher that the police did not need to get involved after all.

Grievant's statement at the Board of Adjustment conforms somewhat with her testimony, with certain exceptions. Included were her assertions that Cornejo told her the people had loaded the box with alcohol, that she mentioned she did not want to get involved, that Cornejo handed her the phone with the police number already dialed then "left towards the liquor aisle." She writes "I let the police know what was going on to the best of my knowledge of what Cindy was telling me," and "looked down the aisle to give the police a description of the person from the front lobby." Grievant claims she stayed at self-check, and Cornejo returned to report that the box inside the wagon was now gone, only to leave and come back once more with the empty box. When the dispatcher announces the police are outside the door, grievant writes that she tells her they are not needed and that they can leave "because of Cindy bringing up the empty box." The officers came to talk to her after she "walked to my self-check out station and helped customers" for a few minutes, she tells them that "I told dispatch that you were no longer needed as per Cindy's observation." One of the officers says to me "I am just going to assess the situation." The two left self-check and walked away further into the store.

After the second interview, Kettle contacted the Dublin Police Department and obtained an audio recording of grievant's call to the dispatcher. After listening to the recording, Kettle concluded that it was inconsistent in certain respects with grievant's account, in particular that it sounded as if grievant made the call voluntarily, and that grievant never told the dispatcher to cancel the call.

/ / / /

## POSITION OF THE EMPLOYER

Credible evidence establishes that on the evening of March 25, grievant violated Company policies regarding shoplifter deterrence and detention, as well as employee conduct and manners, and failed to perform work as required. In determining whether grievant engaged in the conduct alleged, there are a number of reasons that grievant's testimony should be rejected as incredible.

Grievant, as the person with the most to gain or lose from the outcome, has a recognizable incentive to distort her testimony in her favor, an incentive not shared by other witnesses. Her testimony was contradicted on numerous points by these witnesses as well as the recorded conversation with the dispatcher which was depicted in real time. Additionally, her account was internally inconsistent and has changed over time. Finally, grievant simply evaded questions entirely or provided inherently implausible answers.

Grievant falsely denied that Kettle counseled her in January of 2016 about the impropriety of calling the police on suspected shoplifters without management authorization and without having actually observed all the elements of a theft. Kettle credibly testified that she explained to grievant that she should not have called the police as she had not observed all the elements necessary to conclude that shoplifting had occurred, and because, by calling the police without discussing the issue with management, she had effectively assisted with the detention of suspected shoplifters when she was not authorized to do so. Grievant implausibly claimed that Kettle merely told her that she was not allowed to ask for a receipt. She also claimed, for the first time at arbitration, that her manager had asked her to "keep an eye on" the customers in question. Not only was this flatly refuted by the surveillance video, she would surely have raised this exculpatory information in her original written statement.

Kettle's testimony regarding this discussion is further corroborated by the Employer's internal Policy documents which formed the basis for her understanding of the Shoplifting Deterrence Program. A 1995 Interoffice Memo described the framework for training employees how to respond to potential shoplifters, and the pre-conditions which should be met before making a detention or summoning law enforcement, which included personal observation of the behavior, and keeping "the person taking and concealing the property" under observation continually through the checkstand process. It further contains the instruction not to make a "detention" unless designated and after receiving training. It explains why Kettle interpreted the call to the police as "assisting a detention."

Grievant falsely claimed that the customers were physically observed concealing liquor in the box inside the wagon. This claim supplied her alleged factual justification for suspecting the customers of shoplifting. She was unable to credibly explain the basis for her apparent contention that the customers were seen "stashing" liquor in the box within the wagon. In her initial written statement, she claimed Cornejo told her they were filling the box with alcohol. In her written statement to the Board of Adjustment, she repeated this claim.

Cornejo, however, adamantly denies that she ever saw this or told anyone else that she did. In fact, Cornejo reported that grievant told her that "someone from the deli" had seen the customers putting alcohol in the box. Presumably grievant was referring to Cappa. Cappa

17

denies this, testifying that he could not see what the customers were placing in the wagon.

Notwithstanding her written statements, grievant told the dispatcher and testified at hearing that she herself had seen the customers putting liquor in the box. In her testimony, she first says that she did not witness anything, that Cornejo saw it and brought it to her attention, that she had no reason to believe the customer was putting items in a box until she did so, then handed her the phone "without [her] consent." Yet, the first thing she tells the dispatcher is that she has a customer who is down the liquor aisle filling the box, later adding "I just watched them fill up the box." She also claimed that she did not even have the discussion with Cappa until after she began speaking to the dispatcher. Though stating she did not leave the SCO area before the call, she personally saw the customers placing liquor in the box. Questioned about the inconsistency of these statements in view of her first statement to the dispatcher, grievant was unable to give an intelligible answer. She first claimed that Cornejo had already told her that she had seen the customers putting liquor in the box, then claimed that she was able to walk over to the liquor aisle immediately upon starting the call.

Based on these evasive and contradictory responses, it is clear that there is no credible basis to believe that anyone actually observed the customers "stashing" liquor bottles in the box. Instead, it is apparent that grievant simply made the allegation because she had unfairly (and perhaps discriminatorily) prejudged the customers as the type of individuals who were likely to steal, and made up the liquor as a justification for her baseless accusations to the police. There is no objective evidence that the customers ever picked up any liquor, and the only testimonial evidence to that effect came from grievant alone. The claim was simply a complete fabrication on grievant's part.

Grievant also falsely claimed that she did not want to call the police, and tried to resist doing so, but was forced to do so when Cornejo shoved a pre-dialed phone into her hand, from behind, without her consent. Implausible on its face, this story was contradicted by Cornejo, whose version of the exchange makes far more sense. She was adamant that grievant willingly took her phone and did not say anyting about not wanting to be involved. If grievant were forced to accept the phone, she would have explained to the dispatcher that it was a mistake. Grievant's account is also inconsistent with the recording of the call. Grievant's actions during it were not those of a reluctant participant. Instead, she immediately started the call with her baseless, fabricated allegation about the liquor, then spends the rest of the call telling the dispatcher how sure she was that the customers intended to steal.

Grievant likewise falsely claimed that she never left her work area during the call, and, even more implausibly, that she continued to perform her assigned self checkout duties throughout the incident, while Cornejo ignored customers on the front end and wandered around the store monitoring the customers. When these claims began to unravel, she began to implausibly claim that nearly the entire store, including the deli, which is 40 to 50 feet away from the self checkout station, counted as part of her work area. Even under grievant's absurd definition of what her work area is, the entire front of the store, her testimony is still not credible. When Caddell came by, he found Cornejo at the self checkout station with grievant nowhere to be found. Cornejo testified that grievant was wandering around the store keeping tabs on the customers during the call, an account that it highly consistent with the audio recording, while Cornejo was helping customers at the SCO. This is shown by checkstand records which

establish that Cornejo handled an SCO transaction at 8:11pm.  Greivant's statements to the dispatcher also support that she was walking around the store and not interacting with customers.  In fact, grievant abandoned her work duties completely during the call.

The Union may argue that greivant was allowed to wander around the front end as long as she kept on eye on the SCO terminal lights.  However, a number of duties related to customer assistance are not triggered by those lights.  Additionally, though grievant was responsible for gathering handbaskets, this could not possibly have taken the entire time she was on the telephone.

Grievant attempted to claim during the Employer's investigation and at the hearing that she actually told the dispatcher to call off the officers because the customers no longer intended to steal.  These claims are entirely inconsistent with the audio recording of the call.  In her second written statement, once she learned the box was no longer in the wagon, she "let the dispatcher know that the police were not needed anymore," that she "told the dispatcher again to just have the police leave," and that she "then finished talking with the dispatcher letting her know the police outside can leave."

The audio reveals that she did not tell the dispatcher even one time, let alone three, that the police should leave.  Her claim that she communicated that the police should be called off by telling the dispatcher that the customers were "stalling,"[28] is simply ridiculous.  After telling the dispatcher that they were stalling, she continued to maintain, with great confidence, that the customers nevertheless intended to carry out their theft, and were simply waiting until the coast was clear: they were loading more items, probably going out another door.  She even went so far as to accuse the customers of stealing the wagon, without any basis.  This assertion is particularly disturbing in that it is clear from the call that grievant made no effort whatsoever to call off the police.

Grievant also denied making disparaging and implicitly racist comments about the customers.  Cornejo heard her say that the customers did not look like "Ruby Hills people," presumably due to their race and possibly attire.  She made similar remarks to both Caddell and Cappa.  However, she flatly denied making any of these statements, despite being contradicted by three independent witnesses.  The customers in fact own real estate in the Ruby Hills neighborhood.  Grievant's actions throughout the evening amounted to serious misconduct, and she repeatedly lied about her conduct.

For reasons that grievant cannot or will not express, grievant was absolutely convinced that the customers did not belong in an affluent neighborhood and must therefore be criminals who stole the box off of the rightful owner's doorstep.  Contrary to what she would have the Arbitrator believe, grievant did not conclude the customers were innocent but rather continued to voice her conviction that they were engaged in wrongdoing even after the police had spoken with them and concluded they were not guilty of anything.

Termination was an appropriate penalty, given her policy violations, prior discipline and

---

[28]Grievant explained that this was "grocery slang" meaning that "you see them get rid of the items" that they were going to steal.

19

repeated failure to perform work as required.  Grievant clearly violated the Shoplifter Detention and Deterrence policy.  The basic policy is to combat shoplifting with friendly, attentive service. Grievant not only did not offer a cheerful greeting to the customers, as shown by her comments to the dispatcher she deliberately stayed away from them, intent on catching them in the act of shoplifting.  Rather than greeting them, she gave them no attention in the hope that they would steal.  She also violated the policy when she assisted in making a detention by calling the police. While the Policy is brief and does not expressly address the conditions to be met before law enforcement is summoned, grievant had been explicitly told by Kettle that employees are not allowed to act prematurely without actually observing all the elements of a theft, and that contacting law enforcement without management knowledge effectively constitutes "assisting in a detention" without authorization.  Further, it should go without saying that employees should not summon law enforcement to the store based on mere suspicion that a customer might later try to steal something.  Her decision to do so, particularly when persons of color are involved, has all the hallmarks of racial profiling, and can expose the Employer to costly litigation.

Grievant also violated the Employer's policy regarding employee conduct and manners. She made rude and derogatory remarks about the customers with a distinctly racist undertone (stating they did not look like "Ruby Hills people.")  Her behavior damaged the reputation of the Company to the point that the customers threatened legal action.  There was the potential of engendering negative publicity around an incident of this sort, especially given heightened public awareness and sensitivity to issues surrounding racial profiling.  Incidents of this sort must be taken seriously.

To the extent that progressive discipline is even required in a case of this type, this condition precedent has been fully satisfied.  Grievant repeatedly failed to perform her work as required.  In this instance she took a long break from her duties to pursue the customers, who were simply shopping.

Grievant had a history of customer complaints, and had been disciplined twice in the six months prior to March of 2017.  At least one prior complaint involved false shoplifting allegations against people of color.  She had a three day suspension on her record, putting her on notice that further performance problems could result in termination.  The suspension was to be reduced to a written warning only in the event she had not incurred no other further violations six months from the date of the suspension, or May 23, 2017.  These prior write-ups resulted where grievant was not only rude to customers, she totally ignored them and provided no assistance.  She was given warnings and repeated opportunities to improve and correct her problems with customer service, but proved unwilling or unable to do so.

Grievant not only failed to provide "attentive service" to customers but also effectively abandoned her assigned SCO duties so that they had to be covered by Cornejo.  The dispatch recording makes it clear that she was wandering about the store and not in her assigned area. To this day grievant has no self awareness of how she was rude to customers, and has shown no apparent remorse or desire to improve.

The Union has failed to establish mitigating circumstances which would warrant a reduction of the penalty.  There was no disparate treatment. The Union's argument focuses on a past practice allowing other employees to call the police without discipline and on Cornejo's

role in the incident. With regard to the former, evidence submitted by the Union did not include a description of the circumstances in which police were called. The Union presented a record of "Calls for Service" in 2016 and the first three months of 2017, and the testimony of several employees about their experiences. The Report does not identify which individual made the call, whether it was a manager or not. It does however note that grievant was involved in two of these incidents and was the reporting or involved party in 8 more. This does not establish that the calls were justified. Testimony from Raymore that he never called police was contradicted by Castro. There is no evidence of employees apart from grievant calling the police on customers without any legitimate basis for doing so.

With respect to Cornejo, any objective assessment shows grievant's culpability far surpassed Cornejo's. Grievant, not Cornejo, abandoned her duties to pursue innocent customers. While she used Cornejo's phone to make the call, there is no indication that it was anything other than a voluntary decision. If Cornejo herself had been worked up about the "suspicious" customers, she would have called the police herself. Further, Cornejo had never been specifically counseled about calling the police, as grievant had been. Thus, even if the Arbitrator were to make the unlikely determination that grievant and Cornejo shared equal culpability, it was grievant's second offense of the same type, and it would only have been Cornejo's first offense.

Grievant is not entitled to whistleblower protections pursuant to Labor Code Section 1102. 5. This proceeding is solely contractual in nature, and in any event the provision does not apply to the circumstances of this case. Grievant did not have reasonable cause to believe that a crime had been committed. It is undisputed that no crime had been committed at the time grievant called the police. The customers were simply moving about the store shopping for groceries. Using a wagon to shop is neither a crime nor a violation of store policy. Nor was there any credible evidence that the customers "stashed" liquor in the box inside the wagon.

Grievant cannot avoid responsibility for her own actions by attempting to shift the blame to the police for the manner in which they handled the incident. The police would never have approached the customers in the store without grievant's insistence that they were shoplifting, and the comment that they stole the wagon itself. Further, she testified that she spoke to the officers before they approached the customers. They indicated that they were going to assess the situation themselves. Grievant made no effort to stop them from doing so.

Accordingly, based on the foregoing, the Employer respectfully requests that the grievance be denied in its entirety.

## POSITION OF THE UNION

There are many independent reasons why this termination violated the Agreement. Grievant and Cornejo were jointly engaging in an attempt to protect the Employer from what appeared to be shoplifters. In the course of their efforts, the police approached the customers inside the store, without detaining them, twelve minutes after grievant concluded the call with the dispatcher. Grievant never asked the police to approach the customers. When the Employer received a demand letter from the customers' attorneys, ten days later, the Employer terminated grievant as a scapegoat, without issuing any discipline to either Cornejo, Caddell,

21

or Vasquez, all of whom shared culpability.

Initially, the termination was a clear violation of State law, which broadly protects whistleblowers from retaliation. Grievant had reason to believe that there was an ongoing violation of the law, namely, shoplifting. The Employer does not dispute that the discipline was imposed because grievant reported the matter to the Dublin police.

Also relevant is the burden of proof per Labor Code Section 1102.6:

> In a civil action or administrative proceeding brought pursuant to section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

The Employer has not come close to meeting this burden of proof. All witnesses agreed that the conduct of the customers was suspicious and warranted at least thorough surveillance and intervention. The Employer did not contend that the circumstances did not warrant a call to the police by the person in charge or management. Although the Agreement does not specifically incorporate the Labor Code into its provisions, just cause necessarily assumes that the reason for a termination is lawful. Since grievant was terminated for engaging in protected whistleblower activities, the termination cannot stand.

The Employer improperly relied upon prior discipline. Grievant received a suspension on November 23, which was converted to a written warning on January 26, 2017. It is clear from the settlement that the parties intended that the written warning would be null and void six months later. This incident was within that six month period. However, the agreement was clear that the reduction to a written warning and subsequent removal from the file was only for "other violations of a similar type," related to work performance/customer service. The incidents leading to the suspension involved customer contact, and the written warning was for customer complaints. Neither was issued for violation of Company policy.

Here, there is only an asserted violation of Company policy by calling the police. It is not a matter of customer interaction. The termination notice states only "violation of company policy and/or procedures" as the reason for the discharge. The difference is emphasized by the settlement, which states that it and the type of discipline issued "is based solely on the facts and circumstances of this [the former] case." The Employer cannot now contend that the termination was for job performance.

Accordingly, the Employer has not complied with the Agreement because it never gave grievant a warning about violation of the shoplifting policy (which she did not in any case violate) within the six months preceding her termination. The evidence establishes that grievant, Cornejo, and other non-management employees routinely called the police to report suspected shoplifting. The activity was condoned if not allowed to continue. Vasquez and his predecessor explicitly authorized employees to do so. Caddell took no action to stop the surveillance. Nor

22

did he ask the police to leave or investigate the incident himself. There can be no prior warning or progressive discipline where the conduct at issue is engaged in by other employees with the approval of management.

Grievant did not violate any Company police or procedure. The only policy at issue is the "Shoplifting Deterrence Policy." The policy prohibits employees from "assist[ing] in making detentions of shoplifters" unless they have been trained and designated in writing. Employees are also prohibited from pursuing a shoplifter who flees. The policy does not even remotely deal with the question of whether or when the police should be called.

Kettle, in desperation, claims that by calling the police, grievant engaged in a "detention." Nothing in the policy or in the prior incident Kettle discussed with grievant corroborates the idea that the Employer actually believes that an employee engages in a detention simply by calling the police. Nor can the Arbitrator accept such a nonsensical interpretation of the words "detain" or "detention." The call to the dispatcher certainly cannot be described as a detention when grievant never asked to have any of the officers contact the customers and where the officers approached them twelve minutes after the call ended. Kettle's gloss on the term "detention" is simply an irrational interpretation of Company policy. Since this interpretation must be rejected, the Employer's entire case must also therefore be rejected.

Kettle's interpretation was based on another faulty premise. The 1995 document which she relied upon was never shown to grievant or anyone else. In any case, a review of that document makes it clear that a detention means the physical detaining or holding of a potential shoplifter. It does not contemplate that calling a manager, security person, or police officer is a form of detention. No detention was involved.

Grievant did not ask the police to detain the shoplifters. The phone conversation with dispatch ended 12 minutes before the customers were approached, something which grievant never suggested. To the contrary, grievant repeatedly told the dispatcher the customers were "stalling" and in the store so that the officers would not detain them while they were still in the store. When the call ended, she thought the incident was concluded. If there were a detention simply because the officers approached the customers, which is a matter in dispute, it was because the officers decided to do so, not because grievant asked or encouraged them.

Employees had been authorized by Vasquez and the previous Store Manager of calling the police. She and Cornejo were the two primary callers. This is confirmed by a number of witnesses as well as the record of calls to the Dublin police. The fact that Vasquez took no initial action reinforces the fact that employees calling the police was an accepted practice in the store. Employees were only instructed not to call the police after grievant was discharged.

Cornejo's testimony is to be doubted on many grounds. She thought the policy permitted employees to call. She admitted knowing grievant had done so without management approval at least five times. She dishonestly testified that she had no idea whether the police ever showed up at the store. It is abundantly clear that the policy does not address calling the police, thus there was no violation when grievant did so.

The police approached the shoplifters without any request from grievant. Grievant did

not actually ask the police to be dispatched at all. It is clear from the call with the dispatcher that grievant never asked the police to come into the store. On the contrary, she wanted them to wait to see if the customers would attempt to leave without paying. Even Kettle confirmed that it made no sense for the officers to approach the customers in the store. Cornejo and Caddell could have prevented them from doing so, but they did not. Grievant cannot be blamed for the fact that the officers acted outside of protocol and contrary to her understanding when the call with the dispatcher was terminated.

The Employer's failure to discipline Cornejo and others for engaging in more culpable conduct negates the discipline imposed on grievant. It is clear that Cornejo initiated the phone call to the police. She dialed the Dublin police number on her speed dial, handed the phone to grievant, and told her to engage with the dispatcher. It is also clear that, throughout the call, she was engaged in surveillance of the alleged shoplifters. She also went around the store looking for the box the customers had brought in. Her register records indicate that she virtually abandoned her post once the customers arrived. Worse yet, she lied about all these matters. She claimed that she was at her register the entire time the call to the dispatcher was taking place, and that she had no discussion with grievant about the suspected shoplifters during the call. These statements are clearly false, as they are refuted by the audio tape and her register records. The Employer simply ignored these falsehoods. Cornejo was not given a written warning or even so much as a counseling. Management had no explanation for why she was not disciplined for her clear policy violations. The failure to impose any discipline at all on Cornejo is all the more egregious since she claims to have known it was forbidden to call police unless one was authorized by management or the PIC. It is also fatal to the Employer's case.

Caddell was also at fault for the incident. He was the Person in Charge and was well aware that Cornejo and grievant were involved in surveillance of the alleged shoplifters. He also knew the police were called. However, he took no action, and simply removed himself from the situation because he did not want to be bothered. He was culpable yet received no discipline. The Company also failed to take action against Vasquez, the Store Manager, who authorized employees to call the police. Either that proves that the policy did not prohibit calling the police or that he was violating the policy. Grievant should not be discharged when management condoned or failed to take action to prevent something that the Employer now claims merits termination.

The Employer conducted an inadequate and faulty investigation and analysis of the facts. Kettle made numerous errors in her investigation. She made no effort to establish whether there was a practice in the store of non-management employees calling the police. She did not interview Vasquez. Nor did she make any effort to obtain the time records of grievant or Cornejo, or attempt to find the transaction of the customers in question. She did not interview the police, and did not have the dispatcher recording when she spoke with grievant twice. She did not reach out to the customers to find out what information they might have, or make any attempt to investigate their backgrounds. Importantly, she simply believed Cornejo's story uncritically without noticing the obvious inconsistencies. She did not follow up on why Caddell, the person in charge, did nothing. The decision makers ignored the fact that Cornejo called the police and thereafter continued her active involvement in the incident.

Silva's analysis of events is equally at fault. She refused to consider Cornejo's role in

the incident or whether other employees in the store had called the police. Her failure to explore whether the police contacted the customers in the store renders her decision-making faulty. Silva also stated that prior incidents were in part the basis for the discipline. However, they were more than six months old and not subject to written warnings.

The objective facts and uncontradicted testimony support the conclusion that grievant's termination violated the Agreement. The Employer's case rests largely upon Cornejo's testimony, but she testified falsely about two critical aspects of the case. She falsely testified that she was in her checkstand or otherwise performing her duties during the call, and was not involved in surveillance of the alleged shoplifters. Both of these facts were central to the Employer's decision to terminate grievant. However, the audio of grievant's call with the dispatcher and the register tapes completely undermine Cornejo's claims. Further, the Employer made a firm conclusion that it was grievant who had initiated the call despite the fact that Cornejo herself never denied that she had done so and this was a critical element in the case. Cornejo consistently made false statements and gave false testimony in order to escape discipline.

Cappa confirms that he saw the customers in the liquor aisle. He made clear that he was not sure what they put in their wagon. His testimony supports that provided by the grievant. The Union produced three credible witnesses who confirmed that police were routinely called to the store. The Company made no effort to investigate this fact.

The Employer claims that grievant was out of her area and should only have been at the SCO. Kettle and Silva relied on this argument as part of their decision to terminate. The Union established that this was an entirely false view of her work. Her assigned duties took her around the entire front end. While conceding that grievant's primary responsibility to monitor the SCO, the lights above those registers can be monitored from other parts of the store. Additionally, witnesses confirmed that the SCO position involves duties in other locations. Although grievant would normally be in those areas up toward the front of the store, the policy encourages clerks to approach shoplifters and give them service.

Grievant is credible. She consistently maintained that Cornejo initially told her that the alleged shoplifters were putting alcohol in the box. She also testified that she personally saw them putting alcohol in the box. Cappa does not remember confirming this to her, but her precise testimony on this was that he knew they putting something in the box on the right side of the aisle, which is the liquor side. His testimony does not impeach grievant's or Cornejo's, who reported that alcohol was being put in the box.

Though the Employer made a big deal out of the claim that grievant was away of her SCO area, neither Kettle nor Silva had any personal knowledge of the duties of an SCO. Caddell was not asked to confirm this during his direct examination. The point was rebutted by all the employee witnesses. The record proves she was in the SCO for most of the phone call. It also shows she was performing her other duties, such as helping bag.

While the dispatcher tape does not reflect a direct statement from grievant that the police should leave, a fair reading of the exchange shows that grievant was signaling that the couple was stalling and that it was likely that nothing was going to happen for a while. It was the

dispatcher who seemed more interested in continuing the police presence. Grievant never asked the police to come into the store, or told the dispatcher that the police should remain. She certainly was signaling to the dispatcher that police could leave because the alleged shoplifters were hanging around.

Grievant be reinstated with full back pay and benefits, plus interest. Her record should be expunged of any references to this matter. The Employer should be required to post a notice that it will not terminate employees for violations of rules that do not exist, where it does an inadequate investigation and where it persists in a wrongful action against a valued employee. Grievant is also entitled to the Labor Code Section 98.6(b)(3) penalty, which the Union suggests, given the egregious nature of the violation, should be for the full amount of $10,000.

## DISCUSSION

Essentially, the Employer terminated grievant for the way she reacted to two customers who visited its Dublin store. The customers, a black woman and "a very dark skinned" male, entered the Dublin store with a collapsible blue canvas wagon. Contained in the wagon was the box it was delivered in. Both grievant and a co-worker found these circumstances suspicious and/or "odd" and indicative that the customers were potential shoplifters. What ensued became the subject of two competing and contradictory versions describing grievant's conduct before these customers were accosted by the police inside the store.

The evidence established that shoplifting was a regular occurrence there. Employees routinely called police to report patrons removing merchandise from the store that had allegedly not been paid for, or at least reporting individuals whom they suspected were engaging in or were about to engage in such activities. Employees had never been directly instructed not to call the police under these circumstances. To the contrary, it was only after this termination that the Employer instituted and publicized a specific prohibition against doing so unless authorized, thus supporting the conclusion that such reporting was typical among employees, was accepted or condoned by management, and not used as a basis for discipline absent any other aggravating factors.

The Employer deemed grievant's reaction to the customers that evening a "violation of company policy and/or procedures" which was of sufficient seriousness as to provide just cause for her discharge. More particularly, the Employer argues that grievant's March 25, 2017 conduct constituted violations of its shoplifter deterrence and detention policy, its policy regarding employee conduct and manners, and a failure to perform work as required.

Proof of these violations rests on witness credibility. In the version of events relied upon by the Company to support the discipline, grievant was the primary instigator of the March 25 incident, leaving her assigned work station for a portion or perhaps most of the 15 minutes that she was talking to a police dispatcher to report the actions of the customers in question as she followed them around the store. While she may not have initiated the phone call to police, she was the active participant in it. Absent her statements during that call designed to depict incriminating behavior, there would have police presence in the store, a presence which led to their approaching the customers and "assessing" them as possible shoplifters.

26

In the contrasting version advanced by the Union and presented by the grievant, grievant was a reluctant if not unwilling participant in these events. It was her co-worker Cornejo who encouraged her to call the police, thrusting a pre-dialed cell phone upon her as Cornejo pursued the customers around the store. Cornejo rather than grievant left her post to monitor the customers as they navigated the store aisles, returning to grievant's area periodically to provide updates on the customers' activities which grievant relayed to the police dispatcher.

Simply because grievant has the most at stake here is not reason in and of itself for discounting the reliability of her testimony. Nonetheless, significant inconsistencies, contradictions and/or omissions in grievant's account, described in greater detail below, provide convincing reasons for finding that she was less than truthful in describing what actually happened that evening. A number of inconsistencies the Union points to in Cornejo's recitation would likewise seemingly detract from the strength of the evidence she presented. Were this simply a matter of "she said, she said," the Employer's evidence would be insufficient to sustain its burden of proving misconduct. However, grievant's defense to the allegations was not just undermined by Cornejo's version. Her credibility was also damaged by irrefutable evidence from the recording of her conversation with the dispatcher, as well as her shifting and belated factual claims and the implausibility of a number of her assertions.

Faulty information arose early on in grievant's testimony. Seeking to explain her conduct during a January, 2016 incident which possibly involved racial profiling, grievant asserted that she was instructed by an assistant manager to "keep an eye on a certain customer," and ask her for a receipt. Surveillance video depicts no such conversation or even interaction with the assistant manager, while the statement she provided several days after the incident fails to mention it. Her willingness to present this misleading and factually insupportable excuse naturally infects her credibility overall. As such, her denial that Kettle instructed her thereafter that she was not authorized to detain anyone or mentioned anything beyond that she was not allowed to ask a customer for a receipt is not accepted as truthful.

Moreover, it is clear that Kettle counseled her about the shoplifting deterrence policy in early 2016 and instructed her as to the appropriate course of action when she suspected someone of shoplifting. While the disciplinary aspect of this event is not to be considered as it is rendered "null and void" under the Contract, it still may be utilized to impeach grievant's credibility as well as to establish that she had received additional training on the subject of shoplifting deterrence.

Of greater significance for purposes of resolving credibility and determining whether there was sufficient evidence of just cause for the discharge are the calculated evasions and inaccurate statements which were evident in her description of her actions that evening. As noted, grievant maintained that it was only upon Cornejo's urging that she got involved in the call to the police, that it was Cornejo, not she, that followed the customers around the store, monitoring their behavior and movements, and that the information she was passing along to the dispatcher during that call was based on what she was told by Cornejo.

These claims, which are viewed as an attempt to deflect responsibility for what happened on to Cornejo, are simply not supported by the evidence. Asked to explain on cross-examination how she was able to stand at a check-out station immediately after getting the

phone from Cornejo while describing what was happening on aisle 17, as recounted in a foot-note above, grievant's response was virtually incomprehensible and inherently implausible. Cornejo's record of checkstand activity has no entries during the time period of the call, thus arguably demonstrating that she was also away from the checkstands at that time. However, after grievant announces she is "back at self-check" about half-way through the call, she addresses Cornejo, demonstrating that Cornejo was already there when she arrived. Register records show that Cornejo was handling an order at self-check at 8:11, when the call ended. In addition, Caddell credibly testified that when he came by the SCO it was Cornejo that was helping customers there while, as conclusively shown by the recording of the conversation with the dispatcher, grievant had left the area to observe the customers whom she thought were stealing.

Grievant offered shifting reasons why she was monitoring the customers in the first place. She initially testified that Cornejo reported to her that she had seen customers "stashing" liquor before Corenjo dialed the police and handed it to grievant. She added that deli clerk Cappa also observed this behavior. Neither witness corroborated that they said this to the grievant. Grievant then claimed that she personally observed the "stashing." Statements which she furnished to the Company and to the Union neglected to contain this significant detail. When the customers processed the items they had placed in the wagon, there was no alcohol in their order. Though grievant maintained they "got rid of . . . the alcohol in the box" while insisting that she saw them putting liquor in it, she acknowledged that she did not know where the alcohol went, and did not see the customers dispose of it, notwithstanding the fact that she was following them around the store. Cornejo did not report seeing any alcohol near the place where she found the empty box. All of this casts serious doubt on grievant's claim that she actually saw the customers attempting to conceal alcohol inside it.

Grievant additionally asserted that she remained at her work station for most of the phone call, assisting customers; that the work station itself encompassed nearly the entire front end of the store; and that she tried to persuade the dispatcher that the police should discontinue their involvement because the customers had apparently abandoned their intention to remove merchandise from the store without paying for it. None of this is supported by the recording of the call to the dispatcher.

There was no evidence which might demonstrate that she was helping patrons while the call was taking place. Grievant is not heard speaking to any customers during the call, nor are any heard speaking to her. Check stand records for that period do not show any transactions that grievant processed. It is highly unlikely that she could have been speaking on a hand-held mobile device while simultaneously using her hands to provide some form of checkstand assistance, particularly in the absence of any audible indication that the phone was put down or the discussion with the dispatcher was interrupted at any point. Nor was there any evidence save for her own unsubstantiated claim that her area of responsibility as the SCO clerk encompassed the entire front end of the store, from the deli and liquor aisle 17 to the produce area on aisle 2.

The conversation with the dispatcher establishes that grievant was not at the SCO for the first half of the 15 minute call, as well as about nine and one-half minutes into it and thereafter. It begins with her report that the customer is filling the box up "with liquor" on aisle

28

17, 40-50 feet away from the SCO. She continues with a running description of what the customer is wearing and the comment that the customer is on the phone. Grievant could not have obtained such details from Cornejo, as she is not heard speaking to Cornejo at or near the time she passes this information along to the dispatcher. It is also apparent from these statements on the recording that the information was solely derived from her own minute by minute personal observation.

Grievant next mentions the customer is on the freezer aisle, "loading the whole box." The sequence shows that she is following the customer from the liquor aisle, aisle 17, to the freezer aisle, 16, neither of which she could view from the SCO. Grievant then trails after her to another aisle and notices the customer is with another person, whom she also describes in detail, and reports that they are now "stalling" in aisle 16, although she can't see how much is in the box because "it's sideways inside the wagon."

Despite hearing from the dispatcher that there is an officer outside, grievant persists in pursuing the costumers, reporting that they are now on a contiguous aisle, freezer aisle 15, and that she has "just watched them fill the box." Again, it is grievant, not Cornejo, who is doing the watching. That grievant is still following the customers around is also obvious from her comment to the effect that they have spotted her and "they know what I look like." Grievant continues to observe them "stalling" halfway down aisle 15, then announces to the dispatcher that she is "back at self-check." This statement occurs roughly 7 minutes into the phone call. She is heard talking to Cornejo, telling her they got rid of the box, while announcing to the dispatcher that she is going to see if she can find the box, about nine and a half minutes into the call. From this, it is apparent that she leaves the SCO once more. A further implication that she is no longer there is her statement that the suspected shoplifters went via the back of the store and are "getting ready to come up aisle 2," which is on the opposite side of the store from SCO. Grievant sees them in produce and tells the dispatcher that "I'm gonna back off 'cause they know I'm on the cell phone," another statement indicating she is in close proximity to the customers and has followed them to the other side of the store.

Grievant's lack of candor is also evident from her contention that she tried to tell the dispatcher that there was no reason for the continued police presence as the customers had abandoned their plan to shoplift, and that her use of the word "stalling" was some sort of code reflecting that fact. This is again viewed as an attempt by grievant to minimize her problematic involvement. Far from indicating grievant's efforts get the police to leave, the content of the call plainly establishes that she is encouraging them to stay. Various comments, off-hand and otherwise, convincingly show grievant emphasizing that the customers are continuing to exhibit signs that they are intent on stealing, and that the police should remain ready to intervene.

After being told that there is an officer on scene, grievant persists in relaying information that the customers are "stalling," waiting until "the coast is clear" before they leave the store with the unpaid-for merchandise, making remarks to the effect that she wants them to make an incriminating move, that they are "just going to continue shopping" and "probably go out another door," that they probably stole the wagon too, and that they're "gonna try to go out the produce side." When the dispatcher tells her there are four officers on scene, she says "I know! Yeah that's fine." It is only after the dispatcher asks her if she wants to disconnect that grievant states that because the officers "have a visual on them," she is going to "let them go out," and "it's ok

29

now." At no point is grievant heard to say words to the effect that "I made a mistake, the couple is not stealing, it's alright for the police to leave."

The Shoplifting Deterrence Policy, in both its 2003 and revised versions, directs employees to deter shoplifting by "cheerfully greeting customers." Grievant was reminded of this when counseled by Kettle roughly one year before these events. She was also instructed that before claiming merchandise has been shoplifted she needed to witness something being removed from the store which was not paid for. On the evening in question, grievant plainly failed to act in a manner consistent with this policy. Rather, she let the customers go about their business without having any interaction with them, leaving her work station for an extended period to observe and report on what they were doing. Her surveillance was based on assumptions which turned out to be thoroughly unwarranted, assumptions which were arguably and inappropriately grounded not on any evidence but on pre-conceived notions derived from the race and appearance of the customers involved. Grievant's predispositions in this direction, whether conscious or not, were shown by her remarks designed to highlight incriminating behavior to the dispatcher: the customers were "stashing" merchandise, "stalling" until they were no longer being watched, that they must have stolen the wagon. She also mentioned to the police that they were not "Ruby Hills" people.

Within six months of this incident grievant had been disciplined for poor work performance and specifically being "rude and short" with customers and not providing them with "basic customer service." The Union maintains that these disciplinary events did not involve "violations of a similar type" as those presently under discussion because unlike here, they concerned her direct interactions with customers. As such, they should not be considered prior discipline steps which would satisfy the Contract's requirement that a discharge for failure to perform work as required must be preceded by a written warning and an opportunity to improve.

Broadly stated, any rule or policy violation could be viewed as a "failure to perform work as required." Discriminatory treatment of customers via racial profiling and accusing them of stealing on that pretense would certainly be encompassed within the meaning of "failing to perform job duties in a friendly, courteous and satisfactory manner." Moreover, "failure to perform work as required" in the strict sense of abandoning one's work station and not being available to provide customer assistance was not the only reason advanced by the Company for the discharge. There was another, more serious reason, one which the Company urges is severe enough under just cause principles to warrant summary termination. Accepting for the sake of argument that a prior warning would be required for this discharge, that requirement has been satisfied.

The Union next challenges the discharge on the basis that it constituted a violation of Labor Code 1102.5, which prohibits employers from enforcing rules or policies which prevent employees from disclosing information about a violation of law to a law enforcement agency. A discharge which would be contrary to state law cannot be consistent with just cause principles and the Contract's requirements. Again assuming for

30

the sake of discussion that an employee's report of shoplifting would fall within the whistleblower protections of the Labor Code, the statute requires that the employee have "reasonable cause to believe" that the information that is provided to law enforcement discloses a violation of state law.

Someone's race and the mere fact that they are in a retail grocery store pulling a wagon with a box inside of it, without more, would certainly not be sufficient to supply reasonable cause to believe they were engaged in any kind of illegal activity. It is commonplace for customers to bring their own carts and containers to such a store, in view of the state's "bag ban." Grievant's claim that she personally saw customers stashing liquor in the box, even if accepted as accurate, or even if coupled with her belief that patrons were acting "suspiciously," would also not meet the reasonable cause standard in this context. For an act of shoplifting to occur an item must not only be selected. It also must be removed from the store without having been paid for. This simply did not happen. The customers went through a checkstand and paid for the merchandise they selected, which parenthetically did not include liquor. Labor Code 1102.5 does not apply.

The Union contends that grievant should not be held responsible for the police confronting or "detaining" the customers as she never made any request that they do so or enter the store. The Union further asserts that grievant did not actually ask that they should be dispatched. Regarding this point, grievant's call to the police could not logically have been for any other reason. Moreover, as previously discussed, the dispatcher's recording is replete with signals from the grievant that the customers were up to no good and encouraging the police to take action of some sort. When the dispatcher tells grievant there is an officer at the East side and asks her if she wants to stay on the phone, grievant says "I don't mind." She later adds that "They're gonna try to go out" and "I gotta let 'em go out the door." It is only after she is told that an officer is with them, and sees that the officers outside "have a visual on them" that she decides that "it's ok" and she can end the call.

The Employer has convincingly established that grievant engaged in serious misconduct by indulging in racial profiling and falsely accusing customers of theft without having a reasonable basis for doing so. As the Employer points out, her actions exposed the Company to liability and had the potential of bringing discredit upon it. In addition, credible evidence demonstrates that grievant left her assigned work area for a period of time so that she could follow the customers around the store and keep an eye on them, rather than greeting them and reporting what she thought was illegal activity to management, or remaining available to help patrons at the SCO. These violations of company policy and/or procedures provide just cause for discipline.

Nevertheless, for this discharge to comply with the Contract's just cause requirements, grievant as well as other employees had to be on notice of the particular rule or policy or aspect of that rule which is used in whole or in part as the basis of the discipline. While grievant was on clear notice as a result of her January, 2016 experience that racial profiling was against policy and could lead to discipline, Kettle misinterpreted and misapplied the Company's deterrence policy in that she found that grievant's call to police was contrary to the prohibition that employees were not to assist in making detentions of shoplifters unless specifically authorized to do so. Despite Kettle's instruction

to grievant that she considered merely summoning law enforcement as equivalent to assisting a detention, the rule as she viewed it was never clarified for employees. Their regular calls to the police, including calls by grievant herself, continued for more than a year beyond Kettle's counseling and the training which she provided to the grievant. Because grievant or no one else for that matter was placed on adequate notice that the Company would be interpreting the shoplifting policy in this particular and unique manner, much less be disciplined for such conduct, the discharge must be set aside.

As the Union emphasizes, the plain meaning of the term "detention" involves a delay or restraint on someone's movement, or, in the extreme, placing them in custody. The 2016 incident more closely approached a detention, as grievant impeded the movement of a customer when she asked her repeatedly for a receipt. Such was not the case here. Whatever "detention" occurred was solely by the police when they spoke to the customers outside of grievant's presence. If the Company seeks to broaden the definition of "assisting a detention" as set forth in its policy to include summoning law enforcement who might then restrain someone's freedom of movement, it was required to notify employees of this view. In light of the widespread practice among employees of calling police without disciplinary consequences, the mere act of making such a call cannot supply an enhanced rationale for discharge based on the notion that doing so constitutes assistance with a detention in violation of the shoplifting deterrence policy.

Serious discipline remains warranted for the misconduct, however. Grievant's lack of candor throughout this process and particularly at the hearing unnecessarily aggravated its severity in that it indicates grievant's lack of awareness why her behavior was inappropriate or problematic and her failure to accept full responsibility for it. The discharge will accordingly be reduce to a lengthy suspension.

### AWARD

The discharge of the grievant Debra Horn violated the Collective Bargaining Agreement. Just cause for considerable discipline has been shown nonetheless. The discharge will accordingly be reduced to a suspension of one year from the date of grievant's termination. Grievant is to be reinstated immediately without loss of seniority and made whole for all wages and benefits she would have earned but for the discharge, together with interest at the Contract rate, less those for the period of her suspension. Pursuant to Section 18.6 of the Agreement, the cost of the Arbitrator shall be borne by the parties in equal shares.

The Arbitrator retains jurisdiction in this matter over any questions arising from the interpretation or implementation of this Award.

Dated: February 10, 2019

MATTHEW GOLDBERG
Arbitrator

32

Atkinson-Baker, Inc.
www.depo.com

```
 1                    REPORTER'S CERTIFICATION

 2

 3
          I, VALERIE E. JENSEN HARRIS, CSR No. 4401,
 4
     Certified Shorthand Reporter, certify:
 5
          That the foregoing proceedings were taken
 6
     before me at the time and place therein set forth;
 7
          That the foregoing proceedings were recorded
 8
     stenographically by me and were thereafter transcribed;
 9
          That the foregoing is a true and correct
10
     transcript of my shorthand notes so taken.
11
          I further certify that I am not a relative or
12
     employee of any attorney or any of the parties, nor
13
     financially interested in the action.
14
          I declare under penalty of perjury under the
15
     laws of the State of California that the foregoing
16
     is true and correct.
17
          Dated this 17 day of February, 2021.
18

19          _____

20
              VALERIE E. JENSEN HARRIS, CSR NO. 4401
21

22

23

24

25   Signature requested.
```

# EXHIBIT "D"

FILED BY FAX
ALAMEDA COUNTY
March 11, 2019
CLERK OF
THE SUPERIOR COURT
By Milagros Cortez, Deputy
CASE NUMBER:
RG19010397

1 | DAN SIEGEL, SBN 56400
2 | MICAH CLATTERBAUGH, SBN 316808
| SIEGEL, YEE, BRUNNER & MEHTA
3 | 475 14th Street, Suite 500
| Oakland, California 94612
4 | Telephone: (510) 839-1200
| Facsimile: (510) 444-6698
5 | dansiegel@siegelyee.com

6 | Attorneys for Plaintiff
| DEBRA HORN
7

8

9 | **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

10 | **COUNTY OF ALAMEDA**

11

| DEBRA HORN | ) | Case No. _____
12 | | )
| | ) 
13 | Plaintiff, | ) VERIFIED COMPLAINT FOR DAMAGES
| | ) AND INJUNCTIVE RELIEF
14 | vs. | )
| | )
15 | SAFEWAY INC., and Does 1-50, | ) Demand for Jury Trial
| Defendants. | )
16 | | )

17

18 | Plaintiff DEBRA HORN complains against defendants SAFEWAY INC., and Does

19 | 1-50 as follows:

20 | **PRELIMINARY STATEMENT**

21 | 1.   DEBRA HORN ("Ms. Horn") brings this action against defendant SAFEWAY

22 | INC. ("Safeway") for discrimination based on disability, failure to prevent

23 | discrimination, failure to accommodate disability, failure to enter into the interactive

24 | process to determine reasonable accommodation, retaliation, and harassment.  Ms.

25 | Horn was a hard-working employee for approximately 14 years.  She suffered workplace

26 | injuries to her foot, knees, and hand, requiring multiple surgeries and reasonable

27 | accommodation.  Safeway routinely refused to provide reasonable accommodation or

28

---

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 1

1   enter into the interactive process to determine reasonable accommodation.  When Horn

2   insisted on reasonable accommodation, her supervisors harassed her based on her

3   disability and encouraged, condoned, or failed to prevent her coworkers from doing the

4   same.  When Horn insisted on reasonable accommodation in 2016 and 2017, her

5   supervisors retaliated against her through unfounded discipline, including written

6   warnings, a three-day suspension, indefinite suspension, and termination.

### JURISDICTION AND VENUE

7

8       2.    Plaintiff's claims arise under the statutory law of the State of California.

9       3.    The actions giving rise to this lawsuit occurred in the County of Alameda.

### PARTIES

10

11      4.    Plaintiff DEBRA HORN was an employee of defendant SAFEWAY INC. at its

12  Dublin, California store at all times relevant to this controversy.

13      5.    At all times relevant to this controversy, defendant SAFEWAY INC. was a

14  corporation operating grocery stores and was HORN's employer.

15      6.    Plaintiff is unaware of the true names and capacities of the defendants sued

16  herein as DOES 1-50 and therefore sues said defendants by such fictitious names.

17  Plaintiff will amend this complaint to allege their true names and capacities when they

18  become known to plaintiff.  Plaintiff is informed and believes, and thereon alleges, that

19  DOES 1-50 are agents of Safeway Inc., acted in concert with it, and are liable for some or

20  all of the damages suffered by plaintiff.  Plaintiff is informed and believes, and thereon

21  alleges, that DOES 1-50 are residents of the State of California.  Plaintiff will hereafter

22  refer to all defendants jointly as "Safeway."

23

### STATEMENT OF FACTS

24

25      7.    Safeway hired Ms. Horn as a clerk in 2003.  She stocked product shelves,

26  cashiered, assisted with self-checkout, and performed general customer service.

27      8.    In 2005 Ms. Horn suffered injuries to her left foot while performing her job

28

---

1   duties at Safeway.  She had several surgeries to her foot to address these injuries in

2   2005, 2006, and 2007.

3       9.   Ms. Horn's foot injuries caused her increasing pain which occurred within

4   an hour of standing at Safeway's check-out stand.  This condition continued thereafter.

5       10.   In December 2006 Ms. Horn's doctor recommended that Safeway either

6   provide her with a stool at her work station or restrict her work to activities that would

7   not require her to stand for long periods.

8       11.   On February 16, 2007, Ms. Horn's doctor issued a work status report placing

9   Ms. Horn on modified duty with a permanent restriction limiting standing to four hours

10   per eight hour shift.

11       12.   When Ms. Horn returned to work shortly thereafter, Store Manager Brian

12   Sullivan frequently assigned her to check-out for more than four hours in a shift.

13       13.   Also in 2007, Safeway failed to discuss with Ms. Horn possible ways to

14   accommodate the restrictions Ms. Horn's doctor placed on her work in 2007.  It did not

15   provide a stool at her work station.

16       14.   In 2009 Ms. Horn's doctor recommended she not work check-out standing

17   in a confined space for more than two hours at any one time or for more than four hours

18   per day.

19       15.   Also in 2009, Ms. Horn presented Sullivan with the accommodations

20   recommended by her doctors, per Sullivan's request.  Sullivan threw it in her face and

21   told her to do as she was told or get another job.

22       16.   In or around 2009, Michael Vasquez became Assistant Store Manager at

23   Safeway.  He frequently assigned Ms. Horn to check-out for more than four hours in a

24   shift.

25       17.   On or about July 8, 2010, Ms. Horn reported to Safeway that she was

26   experiencing persistent pain in her left hand associated with work.  Safeway refused to

27   allow her to file an accident report and instructed her to wait to see if it went away.

28

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 3

18. On or about November 12, 2010, Safeway finally allowed Ms. Horn to file an accident report regarding her left hand. She had spent the previous four months in intense pain in her left hand.

19. Ms. Horn's left hand required multiple surgeries, which she received in 2012. Her doctor recommended that she perform work that did not require repetitive motion. Safeway ignored this recommendation and continued to assign Ms. Horn to check-out.

20. In 2012, on the recommendation of her doctor, Ms. Horn asserted her rights as a disabled employee through a letter from her attorney. Safeway continued its failure to reasonably accommodate her disability, continued to refuse to engage in the interactive process to determine reasonable accommodation, continued to harass her on the basis of her disability, and continued to allow its employees to do the same.

21. In 2013, Ms. Horn's doctor recommended that she not perform work at a check-out stand for more than two hours per day. Safeway refused.

22. In 2014, Ms. Horn complained to Safeway that it was discriminating against her on the basis of her disability, that it was failing to reasonably accommodate her disability, and that coworkers were harassing her by making negative comments about her disability—at times in front of customers—and suggesting that her disability or need for accommodation was insincere. Safeway ignored Ms. Horn's complaints and took no action.

23. In October 2016, Ms. Horn complained again to Safeway that it was discriminating against her on the basis of her disability, that it was failing to reasonably accommodate her disability, that coworkers were harassing her by making negative comments about her disability—at times in front of customers—and suggesting that her disability or need for accommodation was insincere, and that Safeway violated her rights to have her medical history and health information maintained confidential. Safeway ignored Ms. Horn's complaints and took no action.

24.   From 2009 through 2016 Safeway routinely assigned Ms. Horn to work at a check-out stand for more than two hours at a time and for more than four hours per day, without access to a stool or other means to perform check-out duties without standing.

25.   In 2016 Ms. Horn repeatedly insisted that Safeway provide accommodations consistent with her doctors' recommendations.  Store Manager Michael Vasquez flatly refused and told her to get another job.  Vasquez refused to enter into discussions exploring options for accommodation.

26.   On or about November 14, 2016, Vasquez issued a written warning to Horn, accusing her of poor customer service.  Ms. Horn reasonably believes this written warning was in retaliation for her assertion of her rights as a disabled employee.

27.   On or about November 23, 2016, Vasquez issued a three-day suspension without pay to Horn, again accusing her of poor customer service.  Ms. Horn reasonably believes this suspension was in retaliation for her assertion of her rights as a disabled employee.

28.   On November 24, 2016, Ms. Horn slipped and fell while on the job, injuring her knees.  Ms. Horn repeatedly requested assistance from Safeway in getting treatment for this on-the-job injury.  Safeway provided no assistance.

29.   On or about December 3, 2016, Ms. Horn's doctor recommended performing repetitive motion with either hand for no more than 25 percent of the shift; lifting, carrying, pushing or pulling no more than ten pounds; no climbing; no pivoting; no squatting; no stooping; no crawling; and no standing or walking for more than ten minutes per hour.  Safeway again refused to provide reasonable accommodations consistent with these medical recommendations.  Safeway again refused to discuss possible ways to provide reasonable accommodation of Ms. Horn's disability.

30.   On or about March 1, 2017, Ms. Horn submitted a vacation request form to Vasquez.  Vasquez refused to approve Ms. Horn's vacation request according to the

collective bargaining agreement.  When Ms. Horn protested, he said to file a grievance.  Ms. Horn reasonably believes this refusal was in retaliation for her assertion of her rights as a disabled employee.

31.  On or about March 16, 2017, Safeway denied Ms. Horn's request for funeral leave to attend her grandmother's wake and funeral.  Ms. Horn reasonably believes this denial was in retaliation for her assertion of her rights as a disabled employee.

32.  On March 25, 2017, Ms. Horn's coworker, Cindy Cornejo, told her to call the police on a suspected shoplifter.  Ms. Horn refused.  Cornejo dialed 911 on her own phone, handed it to Ms. Horn, and began following the customer Cornejo suspected of shoplifting.  The customer later came to Ms. Horn's self check-out and asked for the manager.  Ms. Horn called the Person In Charge, Zaine Caddell.

33.  On April 26, 2017, Safeway suspended Ms. Horn indefinitely.  Safeway refused to provide an explanation.  Ms. Horn reasonably believes this suspension was in retaliation for her assertion of her rights as a disabled employee.

34.  On April 28, 2017, Ms. Horn submitted to Vasquez a request for medical coverage while on leave.  Vasquez refused to approve it.  Ms. Horn reasonably believes this refusal was in retaliation for her assertion of her rights as a disabled employee.

35.  On June 29, 2017, Safeway District Manager Kevin Lovell issued a letter to Horn terminating her employment, accusing her of violation of company policy or procedures.

36.  Safeway has subsequently informed Ms. Horn that the alleged violation of policy was regarding a policy for handling suspected shoplifters.  Ms. Horn denies violation of any such policy or procedure.

37.  On February 10, 2019, Safeway reduced Ms. Horn's termination to a one-year suspension through binding arbitration pursuant to her collective bargaining agreement.

38.  Throughout Ms. Horn's employment by Safeway, there were assignments

available consistent with her doctor's recommendations which Safeway could have, but chose not to give to Ms. Horn.  These include, but are not limited to, day stocker without checking duties, produce clerk, dairy clerk, liquor clerk, and general merchandise clerk.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

39.  Ms. Horn exhausted administrative remedies by filing charges with the California Department of Fair Employment and Housing (DFEH) and the United States Equal Employment Opportunity Commission (EEOC).  The California Department of Fair Employment and Housing issued a right to sue letter on May 16, 2017.

40.  The EEOC issued a right to sue letter to her on September 25, 2018.

41.  On December 13, 2018, Safeway entered into a tolling agreement with Ms. Horn, tolling the statute of limitations for any and all claims between them until either thirty days after mediation through the EEOC (scheduled for April 11, 2019), or until written cancellation of the tolling agreement by either party, with 30 days' notice.  Ms. Horn hereby cancels the tolling agreement, effective 30 days after service of this complaint on Safeway.

## FIRST CLAIM FOR RELIEF
VIOLATION OF CALIFORNIA LABOR CODE § 1102.5
(against defendants SAFEWAY INC. and DOES 1-50)
(Cal. Lab. Code § 1102.5)

42.  Plaintiff incorporates by reference paragraphs 1-41 above as though fully set forth herein.

43.  By virtue of the foregoing, defendants SAFEWAY INC. and Does 1-50 retaliated against HORN for disclosing what she reasonably believed were violations of the law and because defendants SAFEWAY INC. and Does 1-50 suspected she would disclose violations of the law.

**SECOND CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Retaliation)

44.   Plaintiff incorporates by reference paragraphs 1-43 above as though fully set forth herein.

45.   By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 retaliated against HORN because she complained about disability discrimination against her, because she complained about failure to reasonably accommodate disability, and because she complained about harassment based on disability or perceived disability.

**THIRD CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Harassment)

46.   Plaintiff incorporates by reference paragraphs 1-45 above as though fully set forth herein.

47.   By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 harassed HORN on the basis of her disability or perceived disability, causing her to suffer a hostile work environment.

**FOURTH CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Aiding, abetting, inciting, compelling, or coercing harassment)

48.   Plaintiff incorporates by reference paragraphs 1-47 above as though fully set forth herein.

49.   By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 aided, abetted, incited, compelled, or coerced others to harass HORN regarding her disability or perceived disability.

**FIFTH CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Disability Discrimination)

50.  Plaintiff incorporates by reference paragraphs 1-49 above as though fully set forth herein.

51.  By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 discriminated against HORN on the basis of her disability or perceived disability.

**SIXTH CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Failure to Prevent Discrimination)

52.  Plaintiff incorporates by reference paragraphs 1-51 above as though fully set forth herein.

53.  By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 failed to take reasonable steps to prevent discrimination against HORN on the basis of her disability or perceived disability.

**SEVENTH CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Failure to Accommodate)

54.  Plaintiff incorporates by reference paragraphs 1-53 above as though fully set forth herein.

55.  By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 failed to reasonably accommodate HORN's disability or perceived disability.

**EIGHTH CLAIM FOR RELIEF**
VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12940
(against defendants SAFEWAY INC. and DOES 1-50)
(Failure to Engage in Interactive Process)

56.  Plaintiff incorporates by reference paragraphs 1-55 above as though fully set forth herein.

57.  By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 failed

to properly engage in the interactive process in determining reasonable accommodation of HORN's disability or perceived disability.

## NINTH CLAIM FOR RELIEF
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
42 U.S.C. 12101, *et seq.*
(against defendants SAFEWAY INC. and DOES 1-50)
(Disability Discrimination)

58. Plaintiff incorporates by reference paragraphs 1-57 above as though fully set forth herein.

59. By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 discriminated against HORN on the basis of her disability or perceived disability.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
42 U.S.C. 12101, *et seq.*
(against defendants SAFEWAY INC. and DOES 1-50)
(Failure to Accommodate)

60. Plaintiff incorporates by reference paragraphs 1-59 above as though fully set forth herein.

61. By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 failed to reasonably accommodate HORN's disability or perceived disability.

## ELEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
42 U.S.C. 12101, *et seq.*
(against defendants SAFEWAY INC. and DOES 1-50)
(Harassment)

62. Plaintiff incorporates by reference paragraphs 1-61 above as though fully set forth herein.

63. By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 harassed HORN regarding her disability or perceived disability, causing her to suffer a hostile work environment.

**TWELFTH CLAIM FOR RELIEF**
VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
42 U.S.C. 12101, *et seq.*
(against defendants SAFEWAY INC. and DOES 1-50)
(Retaliation)

64.   Plaintiff incorporates by reference paragraphs 1-63 above as though fully set forth herein.

65.   By virtue of the foregoing, defendants SAFEWAY INC. and DOES 1-50 retaliated against HORN because she complained about disability discrimination against her, because she complained about failure to reasonably accommodate disability, and because she complained about harassment based on disability or perceived disability.

**DAMAGES**

66.   As a result of the actions of defendants SAFEWAY INC. and DOES 1-50, plaintiff has been injured and has suffered damages as follows:

(a) She has lost compensation and other employment-related benefits to which she has been entitled and will lose such compensation and benefits in the future;

(b) She has suffered from physical pain and suffering;

(c) She has suffered from emotional distress, embarrassment and humiliation, and has suffered damage to her professional reputation and standing; and

(d) She has incurred out-of-pocket expenses for health care benefits.

**PUNITIVE DAMAGES**

67.   In taking the actions described above, defendants SAFEWAY INC. and DOES 1-50 acted maliciously and oppressively, with a conscious disregard of HORN's rights and for the purpose of punishing her because she complained about disability discrimination against her, because she complained about failure to reasonably accommodate disability, and because she complained about harassment based on disability or perceived disability.

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 11

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff requests that this Court grant her relief as follows:

(1)   Injunctive relief to require defendants SAFEWAY INC. and DOES 1-50 to cease and desist from engaging in or allowing unlawful workplace harassment on the basis of disability or perceived disability;

(2)   Injunctive relief to require defendant SAFEWAY INC. to provide mandatory training to all supervisors it employs in the identification and prevention of workplace harassment based on disability, failure to reasonably accommodate disability in the workplace, and failure to engage in the interactive process in determining reasonable accommodation of disability or perceived disability in the workplace;

(3)   Injunctive relief to require defendant SAFEWAY INC. to publish a policy statement delineating employee rights and manager responsibilities with regard to employee complaints of harassment or discrimination on the basis of disability and to post that policy statement prominently in the workplace;

(4)   Compensatory damages for past and future lost wages and benefits, in an amount to be determined;

(5)   Interest at the legal rate;

(6)   General damages for emotional distress and pain and suffering, in an amount to be determined;

(7)   Special damages for out-of-pocket expenses;

(8)   Punitive damages, in an amount to be determined;

(9)   Attorneys' fees;

(10)   Costs of suit; and

(11)   Such other and further relief as the Court may deem proper.

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 12

1

## DEMAND FOR JURY TRIAL

2  Plaintiff DEBRA HORN hereby demands a jury trial.

3  Dated: March 11, 2019

4  SIEGEL, YEE, BRUNNER & MEHTA

5

6  By:

7  Micah Clatterbaugh

8  Attorneys for Plaintiff
   DEBRA HORN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, DEBRA HORN, declare as follows:

I am the plaintiff in this action. I have read the foregoing Verified Complaint for Injunctive Relief and Damages and know the contents thereof. The same is true of my personal knowledge except where stated on information and belief and, as to such matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 8, 2019, at _____Dublin_____, California.

_____
Debra Horn

---

*Horn v. Safeway Inc.*, Case No. _____
Complaint – 14

# EXHIBIT "E"

1  DAN SIEGEL, SBN 56400
   MICAH CLATTERBAUGH, SBN 316808
2  SIEGEL, YEE, BRUNNER & MEHTA
   475 14th Street, Suite 500
3  Oakland, California 94612
   Telephone: (510) 839-1200
4  Facsimile: (510) 444-6698
   dansiegel@siegelyee.com
5  micah@siegelyee.com

6

7  Attorneys for Plaintiff
   DEBRA HORN

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11

12  DEBRA HORN,                    )  Case No. 3:19-cv-02488-JCS
                                   )
13          Plaintiff,             )  **PLAINTIFF'S RESPONSES TO**
                                   )  **DEFENDANT SAFEWAY INC.'S**
14      vs.                        )  **INTERROGATORIES, SET ONE**
                                   )
15  SAFEWAY INC. and Does 1-50,    )
                                   )
16          Defendant.             )  Case Filed: March 11, 2019
                                   )  Trial Date: None Set
17                                 )

18
19  PROPOUNDING PARTY:  Defendant Safeway Inc.

20  RESPONDING PARTY:   Plaintiff Debra Horn

21  SET NO.:            One

22      Pursuant to Federal Rules of Civil Procedure, Rules 26 and 33, plaintiff Debra

23  Horn hereby responds as follows to defendant Safeway Inc.'s Interrogatories, Set One.

24              **INTRODUCTORY STATEMENT**

25      The inadvertent production of information that is protected from disclosure by

26  the attorney-client privilege and/or the attorney work-product doctrine shall neither

27  constitute a waiver of any privilege nor a waiver of any rights plaintiff may have to object

28  to the use of any of the information in any subsequent pretrial proceedings or at trial.

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 1

Plaintiff's research, investigation, discovery and preparation for trial in this matter are presently ongoing and not yet complete. Responses, if any, contained herein are based only upon such information and documents that are currently available and specifically known to plaintiff's counsel and disclose only those contentions which currently occur to plaintiff's counsel. Plaintiff anticipates that her continuing discovery, review, research, investigation, and analysis will supply additional facts, add meaning to the known facts, modify plaintiff's present analysis, and establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the contentions herein set forth, upon which plaintiff may rely at trial. Responses, if any, contained herein are made in a good faith effort to supply factual information which is responsive and not otherwise privileged and specification of legal contentions as is presently known, which should in no way be to the prejudice of plaintiff in relation to further discovery, review, research, investigation or analysis. Accordingly, plaintiff reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, review of documents is furthered, legal research is continued, and/or contentions are made. Plaintiff's responses to this set of Interrogatories is made without prejudice to plaintiff's right to introduce evidence, at a later date or at trial, of any subsequently discovered, reviewed, or analyzed fact which responding plaintiff may later recall, find, or analyze.

All of the specific objections below are hereby expressly reserved and may be interposed at the time of trial or at any other time.

Subject to these qualifications, plaintiff provides the following responses:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State the name, address and telephone number of each employer for whom you have worked since the termination of your employment with Defendant, the dates of each such employment and the position(s) you held.

1  **RESPONSE TO INTERROGATORY NO. 1:**

2      I worked at Instacart from January 28, 2019 to February 25, 2019 as a Shopper.

3  Instacart's address is 50 Beale St Suite 600, San Francisco, CA 94105 and phone

4  number is (888) 246-7822.

5  **INTERROGATORY NO. 2:**

6      State each and every fact supporting your contention that Defendant retaliated

7  against you for disclosing what you reasonably believed were violations of the law.

8  Identify by name, last known address and telephone number all persons who you believe

9  have knowledge of any facts relating to your contention.

10  **RESPONSE TO INTERROGATORY NO. 2:**

11      The facts supporting my contention that Safeway retaliated against me include:

12      On many occasions I or my doctors notified Safeway of my disabilities which

13  required accommodation.  On many occasions I disclosed or complained of the

14  following to Safeway: (1) that Safeway failed to properly engage in the interactive

15  process in determining reasonable accommodation; (2) that Safeway failed to

16  reasonably accommodate my disabilities; (3) that Safeway discriminated against me

17  based on my disabilities or perceived disabilities; (4) that Safeway failed to take

18  reasonable steps to prevent such discrimination; (5) that Safeway harassed me based on

19  my disabilities or perceived disabilities; and (6) that Safeway aided, abetted, incited,

20  compelled, or coerced others to harass me based on my disabilities or perceived

21  disabilities.  On many occasions Safeway retaliated against me for making the above

22  disclosures or complaints and because Safeway suspected I would make such

23  disclosures.  These include:

24      **A.   Notification of Disabilities Requiring Accommodation**

25      On September 1, 2005, Dr. Subotnick informed Safeway about the following

26  disability: On the job repetitive motion injury to my left foot, requiring "between 50%

27  and 75% weight bearing," "[n]o climbing, no walking on irregular surfaces, no squatting,

28  kneeling, crawling or pivoting, no more than "5 hours per day standing or walking, not

1  exceeding 45 minutes at any one time without a 15 minute sit down break," and "no
2  lifting, carrying, pushing or pulling over 20 lbs."
3    On December 6, 2005, I gave a note to Safeway that was written by Dr. Riopelle
4  on October 24, 2005, saying "[i]t is <u>medically necessary</u> for [me] to work the day shift."
5    On December 8, 2006, Dr. Venos informed Safeway about the following
6  disability: On the job repetitive motion injury to my left foot, requiring either "the use of
7  a swiveled stool at [my] work station," or "a more sedentary activity thereafter."
8    On February 16, 2007, Dr. Venos informed Safeway about the following
9  disability: On the job repetitive motion injury to Ms. Horn's left foot, requiring that I
10  "[l]imit Standing To 4/8 Hrs/Day."
11    On May 15, 2007, Dr. Subotnick informed Safeway about the following disability:
12  On the job repetitive motion injury to my left foot, requiring no more than "50% weight
13  bearing."
14    On April 24, 2009, Dr. Subotnick informed Safeway about the following
15  disability: On the job repetitive motion injury to my left foot, requiring I spend no more
16  than "50% of [my] time…as a checker standing in a confined space, no more than 4
17  hours per day," and "no more than 2 hours at any one time standing in a confined space
18  working as a checker."
19    On November 25, 2009, Dr. Subotnick informed Safeway about the following
20  disability: On the job repetitive motion injury to my left foot, requiring I work no more
21  than "4 hours per day as a checker as long as [I] can take a 15 minute sit down break
22  after every 2 hours of standing."
23    On December 22, 2009, Dr. Subotnick informed Safeway about the following
24  disability: On the job repetitive motion injury to my left foot, requiring I work check-out
25  no more than "4 hours a day with a 10-15 minute sit down break every 2 hours."
26    On April 20, 2010, Dr. Subotnick informed Safeway about the following
27  disability: On the job repetitive motion injury to my left foot, requiring I work check-out
28  no more than "2 hours on [my] first shift then a 15 minute break and then [I] can do

1  stocking," with "another 2 hours for the second half of [my] work shift then another 15
2  minute break and then go back to stocking."

3        On June 22, 2010, Dr. Subotnick informed Safeway about the following
4  disability: On the job repetitive motion injury to my left foot, requiring that I limit
5  "checking for the first 2 hours of [my] shift then 15 minute break."

6        On August 17, 2010, Dr. Subotnick informed Safeway about the following
7  disability: On the job repetitive motion injury to my left foot, requiring I "[work] as a
8  checker, no more than 4 hours in an 8 hour periods," and "[n]o more than 2 hours of
9  standing one place checking at a time then a 15 minute break."

10       On October 19, 2010, Dr. Subotnick informed Safeway about the following
11 disability: On the job repetitive motion injury to my left foot, requiring "[a]fter every 2
12 hours of checking sit for 15 minutes" and "[n]o more than 4 hours of checking per 8
13 hour day."

14       On November 10, 2010, Dr. Riopelle noted that that not having a stool available
15 for my work was contributing to my stress and anxiety.

16       On November 12, 2010, Dr. Schwartz informed Safeway about "increasing pain
17 and numbness in both of [my] hands," and "noted difficulty with repetitive and
18 continuous use of [my] hands at a grocery stand."

19       On November 30, 2010, Dr. Subotnick informed Safeway about the following
20 disability: On the job repetitive motion injury to my left foot, requiring "[a]fter every 2
21 hours of checking sit for 15 minutes" and "[n]o more than 4 hours of checking per 8
22 hour day."

23       On January 24, 2011, Dr. Subotnick informed Safeway about the following
24 disability: On the job repetitive motion injury to my left foot, requiring no more than "4
25 hours of checking," and "15 minutes of sitting after every 2 hours of checking."

26       On May 23, 2011, Dr. Subotnick informed Safeway about the following disability:
27 On the job repetitive motion injury to my left foot, requiring limiting "checking [to] 4
28 hours total per day" and "no more than 2 hours at a time."

On September 22, 2011, Dr. Subotnick informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring no more than "4 hours checking," and "no more than 2 hours at a time."

On January 5, 2012, Dr. Subotnick informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring I"check [no more than] a total of 4 hours per 8 hour shift," up to "2 hours at a time."

On May 2, 2012, Dr. Schwartz informed Safeway about the following disability: On the job repetitive motion injury to my hands and wrists, requiring I "continue to advance activities as tolerated."

On May 8, 2012, Dr. Subotnick informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring a limit of checking "no more than 2 hours at a time, 4 hours total per day."

On June 11, 2012, Dr. Subotnick informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring no more than "check[ing] 2 hours at a time" and "for a total of 4 hours of time checking per 8 hour work day."

On June 12, 2012, Dr. Subotnick informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring "checking no more than 2 hours at any one time without doing some other work for 2 hours such as stocking" and "[n]o checking more than 4 hours total per day."

On June 18, 2012, I spoke with Lynette Ledesma, HR representative, about accommodations for my disability and she told me that to use a stool in the check stand, I would need to provide a note from my doctor.

On August 2, 2012, I gave a written note to Brian Sullivan, Marsha Kessler, Lynette Ledesma and MaryAnn Weathers that said "I am a disabled person, with a permanent and stationary restriction for work. You have not honored these restrictions for some time. I don't know when you are going to accept this, but in the meantime I am continuing to hurt myself further. Please talk to me about what you can do to obey these restrictions. You are retaliating against me. This has been going on for some time and I

1   refuse to allow you to treat me and my condition this way."

2        On August 14, 2012, Dr. Subotnick informed Safeway about the following

3   disability: On the job repetitive motion injury to my left foot, requiring a limit of

4   "checking 2 hours at a time then 2 hours of other type of work, not standing in one

5   place," and "then another 2 hours of checking for a total of 4 hours of checking per

6   shift."

7        On October 8, 2012, Dr. Subotnick informed Safeway about the following

8   disability: On the job repetitive motion injury to my left foot, requiring that I work "as a

9   checker for [no more than] two hours at a time," then do other work "[a]fter two hours

10  of checking," with a "total of 4 hour per 8-hour day of checking."

11       On October 22, 2012, Dr. Subotnick informed Safeway about the following

12  disability: On the job repetitive motion injury to my left foot, repeating the above

13  requirement described on October 8, 2012.

14       On December 11, 2012, Dr. Subotnick informed Safeway about the following

15  disability: On the job repetitive motion injury to my left foot, repeating the above

16  requirement described on October 8, 2012.

17       On January 22, 2013, Dr. Subotnick informed Safeway about the following

18  disability: On the job repetitive motion injury to my left foot, requiring that: "[I] have a

19  stool at [my] check stand," and "not spend more than two hours checking at any one

20  time without doing other work."

21       On April 23, 2013, Dr. Subotnick informed Safeway about the following

22  disability: On the job repetitive motion injury to my left foot, requiring "[I have] a stool

23  that [I] [use] while checking," stating "[t]he stool has wheels and helps [me]

24  considerably."

25       On May 14, 2013, Dr. Subotnick informed Safeway about the following disability:

26  On the job repetitive motion injury to my left foot, requiring that I "[use] a stool with

27  wheels, while checking."

28       On July 31, 2013, Dr. Schwartz informed Safeway about the following disability:

1  On the job repetitive motion injury to my hands, requiring that my "checking is limited
2  to two hours a day."

3      On August 16, 2013, Dr. Schwartz informed Safeway about the following
4  disability: On the job repetitive motion injury to my hands, requiring "no more than 2
5  hours of checking per day," "no more than six hours per week of checking," and "part-
6  time hours only."

7      On September 19, 2013, Dr. Schwartz informed Safeway about the following
8  disability: On the job repetitive motion injury to my hands, repeating the above
9  requirement described on August 16, 2013. This time, Dr. Schwartz informed Safeway
10 that he was releasing me to "full duty work because [I] was afraid that [I would] will lose
11 [my] job." This was because Safeway falsely told me that light duty work was no longer
12 available to me and that I would not have a job if I did not come back to work without
13 restrictions. I relayed this to Dr. Schwartz. He informed Safeway that his "prognosis
14 [was] guarded" and that "it [was] unclear as to whether [I could] tolerate full duty
15 work."

16     On November 11, 2013, Dr. Subtonick informed Safeway about the following
17 disability: On the job repetitive motion injury to my left foot, requiring that I use a "stool
18 with wheels, while checking."

19     In 2014, I complained verbally to Safeway every day that I worked. My
20 complaints included needing accommodations for my disability. I detail some of those
21 complaints below.

22     On January 2, 2014, I left a note taped to the desk in the manager's office. It said:
23         To whom it may concern:
24         Please keep my stool accessible. I am continuously without a stool because
25     I cannot locate it. This is my accommodation from 2012, when HR Manager Dina
26     Woods brought me, my stool and told Brian Sullivan & Kelli Snow, to keep my
27     stool locked up in office, no one is to use it. I come to work on other days and
28     people are using my stool. I have to ask management to retrieve - please help me.

1    Debra Horn.

2        On February 6, 2014, I left a note taped to the desk in the manager's office.  It

3    said:

4            To: Management –

5            I was not able to locate my stool, again.  Please this is part of my

6        accommodation since 2012 – I am in a lot of pain cause not having a stool.

7        Please make sure it is accessible – Thanks – Debra Horn.

8        On February 10, 2014, Dr. Subotnick informed Safeway about the following

9    disability: On the job repetitive motion injury to my left foot, requiring that I use "a stool

10   with wheels while checking."

11       On May 14, 2014, Dr. Subotnick informed Safeway about the following disability:

12   On the job repetitive motion injury to my left foot, requiring that I use "a stool with

13   wheels, while checking."

14       During the period of July 2, 2014 to July 7, 2014, I worked 6 days.  On 4 of those

15   6 days, I was required to work more than 2 hours in a 4 hour period.  On all 6 days I was

16   unable to find my stool.  When I approached Brian Sullivan about the lack of

17   accommodations regarding working 2 hours out of 4, he harshly told me that "the store

18   needs you to check more than you are supposed to at times, I cannot help it if the

19   customers need help."  When I said that my stool was never available, he said "I don't

20   know where it is" and that he can't control who goes in and out of the office.

21       On July 4, 2014, I left a note taped to the desk in the manager's office.  It said:

22           Management –

23           Again I could not locate my stool, please keep in office where it is suppose

24       to be kept – Also last week, I had to get it from Employees who were using it.

25       This is not suppose to happen – Please find my stool – Thanks – Debra Horn."

26       In 2015, I occasionally complained verbally to Safeway about needing

27   accommodations for my disability.  However, while Amadeu Oliveira was store manager

28   in 2015, I rarely had issues because he actively provided the accommodation I needed.

It was only when management under his supervision did not follow his instructions that I had to make such complaints.

In 2016, I complained verbally to Safeway twice a day during the days that I worked. My complaints included needing accommodations for my disability. I detail some of those complaints below.

On August 26, 2016, I left a note taped to the desk in the manager's office. It said:

> Management
>
> I cannot find my stool - please keep in office – I asked everybody, nobody had seen it. I had courtesy clerks look in offices, breakroom, other dept. No stool – I need my stool to work – it is part of my accommodation – Thanks Debra Horn."

On December 3, 2016, Dr. Lee informed Safeway about the following disabilities: On the job fall injury to my knees, repetitive motion injury to my left foot, and repetitive motion injury to my hands, requiring "[r]epetitive right hand motions" restricted to no more than "25% of shift," "[r]epetitive left hand motions" restricted to no more than "25% of shift," that I "[l]ift/[c]arry/[p]ush/[p]ull no more than 10 pounds," and that I "[l]imit standing/walking to 10 minutes/hour," with "[n]o pivoting, kneeling, squatting, stooping, or crawling." Assistant Manager Jessica Taylor assured my union representative Jamie Moore and me that I would have a stool and a courtesy clerk to bag while I checked, so that I would not pivot and so that I would not stand for more than ten minutes per hour.

On June 1, 2018, Dr. Martinovsky informed Safeway about the following disability: On the job repetitive motion injury to my left foot as well as to my hands, requiring "limited standing" and "walking for 10 minutes per hour;" "no kneeling and squatting;" and "no forceful gripping or squeezing with both hands."

On January 15, 2019, Dr. Roth informed Safeway about the following disability: On the job repetitive motion injury to my left foot, requiring "limitations of 2 hours of

1  standing twice a day," and "a total of 4 hours per day standing."

2  On February 26, 2019, Dr. Roth informed Safeway about the following disability:

3  On the job repetitive motion injury to my left foot, requiring a limit of "standing two

4  hours followed by a 15 minute rest," "2 times per day."

5  **B.   Failure to Properly Engage in the Interactive Process**

6  Throughout my employment with Safeway, there were plenty of opportunities to

7  accommodate my disabilities, allowing me to continue to work.  These include

8  opportunities to allow me to (1) use a stool while working the checkout stand, (2) work

9  as a day stocker without asking me to work the checkout stand for more than two hours,

10  (3) work in self-checkout, (4) work as a produce clerk, (5) work as a dairy clerk, (6) work

11  as a liquor clerk, (7) work as a bookkeeper, or (8) work as a general merchandise clerk.

12  Safeway usually did not allow any of these.  Safeway did not claim it could not do any of

13  these, it simply told me it did not have to.  Safeway also did not make any effort to

14  explore other possible ways to accommodate my disabilities.  I detail examples below:

15  On November 25, 2009, Brian Sullivan, store manager, asked me to again

16  provide him with a restriction sheet.  When I gave it to him, he threw it in my face and

17  told me to either do what I was told or get another job.

18  From the time period of July 2010 the stool that Safeway knew I needed to

19  accommodate my disability while checking would be unavailable to me.  Sometimes it

20  would just be gone.  Sometimes another employee would take it and not want to give it

21  back and the managers would not provide one for me.  Sometimes it would be placed in

22  a locked room where I could not get to it.  I would tell Safeway verbally about the need

23  for a stool and the lack of a stool quite often with little result.

24  On June 12, 2012, I told Brian Sullivan that Assistant Manager Ben Beede was

25  not letting me use my stool.

26  On June 18, 2012, I spoke with HR Representative Lynette Ledesma about

27  accommodations for my disability; she told me that to use a stool in the check stand, I

28  would need to provide a note from my doctor.

---

On June 21, 2012, Ron Shepard, person in charge, sent me home limping after I was unable to work standing in the same place more than 2 hours in a 4 hour time period.

On or about July 13, 2012, Assistant Managers Ben Beede and Michael Gravelle took me into the back room and questioned me about my use of a stool, which I had been sitting on. I had been using an extra stool that was from our sushi bar, which had so many extra stools that the sushi bar staff had also put one of them in the break room. Beede repeatedly had the stool I was using removed from the check out stand I used even though it was an extra check out lane that only I used. Beede continued to do so and Gravelle made no effort to ensure I could use a stool while checking.

On August 2, 2012, I gave a written note to Brian Sullivan, Marsha Kessler, Lynette Ledesma, and MaryAnn Weathers that said "I am a disabled person, with a permanent and stationary restriction for work. You have not honored these restrictions for some time. I don't know when you are going to accept this, but in the meantime I am continuing to hurt myself further. Please talk to me about what you can do to obey these restrictions. You are retaliating against me. This has been going on for some time and I refuse to allow you to treat me and my condition this way."

On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said that Mr. Beede was discriminating and retaliating against me by continuing to keep me from using a stool while checking.

On February 13, 2013, HR manager Dina Woods brought me a stool and told me that had been allocated solely for my use and would be kept in the manager's office for me. Despite this, it was rarely kept in the manager's office and I was continually looking for it.

In 2014, I complained verbally to Safeway every day that I worked. My complaints included needing accommodations for my disability. I detail some of those complaints below.

During the period of January 2, 2014 to February 8, 2014 I worked 22 days and

1   on 18 of those days, Safeway required me to work check out for more than 2 hours in a 4

2   hour period, without a stool.  Safeway did this through Michael Vasquez, Michael

3   Gravelle, Brian Sullivan, Armando last name unknown (person in charge) Ben Beede,

4   Front End Manager Robin Hill, Kelli Snow, and Alfonso Balboa (person in charge).

5        On January 2, 2014, I left a note taped to the desk in the manager's office.  It said:

6           To whom it may concern:

7           Please keep my stool accessible.  I am continuously without a stool because

8   I cannot locate it.  This is my accommodation from 2012, when HR Manager Dina

9   Woods brought me, my stool and told Brian Sullivan & Kelli Snow, to keep my

10  stool locked up in office, no one is to use it.  I come to work on other days and

11  people are using my stool.  I have to ask management to retrieve - please help me.

12  Debra Horn.

13       On February 6, 2014, I left a note taped to the desk of the manager's office.  It

14  said:

15          To: Management –

16          I was not able to locate my stool, again.  Please this is part of my

17  accommodation since 2012 – I am in a lot of pain cause not having a stool Please

18  make sure it is accessible – Thanks – Debra Horn."

19       During the period of July 2, 2014 to July 7, 2014, I worked 6 days.  On 4 of those

20  6 days, I was required to work the check out stand for more than 2 hours in a 4 hour

21  period.  On all 6 days I was unable to find my stool.  When I approached Brian Sullivan

22  about the lack of accommodations regarding working 2 hours out of 4, he harshly told

23  me that "the store needs you to check more than you are supposed to at times, I cannot

24  help it if the customers need help."  When I said that my stool was never available, he

25  said "I don't know where it is" and that he can't control who goes in and out of the office.

26       On July 4, 2014, I left a note taped to the desk in the manager's office.  It said:

27          Management –

28          Again I could <u>not</u> locate my <u>stool</u>, please keep in office where it is suppose

to be kept – Also last week, I had to get it from Employees who were using it. This is not suppose to happen – Please find my stool – Thanks – Debra Horn.

On December 4, 2014, I left a note taped to the desk in the manager's office. It said:

> Managers – Please locate my stool <u>again</u> I cam to work & could not locate it. I had courtesy clerks help to find it – it is always placed in different places – supposed to be in office – <u>only</u>, per Dina Woods – H.R. – Debra Horn.

On December 25, 2014, I left a note taped to the desk in the manager's office. It said:

> Management,
>
> I really need my stool available <u>all</u> the <u>time</u>, I keep having to look for it ½ the time I never find it, then I let you know and it appears. I need my stool for my injury – Debra Horn.

In 2015, I complained verbally to Safeway more than once a week during the weeks that I worked about needing accommodations for my disability.

On June 8, 2015, I left a note taped to the desk in the manager's office. It said:

> Managers –
>
> Could not find my stool, asked courtesy clerks to help me find. No luck – asked checkers if they saw – No one knew. It is quite a problem to find & use. Most of the time I don't find it. Please keep in office, that is where it is suppose to be kept – Thanks Debra Horn.

In 2016, I complained verbally to Safeway twice a day during the days that I worked. I detail some of those complaints below.

On August 6, 2016, like on a lot of days, I could not find my stool. It was not available to me in the manager's office. I asked other employees to help look for it in locked offices, in the breakroom and in other departments. I left a note for management. I never did find it that day.

On August 26, 2016, I left a note taped to the desk in the manager's office. It

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 14

1   said:

2           Management

3           I cannot find my stool - please keep in office – I asked everybody, nobody

4   had seen it.  I had courtesy clerks look in offices, breakroom, other dept.  No stool

5   – I need my stool to work – it is part of my accommodation – Thanks Debra

6   Horn.

7           During September of 2016, Store Manager Michael Vasquez would constantly ask

8   me to check more than 2 hours out of 4 in spite of me pointing out to him that this went

9   against my accommodations for my disability.

10          On September 6, 2016, I left a note taped to the desk in the manager's office.  It

11  said:

12          Managers

13          I really need my stool, been since 2012 for OK for my stool – suppose to be

14  kept in office – without my stool – I hurt more – Please keep in office to I can get

15  to it.  Thanks Debra Horn.

16          On September 7, 2016, I started working in the check stand at 2:00 p.m. and

17  should have been accommodated for my disability with a 15 minute sit-down break that

18  would allow me to ice my foot.  I called for a break at 3:55 p.m. but was not able to take a

19  break until 4:31 p.m.  This was a very typical pattern.  I would always need to ask for the

20  break that I needed and I would not get the break until much later.  By the time I had

21  been checking for two hours I was in intolerable pain.

22          On September 25, 2016, I had to call 4 times for my break and still was not

23  allowed to take my 15 minute break to ice my foot until 4:22 p.m. when it should have

24  happened at 4:00 p.m.  By the time I had been checking for two hours I was in

25  intolerable pain.

26          On October 3, 2016, I started working in the check stand at 2:00 p.m. and was

27  not allowed to take a sit-down break to ice my foot until 4:43 p.m. when it should have

28  been at 4:00 p.m.  By the time I had been checking for two hours I was in intolerable

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 15

pain.

On October 5, 2016, Assistant Manager Jerry Hunt, asked me to work past the amount of time I should to accommodate my disability and when I refused, he retaliated by not letting me take my break until 48 minutes after it should have been scheduled and by taking me off my break at 10 minutes instead of 15 minutes. By the time I had been checking for two hours I was in intolerable pain.

On October 9, 2016, I left a note taped to the desk in the manager's office. It said:

Management:

Came to work today, could not locate stool – Erick said that Kelli locked it up in file maintenance room – asked to check room – she said it is not in there. Please keep my stool available for me Debra Horn.

On October 10, 2016, I was not allowed a break until 2 hours and 35 minutes after I started in the check stand, 35 minutes past the time my accommodations for my disability specified. By the time I had been checking for two hours I was in intolerable pain.

On October 28, 2016, I started work at 2:00 p.m. and in spite of asking for relief several times so that I could have a sit-down break to ice my foot, nobody ever relieved me. Finally, at 5:03 p.m., I closed myself off and took my break, 63 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On October 30, 2016, I started work at 2:00 p.m. and in spite of asking for relief so that I could have a sit-down break to ice my foot, nobody ever relieved me. Finally, at 4:35 p.m., I closed myself off and took my break, 35 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On October 31, 2016, I started work at 2:00 p.m. and was not relieved until 4:51. I my break, 51 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On November 2, 2016, I started work at 2:00 p.m. and was not relieved until 4:28

p.m. in spite of calling for relief at 3:58 p.m. and again at 4:16 p.m. My break started 28 minutes after I should have iced my foot.  My second break to ice my foot should have been at 8:30 but I was not relieved until 8:43.  My break started 13 minutes after I should have iced my foot.  By the time I had been checking for two hours I was in intolerable pain.

On November 3, 2016, Maniya Darden asked me at 7:00 p.m. to work in the check stand for 1 hour in spite of me having already worked the 2 hours I could work with my disability.  Ms. Darden said her request was at the direct order of Assistant Manager Jessica Taylor.

On November 9, 2016, I could not find my stool; Harbans Kaur told me that Bookkeeper Kelli Snow had told her to move my stool to the training room.  I did not have access to this locked room and Ms. Snow (who had the key) had left for the day could not use the stool at all.  I left a note taped to the desk in the manager's office.  It said:

"Managers –

Again no stool today – Harbans said she was asked to put in training room by Kelli.  I need my stool to work it is part of my accommodation – since 2012 – causes me more pain without stool, Debra Horn.

Also on November 9, 2016, I started work at 2:00 p.m. and was not relieved until 4:37 p.m. My break started 37 minutes after I should have iced my foot.  My second break to ice my foot should have been at 8:45 but I was not relieved until 10:02.  My break started 17 minutes after I should have iced my foot.  By the time I had been checking for two hours I was in intolerable pain.

On November 14, 2016, I started work at 2:00 p.m. and was not relieved until 4:28 p.m. My break started 28 minutes after I should have iced my foot.  By the time I had been checking for two hours I was in intolerable pain.

On November 17, 2016, Nobody relieved me at the check stand and I finally close my check stand off so I could take a break and ice my foot.  By the time I had been

checking for two hours I was in intolerable pain.

On November 23, 2016, I was not relieved from the check stand in time to ice my foot after working 2 hours. When I brought this to management's attention, they did not show any interest in accommodating my disability. By the time I had been checking for two hours I was in intolerable pain.

On November 27, 2016, 2 days after my workplace injury, Assistant Manager Jerry Hunt, made me work almost 3 hours in the check stand even though I should work 2 hours at the most in a 4 hour period. By the time I had been checking for two hours I was in intolerable pain.

On November 28, 2016, I called HR Manager Dina Woods and told her that discrimination was still occurring and that my disabilities were not being accommodated. She told me to fax her a copy of my work restrictions, and I did. She never took steps to ensure that Safeway would accommodate my disability.

On December 3, 2016, Dr. Lee informed Safeway about the following disabilities: On the job fall injury to my knees, repetitive motion injury to my left foot, and repetitive motion injury to my hands, requiring "[r]epetitive right hand motions" restricted to no more than "25% of shift," "[r]epetitive left hand motions" restricted to no more than "25% of shift," that I "[l]ift/[c]arry/[p]ush/[p]ull no more than 10 pounds," and that I "[l]imit standing/walking to 10 minutes/hour," with "[n]o pivoting, kneeling, squatting, stooping, or crawling." Assistant Manager Jessica Taylor assured my union representative Jamie Moore and me that I would have a stool and a courtesy clerk to bag while I checked, so that I would not pivot and so that I would not stand for more than ten minutes per hour.

On December 4, 2016, I worked in the check stand and called 8 times for courtesy clerks to bag for me between 3:00 p.m. and 3:50 p.m. Assistant Manager Jessica Taylor ignored my 8 calls. Assistant Manager Jerry Hunt also ignored my calls. When Mr. Hunt walked by the check stand where I was working, I asked him for a bagger and he said that the store only had 3 baggers and that they were bagging at other check stands.

1  I was required to bag for customers, which forced me to repeatedly stand and pivot,

2  causing me intense pain.

3       Also on December 4, 2016, I was working as a greeter in the evening.  Per Doctor

4  Lee, the injuries to my knees required that I not kneel, squat or stoop and that I limit

5  standing and walking to 10 minutes per hour.  I was given a chair to sit on while working

6  as greeter that was so low as to create a kneeling position, which aggravated my knees.

7  Assistant Manager Jerry Hunt, kept pacing back and forth in front of me which was

8  intimidating as he did not appear to have any work to do there.  When I complained to

9  Mr. Hunt about the low chair aggravating my knees, he told me that it was the only chair

10  available to me, even though the store had a wide variety of chairs.

11       On December 16, 2016, I was required to check for 2 ½ hours, 30 minutes

12  beyond what I should have worked.  I also did not have a courtesy clerk available to bag

13  so I was forced to bag for customers, which forced me to repeatedly stand and pivot,

14  causing me intense pain.

15       On May 9, 2017, I filed charges of disability discrimination and retaliation with

16  the California Department of Fair Employment & Housing and the U.S. Equal

17  Employment Opportunity Commission against Safeway.

18      **C.   Failure to Reasonably Accommodate**

19       Throughout my employment with Safeway, there were plenty of opportunities to

20  accommodate my disabilities, allowing me to continue to work.  These include

21  opportunities to allow me to (1) use a stool while working the checkout stand, (2) work

22  as a day stocker without asking me to work the checkout stand for more than two hours,

23  (3) work in self-checkout, (4) work as a produce clerk, (5) work as a dairy clerk, (6) work

24  as a liquor clerk, (7) work as a bookkeeper, or (8) work as a general merchandise clerk.

25  Safeway usually did not allow any of these.  Safeway did not claim it could not do any of

26  these, it simply told me it did not have to.  Safeway also did not make any effort to

27  explore other possible ways to accommodate my disabilities.  I detail examples below:

28       On November 25, 2009, Brian Sullivan, store manager, asked me to again

---

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 19

1  provide him with a restriction sheet.  When I gave it to him, he threw it in my face and

2  told me to either do what I was told or get another job.

3      From the time period of July 2010 the stool that Safeway knew I needed to

4  accommodate my disability while checking would be unavailable to me.  Sometimes it

5  would just be gone.  Sometimes another employee would take it and not want to give it

6  back and the managers would not provide one for me.  Sometimes it would be placed in

7  a locked room where I could not get to it.  I would tell Safeway verbally about the need

8  for a stool and the lack of a stool quite often with little result.

9      On June 12, 2012, I told Brian Sullivan that Assistant Manager Ben Beede was

10  not letting me use my stool.

11      On June 18, 2012, I spoke with HR Representative Lynette Ledesma about

12  accommodations for my disability; she told me that to use a stool in the check stand, I

13  would need to provide a note from my doctor.

14      On June 21, 2012, Ron Shepard, person in charge, sent me home limping after I

15  was unable to work standing in the same place more than 2 hours in a 4 hour time

16  period.

17      On or about July 13, 2012, Assistant Managers Ben Beede and Michael Gravelle

18  took me into the back room and questioned me about my use of a stool, which I had

19  been sitting on.  I had been using an extra stool that was from our sushi bar, which had

20  so many extra stools that the sushi bar staff had also put one of them in the break room.

21  Beede repeatedly had the stool I was using removed from the check out stand I used

22  even though it was an extra check out lane that only I used.  Beede continued to do so

23  and Gravelle made no effort to ensure I could use a stool while checking.

24      On August 2, 2012, I gave a written note to Brian Sullivan, Marsha Kessler,

25  Lynette Ledesma, and MaryAnn Weathers that said "I am a disabled person, with a

26  permanent and stationary restriction for work.  You have not honored these restrictions

27  for some time.  I don't know when you are going to accept this, but in the meantime I am

28  continuing to hurt myself further.  Please talk to me about what you can do to obey these

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 20

1   restrictions. You are retaliating against me. This has been going on for some time and I

2   refuse to allow you to treat me and my condition this way."

3        On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said

4   that Mr. Beede was discriminating and retaliating against me by continuing to keep me

5   from using a stool while checking.

6        On February 13, 2013, HR manager Dina Woods brought me a stool and told me

7   that had been allocated solely for my use and would be kept in the manager's office for

8   me. Despite this, it was rarely kept in the manager's office and I was continually looking

9   for it.

10       In 2014, I complained verbally to Safeway every day that I worked. My

11  complaints included needing accommodations for my disability. I detail some of those

12  complaints below.

13       During the period of January 2, 2014 to February 8, 2014 I worked 22 days and

14  on 18 of those days, Safeway required me to work check out for more than 2 hours in a 4

15  hour period, without a stool. Safeway did this through Michael Vasquez, Michael

16  Gravelle, Brian Sullivan, Armando last name unknown (person in charge) Ben Beede,

17  Front End Manager Robin Hill, Kelli Snow, and Alfonso Balboa (person in charge).

18       On January 2, 2014, I left a note taped to the desk in the manager's office. It said:

19            To whom it may concern:

20            Please keep my stool accessible. I am continuously without a stool because

21       I cannot locate it. This is my accommodation from 2012, when HR Manager Dina

22       Woods brought me, my stool and told Brian Sullivan & Kelli Snow, to keep my

23       stool locked up in office, no one is to use it. I come to work on other days and

24       people are using my stool. I have to ask management to retrieve - please help me.

25       Debra Horn.

26       On February 6, 2014, I left a note taped to the desk of the manager's office. It

27  said:

28            To: Management –

I was not able to locate my stool, again.  Please this is part of my accommodation since 2012 – I am in a lot of pain cause not having a stool Please make sure it is accessible – Thanks – Debra Horn."

During the period of July 2, 2014 to July 7, 2014, I worked 6 days.  On 4 of those 6 days, I was required to work the check out stand for more than 2 hours in a 4 hour period.  On all 6 days I was unable to find my stool.  When I approached Brian Sullivan about the lack of accommodations regarding working 2 hours out of 4, he harshly told me that "the store needs you to check more than you are supposed to at times, I cannot help it if the customers need help."  When I said that my stool was never available, he said "I don't know where it is" and that he can't control who goes in and out of the office.

On July 4, 2014, I left a note taped to the desk in the manager's office.  It said:

Management –

Again I could <u>not</u> locate my <u>stool</u>, please keep in office where it is suppose to be kept – Also last week, I had to get it from Employees who were using it.  This is not suppose to happen – Please find my stool – Thanks – Debra Horn.

On December 4, 2014, I left a note taped to the desk in the manager's office.  It said:

Managers – Please locate my stool <u>again</u> I cam to work & could not locate it.  I had courtesy clerks help to find it – it is always placed in different places – supposed to be in office – <u>only</u>, per Dina Woods – H.R. – Debra Horn.

On December 25, 2014, I left a note taped to the desk in the manager's office.  It said:

Management,

I really need my stool available <u>all</u> the <u>time</u>, I keep having to look for it ½ the time I never find it, then I let you know and it appears.  I need my stool for my injury – Debra Horn.

In 2015, I complained verbally to Safeway more than once a week during the weeks that I worked about needing accommodations for my disability.

On June 8, 2015, I left a note taped to the desk in the manager's office.  It said:

Managers –

Could not find my stool, asked courtesy clerks to help me find.  No luck – asked checkers if they saw – No one knew.  It is quite a problem to find & use.  Most of the time I don't find it.  Please keep in office, that is where it is suppose to be kept – Thanks Debra Horn.

In 2016, I complained verbally to Safeway twice a day during the days that I worked.  I detail some of those complaints below.

On August 6, 2016, like on a lot of days, I could not find my stool.  It was not available to me in the manager's office.  I asked other employees to help look for it in locked offices, in the breakroom and in other departments.  I left a note for management.  I never did find it that day.

On August 26, 2016, I left a note taped to the desk in the manager's office.  It said:

Management

I <u>cannot find</u> my stool - please keep in office – I asked everybody, nobody had seen it.  I had courtesy clerks look in offices, breakroom, other dept.  No stool – I need my stool to work – it is part of my accommodation – Thanks Debra Horn.

During September of 2016, Store Manager Michael Vasquez would constantly ask me to check more than 2 hours out of 4 in spite of me pointing out to him that this went against my accommodations for my disability.

On September 6, 2016, I left a note taped to the desk in the manager's office.  It said:

Managers

I really need my stool, been since 2012 for OK for my stool – suppose to be kept in office – without my stool – I hurt more – Please keep in office to I can get to it.  Thanks Debra Horn.

---

1   On September 7, 2016, I started working in the check stand at 2:00 p.m. and

2   should have been accommodated for my disability with a 15 minute sit-down break that

3   would allow me to ice my foot. I called for a break at 3:55 p.m. but was not able to take a

4   break until 4:31 p.m. This was a very typical pattern. I would always need to ask for the

5   break that I needed and I would not get the break until much later. By the time I had

6   been checking for two hours I was in intolerable pain.

7   On September 25, 2016, I had to call 4 times for my break and still was not

8   allowed to take my 15 minute break to ice my foot until 4:22 p.m. when it should have

9   happened at 4:00 p.m. By the time I had been checking for two hours I was in

10  intolerable pain.

11  On October 3, 2016, I started working in the check stand at 2:00 p.m. and was

12  not allowed to take a sit-down break to ice my foot until 4:43 p.m. when it should have

13  been at 4:00 p.m. By the time I had been checking for two hours I was in intolerable

14  pain.

15  On October 5, 2016, Assistant Manager Jerry Hunt, asked me to work past the

16  amount of time I should to accommodate my disability and when I refused, he retaliated

17  by not letting me take my break until 48 minutes after it should have been scheduled

18  and by taking me off my break at 10 minutes instead of 15 minutes. By the time I had

19  been checking for two hours I was in intolerable pain.

20  On October 9, 2016, I left a note taped to the desk in the manager's office. It said:

21      Management:

22      Came to work today, could not locate stool – Erick said that Kelli locked it

23      up in file maintenance room – asked to check room – she said it is not in there.

24      Please keep my stool available for me Debra Horn.

25  On October 10, 2016, I was not allowed a break until 2 hours and 35 minutes

26  after I started in the check stand, 35 minutes past the time my accommodations for my

27  disability specified. By the time I had been checking for two hours I was in intolerable

28  pain.

1    On October 28, 2016, I started work at 2:00 p.m. and in spite of asking for relief
2    several times so that I could have a sit-down break to ice my foot, nobody ever relieved
3    me. Finally, at 5:03 p.m., I closed myself off and took my break, 63 minutes after I
4    should have iced my foot. By the time I had been checking for two hours I was in
5    intolerable pain.

6    On October 30, 2016, I started work at 2:00 p.m. and in spite of asking for relief
7    so that I could have a sit-down break to ice my foot, nobody ever relieved me. Finally, at
8    4:35 p.m., I closed myself off and took my break, 35 minutes after I should have iced my
9    foot. By the time I had been checking for two hours I was in intolerable pain.

10    On October 31, 2016, I started work at 2:00 p.m. and was not relieved until 4:51.
11    I my break, 51 minutes after I should have iced my foot. By the time I had been
12    checking for two hours I was in intolerable pain.

13    On November 2, 2016, I started work at 2:00 p.m. and was not relieved until 4:28
14    p.m. in spite of calling for relief at 3:58 p.m. and again at 4:16 p.m. My break started 28
15    minutes after I should have iced my foot. My second break to ice my foot should have
16    been at 8:30 but I was not relieved until 8:43. My break started 13 minutes after I
17    should have iced my foot. By the time I had been checking for two hours I was in
18    intolerable pain.

19    On November 3, 2016, Maniya Darden asked me at 7:00 p.m. to work in the
20    check stand for 1 hour in spite of me having already worked the 2 hours I could work
21    with my disability. Ms. Darden said her request was at the direct order of Assistant
22    Manager Jessica Taylor.

23    On November 9, 2016, I could not find my stool; Harbans Kaur told me that
24    Bookkeeper Kelli Snow had told her to move my stool to the training room. I did not
25    have access to this locked room and Ms. Snow (who had the key) had left for the day
26    could not use the stool at all. I left a note taped to the desk in the manager's office. It
27    said:

28    "Managers –

1   Again no stool today – Harbans said she was asked to put in training room

2   by Kelli.  I need my stool to work it is part of my accommodation – since 2012 –

3   causes me more pain without stool, Debra Horn.

4   Also on November 9, 2016, I started work at 2:00 p.m. and was not relieved until

5   4:37 p.m. My break started 37 minutes after I should have iced my foot.  My second

6   break to ice my foot should have been at 8:45 but I was not relieved until 10:02.  My

7   break started 17 minutes after I should have iced my foot.  By the time I had been

8   checking for two hours I was in intolerable pain.

9   On November 14, 2016, I started work at 2:00 p.m. and was not relieved until

10   4:28 p.m. My break started 28 minutes after I should have iced my foot.  By the time I

11   had been checking for two hours I was in intolerable pain.

12   On November 17, 2016, Nobody relieved me at the check stand and I finally close

13   my check stand off so I could take a break and ice my foot.  By the time I had been

14   checking for two hours I was in intolerable pain.

15   On November 23, 2016, I was not relieved from the check stand in time to ice my

16   foot after working 2 hours.  When I brought this to management's attention, they did

17   not show any interest in accommodating my disability.  By the time I had been checking

18   for two hours I was in intolerable pain.

19   On November 27, 2016, 2 days after my workplace injury, Assistant Manager

20   Jerry Hunt, made me work almost 3 hours in the check stand even though I should work

21   2 hours at the most in a 4 hour period.  By the time I had been checking for two hours I

22   was in intolerable pain.

23   On November 28, 2016, I called HR Manager Dina Woods and told her that

24   discrimination was still occurring and that my disabilities were not being

25   accommodated.  She told me to fax her a copy of my work restrictions, and I did.  She

26   never took steps to ensure that Safeway would accommodate my disability.

27   On December 3, 2016, Dr. Lee informed Safeway about the following disabilities:

28   On the job fall injury to my knees, repetitive motion injury to my left foot, and repetitive

1   motion injury to my hands, requiring "[r]epetitive right hand motions" restricted to no

2   more than "25% of shift," "[r]epetitive left hand motions" restricted to no more than

3   "25% of shift," that I "[l]ift/[c]arry/[p]ush/[p]ull no more than 10 pounds," and that I

4   "[l]imit standing/walking to 10 minutes/hour," with "[n]o pivoting, kneeling, squatting,

5   stooping, or crawling." Assistant Manager Jessica Taylor assured my union

6   representative Jamie Moore and me that I would have a stool and a courtesy clerk to bag

7   while I checked, so that I would not pivot and so that I would not stand for more than

8   ten minutes per hour.

9        On December 4, 2016, I worked in the check stand and called 8 times for courtesy

10   clerks to bag for me between 3:00 p.m. and 3:50 p.m. Assistant Manager Jessica Taylor

11   ignored my 8 calls. Assistant Manager Jerry Hunt also ignored my calls. When Mr.

12   Hunt walked by the check stand where I was working, I asked him for a bagger and he

13   said that the store only had 3 baggers and that they were bagging at other check stands.

14   I was required to bag for customers, which forced me to repeatedly stand and pivot,

15   causing me intense pain.

16        Also on December 4, 2016, I was working as a greeter in the evening. Per Doctor

17   Lee, the injuries to my knees required that I not kneel, squat or stoop and that I limit

18   standing and walking to 10 minutes per hour. I was given a chair to sit on while working

19   as greeter that was so low as to create a kneeling position, which aggravated my knees.

20   Assistant Manager Jerry Hunt, kept pacing back and forth in front of me which was

21   intimidating as he did not appear to have any work to do there. When I complained to

22   Mr. Hunt about the low chair aggravating my knees, he told me that it was the only chair

23   available to me, even though the store had a wide variety of chairs.

24        On December 16, 2016, I was required to check for 2 ½ hours, 30 minutes

25   beyond what I should have worked. I also did not have a courtesy clerk available to bag

26   so I was forced to bag for customers, which forced me to repeatedly stand and pivot,

27   causing me intense pain.

28        On May 9, 2017, I filed charges of disability discrimination and retaliation with

1    the California Department of Fair Employment & Housing and the U.S. Equal

2    Employment Opportunity Commission against Safeway.

### D.  Discrimination

4         Throughout my employment with Safeway, there were plenty of opportunities to

5    accommodate my disabilities, allowing me to continue to work.  These include

6    opportunities to allow me to (1) use a stool while working the checkout stand, (2) work

7    as a day stocker without asking me to work the checkout stand for more than two hours,

8    (3) work in self-checkout, (4) work as a produce clerk, (5) work as a dairy clerk, (6) work

9    as a liquor clerk, (7) work as a bookkeeper, or (8) work as a general merchandise clerk.

10   Safeway usually did not allow any of these.  Safeway did not claim it could not do any of

11   these, it simply told me it did not have to.  Safeway also did not make any effort to

12   explore other possible ways to accommodate my disabilities.  I detail examples below:

13        On November 25, 2009, Brian Sullivan, store manager, asked me to again

14   provide him with a restriction sheet.  When I gave it to him, he threw it in my face and

15   told me to either do what I was told or get another job.

16        From the time period of July 2010 the stool that Safeway knew I needed to

17   accommodate my disability while checking would be unavailable to me.  Sometimes it

18   would just be gone.  Sometimes another employee would take it and not want to give it

19   back and the managers would not provide one for me.  Sometimes it would be placed in

20   a locked room where I could not get to it.  I would tell Safeway verbally about the need

21   for a stool and the lack of a stool quite often with little result.

22        On June 12, 2012, I told Brian Sullivan that Assistant Manager Ben Beede was

23   not letting me use my stool.

24        On June 18, 2012, I spoke with HR Representative Lynette Ledesma about

25   accommodations for my disability; she told me that to use a stool in the check stand, I

26   would need to provide a note from my doctor.

27        On June 21, 2012, Ron Shepard, person in charge, sent me home limping after I

28   was unable to work standing in the same place more than 2 hours in a 4 hour time

period.

On or about July 13, 2012, Assistant Managers Ben Beede and Michael Gravelle took me into the back room and questioned me about my use of a stool, which I had been sitting on. I had been using an extra stool that was from our sushi bar, which had so many extra stools that the sushi bar staff had also put one of them in the break room. Beede repeatedly had the stool I was using removed from the check out stand I used even though it was an extra check out lane that only I used. Beede continued to do so and Gravelle made no effort to ensure I could use a stool while checking.

On August 2, 2012, I gave a written note to Brian Sullivan, Marsha Kessler, Lynette Ledesma, and MaryAnn Weathers that said "I am a disabled person, with a permanent and stationary restriction for work. You have not honored these restrictions for some time. I don't know when you are going to accept this, but in the meantime I am continuing to hurt myself further. Please talk to me about what you can do to obey these restrictions. You are retaliating against me. This has been going on for some time and I refuse to allow you to treat me and my condition this way."

On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said that Mr. Beede was discriminating and retaliating against me by continuing to keep me from using a stool while checking.

On February 13, 2013, HR manager Dina Woods brought me a stool and told me that had been allocated solely for my use and would be kept in the manager's office for me. Despite this, it was rarely kept in the manager's office and I was continually looking for it.

In 2014, I complained verbally to Safeway every day that I worked. My complaints included needing accommodations for my disability. I detail some of those complaints below.

During the period of January 2, 2014 to February 8, 2014 I worked 22 days and on 18 of those days, Safeway required me to work check out for more than 2 hours in a 4 hour period, without a stool. Safeway did this through Michael Vasquez, Michael

1    Gravelle, Brian Sullivan, Armando last name unknown (person in charge) Ben Beede,

2    Front End Manager Robin Hill, Kelli Snow, and Alfonso Balboa (person in charge).

3         On January 2, 2014, I left a note taped to the desk in the manager's office.  It said:

4              To whom it may concern:

5              Please keep my stool accessible.  I am continuously without a stool because

6    I cannot locate it.  This is my accommodation from 2012, when HR Manager Dina

7    Woods brought me, my stool and told Brian Sullivan & Kelli Snow, to keep my

8    stool locked up in office, no one is to use it.  I come to work on other days and

9    people are using my stool.  I have to ask management to retrieve - please help me.

10   Debra Horn.

11        On February 6, 2014, I left a note taped to the desk of the manager's office.  It

12   said:

13             To: Management –

14             I was not able to locate my stool, again.  Please this is part of my

15   accommodation since 2012 – I am in a lot of pain cause not having a stool Please

16   make sure it is accessible – Thanks – Debra Horn."

17        During the period of July 2, 2014 to July 7, 2014, I worked 6 days.  On 4 of those

18   6 days, I was required to work the check out stand for more than 2 hours in a 4 hour

19   period. On all 6 days I was unable to find my stool.  When I approached Brian Sullivan

20   about the lack of accommodations regarding working 2 hours out of 4, he harshly told

21   me that "the store needs you to check more than you are supposed to at times, I cannot

22   help it if the customers need help."  When I said that my stool was never available, he

23   said "I don't know where it is" and that he can't control who goes in and out of the office.

24        On July 4, 2014, I left a note taped to the desk in the manager's office.  It said:

25             Management –

26             Again I could not locate my stool, please keep in office where it is suppose

27   to be kept – Also last week, I had to get it from Employees who were using it.

28   This is not suppose to happen – Please find my stool – Thanks – Debra Horn.

1    On December 4, 2014, I left a note taped to the desk in the manager's office.  It

2    said:

3          Managers – Please locate my stool <u>again</u> I cam to work & could not locate

4    it.  I had courtesy clerks help to find it – it is always placed in different places –

5    supposed to be in office – <u>only</u>, per Dina Woods – H.R. – Debra Horn.

6    On December 25, 2014, I left a note taped to the desk in the manager's office.  It

7    said:

8          Management,

9          I really need my stool available <u>all</u> the <u>time</u>, I keep having to look for it ½

10   the time I never find it, then I let you know and it appears.  I need my stool for

11   my injury – Debra Horn.

12   In 2015, I complained verbally to Safeway more than once a week during the

13   weeks that I worked about needing accommodations for my disability.

14   On June 8, 2015, I left a note taped to the desk in the manager's office.  It said:

15          Managers –

16          Could not find my stool, asked courtesy clerks to help me find.  No luck –

17   asked checkers if they saw – No one knew.  It is quite a problem to find & use.

18   Most of the time I don't find it.  Please keep in office, that is where it is suppose to

19   be kept – Thanks Debra Horn.

20   In 2016, I complained verbally to Safeway twice a day during the days that I

21   worked.  I detail some of those complaints below.

22   On August 6, 2016, like on a lot of days, I could not find my stool.  It was not

23   available to me in the manager's office.  I asked other employees to help look for it in

24   locked offices, in the breakroom and in other departments.  I left a note for

25   management.  I never did find it that day.

26   On August 26, 2016, I left a note taped to the desk in the manager's office.  It

27   said:

28          <u>Management</u>

I <u>cannot</u> <u>find</u> my stool - please keep in office – I asked everybody, nobody had seen it.  I had courtesy clerks look in offices, breakroom, other dept.  No stool – I need my stool to work – it is part of my accommodation – Thanks Debra Horn.

During September of 2016, Store Manager Michael Vasquez would constantly ask me to check more than 2 hours out of 4 in spite of me pointing out to him that this went against my accommodations for my disability.

On September 6, 2016, I left a note taped to the desk in the manager's office.  It said:

> Managers
>
> I really need my stool, been since 2012 for OK for my stool – suppose to be kept in office – without my stool – I hurt more – Please keep in office to I can get to it.  Thanks Debra Horn.

On September 7, 2016, I started working in the check stand at 2:00 p.m. and should have been accommodated for my disability with a 15 minute sit-down break that would allow me to ice my foot.  I called for a break at 3:55 p.m. but was not able to take a break until 4:31 p.m.  This was a very typical pattern.  I would always need to ask for the break that I needed and I would not get the break until much later.  By the time I had been checking for two hours I was in intolerable pain.

On September 25, 2016, I had to call 4 times for my break and still was not allowed to take my 15 minute break to ice my foot until 4:22 p.m. when it should have happened at 4:00 p.m.  By the time I had been checking for two hours I was in intolerable pain.

On October 3, 2016, I started working in the check stand at 2:00 p.m. and was not allowed to take a sit-down break to ice my foot until 4:43 p.m. when it should have been at 4:00 p.m.  By the time I had been checking for two hours I was in intolerable pain.

On October 5, 2016, Assistant Manager Jerry Hunt, asked me to work past the

1  amount of time I should to accommodate my disability and when I refused, he retaliated

2  by not letting me take my break until 48 minutes after it should have been scheduled

3  and by taking me off my break at 10 minutes instead of 15 minutes.  By the time I had

4  been checking for two hours I was in intolerable pain.

5  On October 9, 2016, I left a note taped to the desk in the manager's office.  It said:

6  Management:

7  Came to work today, could not locate stool – Erick said that Kelli locked it

8  up in file maintenance room – asked to check room – she said it is not in there.

9  Please keep my stool available for me Debra Horn.

10  On October 10, 2016, I was not allowed a break until 2 hours and 35 minutes

11  after I started in the check stand, 35 minutes past the time my accommodations for my

12  disability specified.  By the time I had been checking for two hours I was in intolerable

13  pain.

14  On October 28, 2016, I started work at 2:00 p.m. and in spite of asking for relief

15  several times so that I could have a sit-down break to ice my foot, nobody ever relieved

16  me.  Finally, at 5:03 p.m., I closed myself off and took my break, 63 minutes after I

17  should have iced my foot.  By the time I had been checking for two hours I was in

18  intolerable pain.

19  On October 30, 2016, I started work at 2:00 p.m. and in spite of asking for relief

20  so that I could have a sit-down break to ice my foot, nobody ever relieved me.  Finally, at

21  4:35 p.m., I closed myself off and took my break, 35 minutes after I should have iced my

22  foot.  By the time I had been checking for two hours I was in intolerable pain.

23  On October 31, 2016, I started work at 2:00 p.m. and was not relieved until 4:51.

24  I my break, 51 minutes after I should have iced my foot.  By the time I had been

25  checking for two hours I was in intolerable pain.

26  On November 2, 2016, I started work at 2:00 p.m. and was not relieved until 4:28

27  p.m. in spite of calling for relief at 3:58 p.m. and again at 4:16 p.m. My break started 28

28  minutes after I should have iced my foot.  My second break to ice my foot should have

been at 8:30 but I was not relieved until 8:43. My break started 13 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On November 3, 2016, Maniya Darden asked me at 7:00 p.m. to work in the check stand for 1 hour in spite of me having already worked the 2 hours I could work with my disability. Ms. Darden said her request was at the direct order of Assistant Manager Jessica Taylor.

On November 9, 2016, I could not find my stool; Harbans Kaur told me that Bookkeeper Kelli Snow had told her to move my stool to the training room. I did not have access to this locked room and Ms. Snow (who had the key) had left for the day could not use the stool at all. I left a note taped to the desk in the manager's office. It said:

"Managers –

Again no stool today – Harbans said she was asked to put in training room by Kelli. I need my stool to work it is part of my accommodation – since 2012 – causes me more pain without stool, Debra Horn.

Also on November 9, 2016, I started work at 2:00 p.m. and was not relieved until 4:37 p.m. My break started 37 minutes after I should have iced my foot. My second break to ice my foot should have been at 8:45 but I was not relieved until 10:02. My break started 17 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On November 14, 2016, I started work at 2:00 p.m. and was not relieved until 4:28 p.m. My break started 28 minutes after I should have iced my foot. By the time I had been checking for two hours I was in intolerable pain.

On November 17, 2016, Nobody relieved me at the check stand and I finally close my check stand off so I could take a break and ice my foot. By the time I had been checking for two hours I was in intolerable pain.

On November 23, 2016, I was not relieved from the check stand in time to ice my

1  foot after working 2 hours.  When I brought this to management's attention, they did

2  not show any interest in accommodating my disability.  By the time I had been checking

3  for two hours I was in intolerable pain.

4      On November 27, 2016, 2 days after my workplace injury, Assistant Manager

5  Jerry Hunt, made me work almost 3 hours in the check stand even though I should work

6  2 hours at the most in a 4 hour period.  By the time I had been checking for two hours I

7  was in intolerable pain.

8      On November 28, 2016, I called HR Manager Dina Woods and told her that

9  discrimination was still occurring and that my disabilities were not being

10  accommodated.  She told me to fax her a copy of my work restrictions, and I did.  She

11  never took steps to ensure that Safeway would accommodate my disability.

12      On December 3, 2016, Dr. Lee informed Safeway about the following disabilities:

13  On the job fall injury to my knees, repetitive motion injury to my left foot, and repetitive

14  motion injury to my hands, requiring "[r]epetitive right hand motions" restricted to no

15  more than "25% of shift," "[r]epetitive left hand motions" restricted to no more than

16  "25% of shift," that I "[l]ift/[c]arry/[p]ush/[p]ull no more than 10 pounds," and that I

17  "[l]imit standing/walking to 10 minutes/hour," with "[n]o pivoting, kneeling, squatting,

18  stooping, or crawling."  Assistant Manager Jessica Taylor assured my union

19  representative Jamie Moore and me that I would have a stool and a courtesy clerk to bag

20  while I checked, so that I would not pivot and so that I would not stand for more than

21  ten minutes per hour.

22      On December 4, 2016, I worked in the check stand and called 8 times for courtesy

23  clerks to bag for me between 3:00 p.m. and 3:50 p.m.  Assistant Manager Jessica Taylor

24  ignored my 8 calls.  Assistant Manager Jerry Hunt also ignored my calls.  When Mr.

25  Hunt walked by the check stand where I was working, I asked him for a bagger and he

26  said that the store only had 3 baggers and that they were bagging at other check stands.

27  I was required to bag for customers, which forced me to repeatedly stand and pivot,

28  causing me intense pain.

1       Also on December 4, 2016, I was working as a greeter in the evening. Per Doctor

2 Lee, the injuries to my knees required that I not kneel, squat or stoop and that I limit

3 standing and walking to 10 minutes per hour. I was given a chair to sit on while working

4 as greeter that was so low as to create a kneeling position, which aggravated my knees.

5 Assistant Manager Jerry Hunt, kept pacing back and forth in front of me which was

6 intimidating as he did not appear to have any work to do there. When I complained to

7 Mr. Hunt about the low chair aggravating my knees, he told me that it was the only chair

8 available to me, even though the store had a wide variety of chairs.

9       On December 16, 2016, I was required to check for 2 ½ hours, 30 minutes

10 beyond what I should have worked. I also did not have a courtesy clerk available to bag

11 so I was forced to bag for customers, which forced me to repeatedly stand and pivot,

12 causing me intense pain.

13       On May 9, 2017, I filed charges of disability discrimination and retaliation with

14 the California Department of Fair Employment & Housing and the U.S. Equal

15 Employment Opportunity Commission against Safeway.

16     **E.   Failure to Prevent Discrimination**

17       Throughout my employment with Safeway, there were plenty of opportunities to

18 accommodate my disabilities, allowing me to continue to work. These include

19 opportunities to allow me to (1) use a stool while working the checkout stand, (2) work

20 as a day stocker without asking me to work the checkout stand for more than two hours,

21 (3) work in self-checkout, (4) work as a produce clerk, (5) work as a dairy clerk, (6) work

22 as a liquor clerk, (7) work as a bookkeeper, or (8) work as a general merchandise clerk.

23 Safeway usually did not allow any of these. Safeway did not claim it could not do any of

24 these, it simply told me it did not have to. Safeway also did not make any effort to

25 explore other possible ways to accommodate my disabilities. I detail examples below:

26       On November 25, 2009, Brian Sullivan, store manager, asked me to again

27 provide him with a restriction sheet. When I gave it to him, he threw it in my face and

28 told me to either do what I was told or get another job.

From the time period of July 2010 the stool that Safeway knew I needed to accommodate my disability while checking would be unavailable to me. Sometimes it would just be gone. Sometimes another employee would take it and not want to give it back and the managers would not provide one for me. Sometimes it would be placed in a locked room where I could not get to it. I would tell Safeway verbally about the need for a stool and the lack of a stool quite often with little result.

On June 12, 2012, I told Brian Sullivan that Assistant Manager Ben Beede was not letting me use my stool.

On June 18, 2012, I spoke with HR Representative Lynette Ledesma about accommodations for my disability; she told me that to use a stool in the check stand, I would need to provide a note from my doctor.

On June 21, 2012, Ron Shepard, person in charge, sent me home limping after I was unable to work standing in the same place more than 2 hours in a 4 hour time period.

On or about July 13, 2012, Assistant Managers Ben Beede and Michael Gravelle took me into the back room and questioned me about my use of a stool, which I had been sitting on. I had been using an extra stool that was from our sushi bar, which had so many extra stools that the sushi bar staff had also put one of them in the break room. Beede repeatedly had the stool I was using removed from the check out stand I used even though it was an extra check out lane that only I used. Beede continued to do so and Gravelle made no effort to ensure I could use a stool while checking.

On August 2, 2012, I gave a written note to Brian Sullivan, Marsha Kessler, Lynette Ledesma, and MaryAnn Weathers that said "I am a disabled person, with a permanent and stationary restriction for work. You have not honored these restrictions for some time. I don't know when you are going to accept this, but in the meantime I am continuing to hurt myself further. Please talk to me about what you can do to obey these restrictions. You are retaliating against me. This has been going on for some time and I refuse to allow you to treat me and my condition this way."

1   On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said

2   that Mr. Beede was discriminating and retaliating against me by continuing to keep me

3   from using a stool while checking.

4   On February 13, 2013, HR manager Dina Woods brought me a stool and told me

5   that had been allocated solely for my use and would be kept in the manager's office for

6   me.  Despite this, it was rarely kept in the manager's office and I was continually looking

7   for it.

8   In 2014, I complained verbally to Safeway every day that I worked.  My

9   complaints included needing accommodations for my disability.  I detail some of those

10   complaints below.

11   During the period of January 2, 2014 to February 8, 2014 I worked 22 days and

12   on 18 of those days, Safeway required me to work check out for more than 2 hours in a 4

13   hour period, without a stool.  Safeway did this through Michael Vasquez, Michael

14   Gravelle, Brian Sullivan, Armando last name unknown (person in charge) Ben Beede,

15   Front End Manager Robin Hill, Kelli Snow, and Alfonso Balboa (person in charge).

16   On January 2, 2014, I left a note taped to the desk in the manager's office.  It said:

17   To whom it may concern:

18   Please keep my stool accessible.  I am continuously without a stool because

19   I cannot locate it.  This is my accommodation from 2012, when HR Manager Dina

20   Woods brought me, my stool and told Brian Sullivan & Kelli Snow, to keep my

21   stool locked up in office, no one is to use it.  I come to work on other days and

22   people are using my stool.  I have to ask management to retrieve - please help me.

23   Debra Horn.

24   On February 6, 2014, I left a note taped to the desk of the manager's office.  It

25   said:

26   To: Management –

27   I was not able to locate my stool, again.  Please this is part of my

28   accommodation since 2012 – I am in a lot of pain cause not having a stool Please

---

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 38

make sure it is accessible – Thanks – Debra Horn."

During the period of July 2, 2014 to July 7, 2014, I worked 6 days.  On 4 of those 6 days, I was required to work the check out stand for more than 2 hours in a 4 hour period.  On all 6 days I was unable to find my stool.  When I approached Brian Sullivan about the lack of accommodations regarding working 2 hours out of 4, he harshly told me that "the store needs you to check more than you are supposed to at times, I cannot help it if the customers need help."  When I said that my stool was never available, he said "I don't know where it is" and that he can't control who goes in and out of the office.

On July 4, 2014, I left a note taped to the desk in the manager's office.  It said:

Management –

Again I could not locate my stool, please keep in office where it is suppose to be kept – Also last week, I had to get it from Employees who were using it.  This is not suppose to happen – Please find my stool – Thanks – Debra Horn.

On December 4, 2014, I left a note taped to the desk in the manager's office.  It said:

Managers – Please locate my stool again I cam to work & could not locate it.  I had courtesy clerks help to find it – it is always placed in different places – supposed to be in office – only, per Dina Woods – H.R. – Debra Horn.

On December 25, 2014, I left a note taped to the desk in the manager's office.  It said:

Management,

I really need my stool available all the time, I keep having to look for it ½ the time I never find it, then I let you know and it appears.  I need my stool for my injury – Debra Horn.

In 2015, I complained verbally to Safeway more than once a week during the weeks that I worked about needing accommodations for my disability.

On June 8, 2015, I left a note taped to the desk in the manager's office.  It said:

Managers –

1    Could not find my stool, asked courtesy clerks to help me find.  No luck –

2    asked checkers if they saw – No one knew.  It is quite a problem to find & use.

3    Most of the time I don't find it.  Please keep in office, that is where it is suppose to

4    be kept – Thanks Debra Horn.

5    In 2016, I complained verbally to Safeway twice a day during the days that I

6    worked.  I detail some of those complaints below.

7    On August 6, 2016, like on a lot of days, I could not find my stool.  It was not

8    available to me in the manager's office.  I asked other employees to help look for it in

9    locked offices, in the breakroom and in other departments.  I left a note for

10   management.  I never did find it that day.

11   On August 26, 2016, I left a note taped to the desk in the manager's office.  It

12   said:

13        Management

14        I cannot find my stool - please keep in office – I asked everybody, nobody

15   had seen it.  I had courtesy clerks look in offices, breakroom, other dept.  No stool

16   – I need my stool to work – it is part of my accommodation – Thanks Debra

17   Horn.

18   During September of 2016, Store Manager Michael Vasquez would constantly ask

19   me to check more than 2 hours out of 4 in spite of me pointing out to him that this went

20   against my accommodations for my disability.

21   On September 6, 2016, I left a note taped to the desk in the manager's office.  It

22   said:

23        Managers

24        I really need my stool, been since 2012 for OK for my stool – suppose to be

25   kept in office – without my stool – I hurt more – Please keep in office to I can get

26   to it.  Thanks Debra Horn.

27   On September 7, 2016, I started working in the check stand at 2:00 p.m. and

28   should have been accommodated for my disability with a 15 minute sit-down break that

---

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 40

1  would allow me to ice my foot.  I called for a break at 3:55 p.m. but was not able to take a

2  break until 4:31 p.m.  This was a very typical pattern.  I would always need to ask for the

3  break that I needed and I would not get the break until much later.  By the time I had

4  been checking for two hours I was in intolerable pain.

5         On September 25, 2016, I had to call 4 times for my break and still was not

6  allowed to take my 15 minute break to ice my foot until 4:22 p.m. when it should have

7  happened at 4:00 p.m.  By the time I had been checking for two hours I was in

8  intolerable pain.

9         On October 3, 2016, I started working in the check stand at 2:00 p.m. and was

10  not allowed to take a sit-down break to ice my foot until 4:43 p.m. when it should have

11  been at 4:00 p.m.  By the time I had been checking for two hours I was in intolerable

12  pain.

13         On October 5, 2016, Assistant Manager Jerry Hunt, asked me to work past the

14  amount of time I should to accommodate my disability and when I refused, he retaliated

15  by not letting me take my break until 48 minutes after it should have been scheduled

16  and by taking me off my break at 10 minutes instead of 15 minutes.  By the time I had

17  been checking for two hours I was in intolerable pain.

18         On October 9, 2016, I left a note taped to the desk in the manager's office.  It said:

19         Management:

20         Came to work today, could not locate stool – Erick said that Kelli locked it

21         up in file maintenance room – asked to check room – she said it is not in there.

22         Please keep my stool available for me Debra Horn.

23         On October 10, 2016, I was not allowed a break until 2 hours and 35 minutes

24  after I started in the check stand, 35 minutes past the time my accommodations for my

25  disability specified.  By the time I had been checking for two hours I was in intolerable

26  pain.

27         On October 28, 2016, I started work at 2:00 p.m. and in spite of asking for relief

28  several times so that I could have a sit-down break to ice my foot, nobody ever relieved

1    me.  Finally, at 5:03 p.m., I closed myself off and took my break, 63 minutes after I

2    should have iced my foot.  By the time I had been checking for two hours I was in

3    intolerable pain.

4         On October 30, 2016, I started work at 2:00 p.m. and in spite of asking for relief

5    so that I could have a sit-down break to ice my foot, nobody ever relieved me.  Finally, at

6    4:35 p.m., I closed myself off and took my break, 35 minutes after I should have iced my

7    foot.  By the time I had been checking for two hours I was in intolerable pain.

8         On October 31, 2016, I started work at 2:00 p.m. and was not relieved until 4:51.

9    I my break, 51 minutes after I should have iced my foot.  By the time I had been

10   checking for two hours I was in intolerable pain.

11        On November 2, 2016, I started work at 2:00 p.m. and was not relieved until 4:28

12   p.m. in spite of calling for relief at 3:58 p.m. and again at 4:16 p.m. My break started 28

13   minutes after I should have iced my foot.  My second break to ice my foot should have

14   been at 8:30 but I was not relieved until 8:43.  My break started 13 minutes after I

15   should have iced my foot.  By the time I had been checking for two hours I was in

16   intolerable pain.

17        On November 3, 2016, Maniya Darden asked me at 7:00 p.m. to work in the

18   check stand for 1 hour in spite of me having already worked the 2 hours I could work

19   with my disability.  Ms. Darden said her request was at the direct order of Assistant

20   Manager Jessica Taylor.

21        On November 9, 2016, I could not find my stool; Harbans Kaur told me that

22   Bookkeeper Kelli Snow had told her to move my stool to the training room.  I did not

23   have access to this locked room and Ms. Snow (who had the key) had left for the day

24   could not use the stool at all.  I left a note taped to the desk in the manager's office.  It

25   said:

26        "Managers –

27        Again no stool today – Harbans said she was asked to put in training room

28   by Kelli.  I need my stool to work it is part of my accommodation – since 2012 –

1   causes me more pain without stool, Debra Horn.

2   Also on November 9, 2016, I started work at 2:00 p.m. and was not relieved until

3   4:37 p.m. My break started 37 minutes after I should have iced my foot. My second

4   break to ice my foot should have been at 8:45 but I was not relieved until 10:02. My

5   break started 17 minutes after I should have iced my foot. By the time I had been

6   checking for two hours I was in intolerable pain.

7   On November 14, 2016, I started work at 2:00 p.m. and was not relieved until

8   4:28 p.m. My break started 28 minutes after I should have iced my foot. By the time I

9   had been checking for two hours I was in intolerable pain.

10   On November 17, 2016, Nobody relieved me at the check stand and I finally close

11   my check stand off so I could take a break and ice my foot. By the time I had been

12   checking for two hours I was in intolerable pain.

13   On November 23, 2016, I was not relieved from the check stand in time to ice my

14   foot after working 2 hours. When I brought this to management's attention, they did

15   not show any interest in accommodating my disability. By the time I had been checking

16   for two hours I was in intolerable pain.

17   On November 27, 2016, 2 days after my workplace injury, Assistant Manager

18   Jerry Hunt, made me work almost 3 hours in the check stand even though I should work

19   2 hours at the most in a 4 hour period. By the time I had been checking for two hours I

20   was in intolerable pain.

21   On November 28, 2016, I called HR Manager Dina Woods and told her that

22   discrimination was still occurring and that my disabilities were not being

23   accommodated. She told me to fax her a copy of my work restrictions, and I did. She

24   never took steps to ensure that Safeway would accommodate my disability.

25   On December 3, 2016, Dr. Lee informed Safeway about the following disabilities:

26   On the job fall injury to my knees, repetitive motion injury to my left foot, and repetitive

27   motion injury to my hands, requiring "[r]epetitive right hand motions" restricted to no

28   more than "25% of shift," "[r]epetitive left hand motions" restricted to no more than

1  "25% of shift," that I "[l]ift/[c]arry/[p]ush/[p]ull no more than 10 pounds," and that I

2  "[l]imit standing/walking to 10 minutes/hour," with "[n]o pivoting, kneeling, squatting,

3  stooping, or crawling."  Assistant Manager Jessica Taylor assured my union

4  representative Jamie Moore and me that I would have a stool and a courtesy clerk to bag

5  while I checked, so that I would not pivot and so that I would not stand for more than

6  ten minutes per hour.

7       On December 4, 2016, I worked in the check stand and called 8 times for courtesy

8  clerks to bag for me between 3:00 p.m. and 3:50 p.m.  Assistant Manager Jessica Taylor

9  ignored my 8 calls.  Assistant Manager Jerry Hunt also ignored my calls.  When Mr.

10  Hunt walked by the check stand where I was working, I asked him for a bagger and he

11  said that the store only had 3 baggers and that they were bagging at other check stands.

12  I was required to bag for customers, which forced me to repeatedly stand and pivot,

13  causing me intense pain.

14       Also on December 4, 2016, I was working as a greeter in the evening.  Per Doctor

15  Lee, the injuries to my knees required that I not kneel, squat or stoop and that I limit

16  standing and walking to 10 minutes per hour.  I was given a chair to sit on while working

17  as greeter that was so low as to create a kneeling position, which aggravated my knees.

18  Assistant Manager Jerry Hunt, kept pacing back and forth in front of me which was

19  intimidating as he did not appear to have any work to do there.  When I complained to

20  Mr. Hunt about the low chair aggravating my knees, he told me that it was the only chair

21  available to me, even though the store had a wide variety of chairs.

22       On December 16, 2016, I was required to check for 2 ½ hours, 30 minutes

23  beyond what I should have worked.  I also did not have a courtesy clerk available to bag

24  so I was forced to bag for customers, which forced me to repeatedly stand and pivot,

25  causing me intense pain.

26       On May 9, 2017, I filed charges of disability discrimination and retaliation with

27  the California Department of Fair Employment & Housing and the U.S. Equal

28  Employment Opportunity Commission against Safeway.

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 44

**F.   Harassment**

On November 25, 2009, Brian Sullivan, store manager, asked me to again provide him with a restriction sheet. When I gave it to him, he threw it in my face and told me to either do what I was told or get another job.

Over a dozen times between 2011 and April 27, 2017, coworkers would harass me in front of my supervisors, including Brian Sullivan and Michael Vasquez. My coworkers would go talk to the manager and then would come to me and tell me to do something that would negate the accommodations I needed for my disability (such as give up my stool or work more than 2 hours a time in the check stand), describing it as an order from the manager. When I would tell them that I could not do that, my coworkers would often yell and scream and would say things like "if she can do day stocking, she can do checking" or "you don't need a stool" or "nobody else gets a stool, you should not have a stool," "you can't really be in pain," "there's no way you can't stand for two hours," and "there's no way you can hurt that much." Sometimes they would bring my home life into it. This did happen in the manager's office but more often it happened out on the sales floor where everyone, including customers, could hear. My only response was to say that I could not discuss it and I would tell my coworkers that they would need to talk to management about it. In each of these cases, Brian Sullivan would silently watch and allow the harassment to happen.

On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said that Mr. Beede was discriminating and retaliating against me by continuing to keep me from using a stool while checking.

In Fall 2016 and Spring 2017 Store Manager Michael Vasquez harassed me on an ongoing basis. He would stand over me for 10-15 minutes while I was working, as if he was looking for something to nit-pick. He did this a few times per week. For instance, he ridiculed me in front of customers for not knowing one produce code among hundreds of codes. All employees would need to occasionally look up produce codes. He also told me that I was failing in my job duties because I did not answer the phone

1   fast enough, and said that I "would be replaced." But in reality my voice was the only

2   voice on the intercom regularly heard announcing phone calls.

3        On October 9, 2016, I came to work and could not find my stool. After hearing

4   that Bookkeeper Kelli Snow had locked it in the maintenance room, I asked her for the

5   key to unlock it and she told me it was not there. An hour later, at 3:00 p.m. I used the

6   key provided by Darion Hickey (person in charge), to enter the maintenance room and

7   found my stool there.

8        Also on October 9, 2016, Maniya Darden, a cashier, and Assistant Manager Jerry

9   Hunt, took my private Personnel File out of the office and brought it to the sales floor.

10  While I was in my workstation with customers, Mr. Hunt was standing next to Ms.

11  Darden and she said to me, "It does not say anywhere in this file that you have a

12  restriction of checking only 2 hours." I told both of them that they were discriminating

13  against me and that they were violating my privacy. They both continued to discuss my

14  private information in a public place and asked me to check more than the 2 hours my

15  accommodations allowed. Directly after this incident, Store Manager Michael Vasquez

16  brought me to the manager's office and said "I'm not sure if I have any work for you,

17  maybe this job is not for you. I cannot accommodate your restrictions because I have

18  other employees who need to be placed in your position, you will have to check when I

19  need you to. Maybe this job isn't for you." After this happened, I called Dina Woods,

20  HR Manager, and left a voicemail about the incident. She never returned my call.

21       On November 9, 2016, I could not find my stool and Harbans Kaur told me that

22  Bookkeeper Kelli Snow had told her to move my stool to the training room. I did not

23  have access to this locked room and Ms. Snow (who had the key) had left for the day

24  could not use the stool at all. I left a note taped to the manager's desk about the lack of

25  stool.

26       On November 24, 2016, I slipped on fell on melted ice at work and in spite of

27  telling Safeway managers in person and over the phone that same day and on following

28  days, I was not treated until 5 days later:

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 46

1. On November 24, 2016 after slipping and falling, I had to be helped to the break room to ice my knees where I reported the injury to Assistant Manager Jerry Hunt. After icing my knees, I went to the manager's office to fill out an accident report. Jerry Hunt and Bookkeeper Kelli Snow questioned my fall and I had them view it on the video recording. I could not get treatment without first getting a claim number. Mr. Hunt called the reporting line to get a number and told me there was no answer.

2. On November 25, 2016, at approximately 7:30 a.m., I called Assistant Manager Jessica Taylor, and told her I could not come in to work due to my injuries. I also asked her to call the reporting line. At 4:30 p.m. Ms. Taylor called me to say that the reporting line had never called her back.

3. On November 26, 2016, I was scheduled to be off work. I did not receive any calls about my injury or claim number.

4. On November 27, 2016, I asked Mr. Hunt if anybody had called with a claim number yet and he said no. About 30 minutes later, he said he had someone on the line to report my injury to, so I told her what happened and then she asked to speak to Mr. Hunt again. After this, Mr. Hunt told me he did not know where I could go to get treated. I looked in the break room for information about the facility to go to in case of accident or injury but nothing was posted.

5. On November 28, 2016, Store Manager Michael Vasquez told me that I was being suspended for poor performance. When I asked him where I could go for my injuries he said he had no clue and gave me a phone number. I called the number he gave me but it was for a medical facility that does not have a contract to see Safeway employees. Finally, five days after my workplace injury, I was able to Kaiser in Livermore to be diagnosed and treated.

On March 12, 2017, I requested March 19-20, 2017 off to attend my

grandmother's funeral.  My grandmother was very special to me.  My union contract allows me 3 days off for bereavement and more if needed.  On March 16, 2017, I saw on the schedule that I had not been given days off for my grandmother's funeral and asked Assistant Manager Jerry Hunt, about it.  He began harassing me claiming that I can't have time off for my grandmother's funeral.  He followed me to the customer service counter as he continued harassing me.  Bookkeeper Tabatha Jacobi told him to leave me alone and told him that I was entitled to the time off, and that he would know that if he had read the union contract.  She also said it was not something he should be addressing on the sales floor in front of customers.  Hunt continued to insist that was not true.  This went on for several minutes.  I left a second note asking for two days off for my grandmother's funeral on the same day.

On March 17, 2017, I called Store Manager Michael Vasquez about time off to attend my grandmother's funeral and he refused to speak to me about it, saying "we will discuss it when you work."

On March 18, 2017, Assistant Manager Jessica Taylor texted me from her personal phone to ask if I was going to work on the days I had requested to take off for my grandmother's funeral.

On March 19, 2017, I called Bookkeeper Kelli Snow to let her know to pay me for the days off for a funeral I attended for my grandmother and she harassed me, asking who died and asking if management knew about it.  She did not pay me and I had to ask to be paid again a week later.  This whole situation made me feel very anxious about my job during a time I needed to be with my family to grieve.

**G.  Aiding, Abetting, Inciting, Compelling, or Coercing Harassment**

On November 25, 2009, Brian Sullivan, store manager, asked me to again provide him with a restriction sheet.  When I gave it to him, he threw it in my face and told me to either do what I was told or get another job.

Over a dozen times between 2011 and 2014, coworkers would harass me in front

1    of Brian Sullivan.  My coworkers would go talk to Brian Sullivan and then would come to
2    me and tell me to do something that would negate the accommodations I needed for my
3    disability (such as give up my stool or work more than 2 hours a time in the check
4    stand), describing it as an order from Brian Sullivan.  When I would tell them that I
5    could not do that, my coworkers would often yell and scream and would say things like
6    "if she can do day stocking, she can do checking" or "you don't need a stool" or "nobody
7    else gets a stool, you should not have a stool," and sometimes they would bring my home
8    life into it.  This did happen in the manager's office but more often it happened out on
9    the sales floor where everyone could hear.  My only response was to say that I could not
10   discuss it and I would tell my coworkers that they would need to talk to management
11   about it.  In each of these cases, Brian Sullivan would silently watch and allow the
12   harassment to happen.

13        On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said
14   that Mr. Beede was discriminating and retaliating against me by continuing to keep me
15   from using a stool while checking.

16        In 2016, Mr. Vasquez harassed me on an ongoing basis.  He would treat me badly
17   because I would not know one of hundreds of produce codes.  All employees would need
18   to look up at least some produce codes.  He would also tell me that I was failing in my
19   job duty of answering the phone and would be replaced, even though the only voice on
20   the intercom announcing phone calls for people was my voice.

21        On October 9, 2016, I came to work and could not find my stool.  After hearing
22   that Bookkeeper Kelli Snow had locked it in the maintenance room, I asked her for the
23   key to unlock it and she told me it was not there.  An hour later, at 3:00 p.m. I used the
24   key provided by Darion Hickey, Person In Charge, to enter the maintenance room and
25   found my stool there.

26        On October 9, 2016, Maniya Darden, a cashier, and Assistant Manager Jerry
27   Hunt, took my private Personnel File out of the office and brought it to the sales floor.
28   While I was in my workstation with customers, Mr. Hunt was standing next to Ms.

Darden and she said to me "It does not say anywhere in this file that you have a restriction of checking only 2 hours." I told both of them that they were discriminating against me and that Ms. Darden was not authorized to view my Personnel File. They both continued to discuss my private information in a public place and asked me to check more than the 2 hours my accommodations allowed. Directly after this incident, Store Manager Michael Vasquez, brought me to the manager's office and said "I'm not sure if I have any work for you, maybe this job is not for you. I cannot accommodate your restrictions because I have other employees who need to be placed in your position, you will have to check when I need you to. Maybe this job isn't for you." After this happened, I called Dina Woods, HR Manager, and left a voicemail about the incident. She never returned my call.

On November 9, 2016, I could not find my stool and Harbans Kaur told me that Bookkeeper Kelli Snow had told her to move my stool to the training room. I did not have access to this locked room and Ms. Snow (who had the key) had left for the day could not use the stool at all. I left a note taped to the manager's desk about the lack of stool.

On November 24, 2016, I slipped on fell on melted ice at work and in spite of telling Safeway managers in person and over the phone that same day and on following days, I was not treated until 5 days later:

6. On November 24, 2016 after slipping and falling, I had to be helped to the break room to ice my knees where I reported the injury to Assistant Manager Jerry Hunt. After icing my knees, I went to the manager's office to fill out an accident report. Jerry Hunt and Bookkeeper Kelli Snow questioned my fall and I had them view it on the video recording. I could not get treatment without first getting a claim number. Mr. Hunt called the reporting line to get a number and told me there was no answer.

7. On November 25, 2016, at approximately 7:30 a.m., I called Assistant Manager Jessica Taylor, and told her I could not come in to work due to

my injuries.  I also asked her to call the reporting line.  At 4:30 p.m. Ms. Taylor called me to say that the reporting line had never called her back.

8. On November 26, 2016, I was scheduled to be off work.  I did not receive any calls about my injury or claim number.

9. On November 27, 2016, I asked Mr. Hunt if anybody had called with a claim number yet and he said no.  About 30 minutes later, he said he had someone on the line to report my injury to, so I told her what happened and then she asked to speak to Mr. Hunt again.  After this, Mr. Hunt told me he did not know where I could go to get treated.  I looked in the break room for information about the facility to go to in case of accident or injury but nothing was posted.

10. On November 28, 2016, Store Manager Michael Vasquez told me that I was being suspended for poor performance.  When I asked him where I could go for my injuries he said he had no clue and gave me a phone number.  I called the number he gave me but it was for a medical facility that does not have a contract to see Safeway employees.  Finally, five days after my workplace injury, I was able to Kaiser in Livermore to be diagnosed and treated.

On March 12, 2017, I requested March 19-20, 2017 off to attend my grandmother's funeral.  My grandmother was very special to me.  My union contract allows me 3 days off for bereavement and more if needed.  On March 16, 2017, I saw on the schedule that I had not been given days off for my grandmother's funeral and asked Assistant Manager Jerry Hunt, about it.  He began harassing me claiming that I can't have time off for my grandmother's funeral.  He followed me to the customer service counter as he continued harassing me.  Bookkeeper Tabatha Jacobi told him to leave me alone and told him that I was entitled to the time off, and that he would know that if he had read the union contract.  She also said it was not something he should be addressing on the sales floor in front of customers.  Hunt continued to insist that was not true.  This

1  went on for several minutes.  I left a second note asking for two days off for my

2  grandmother's funeral on the same day.

3       On March 17, 2017, I called Store Manager Michael Vasquez about time off to

4  attend my grandmother's funeral and he refused to speak to me about it, saying "we will

5  discuss it when you work."

6       On March 18, 2017, Assistant Manager Jessica Taylor texted me from her

7  personal phone to ask if I was going to work on the days I had requested to take off for

8  my grandmother's funeral.

9       On March 19, 2017, I called Bookkeeper Kelli Snow to let her know to pay me for

10 the days off for a funeral I attended for my grandmother and she harassed me, asking

11 who died and asking if management knew about it.  She did not pay me and I had to ask

12 to be paid again a week later.  This whole situation made me feel very anxious about my

13 job during a time I needed to be with my family to grieve.

14       **H.  Acts of Retaliation**

15       On November 25, 2009, Brian Sullivan, the manager of my store, asked me to

16 again provide him with a restriction sheet.  When I gave it to him, he threw it in my face

17 and told me to either do what I was told or get another job.

18       On April 9, 2009, I was given a written warning saying that I failed to ring up an

19 item under a basket and that I did not accurately ring up organic produce.

20       On July 8, 2010, I told Nicole Chenault, acting manager (normally assistant

21 manager), that I needed to file an Accident Report for Carpel Tunnel Syndrome in my

22 left hand and she asked me to wait to see if it goes away.  In order to get my on the job

23 injury treated, I needed to go to my personal physician, Dr. Riopelle.

24       On June 12, 2012 my job was day-stocker, along with 4 other employees.  Brian

25 Sullivan told me that I always must be the first person available to check at all times.

26 The result of this decision was that I would check for 6-8 hours of my 8 hour shift.

27       On June 21, 2012, Ron Shepard, person in charge, sent me home from work early,

28 limping, after I was unable to work standing in the same place more than 2 hours in a 4

1   hour time period.

2        On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said

3   that Mr. Beede was discriminating and retaliating against me by continuing to keep me

4   from using a stool while checking.

5        On October 14, 2012, Store Manager Ben Beede gave me a written warning for

6   not fulfilling a scheduled shift, even though on October 11, 2012, I had told Person In

7   Charge Armando that I needed to attend a family wake on October 13, 2012.

8        On October 3, 2013, Store Manager Brian Sullivan gave me a written warning,

9   saying that I was not giving "World Class Service." This was because a customer had

10   wanted my help after I had closed my check stand, which I had to do following the

11   accommodations for my disabilities of my left foot and hands.

12        In Fall 2016 and Spring 2017 Store Manager Michael Vasquez harassed me on an

13   ongoing basis. He would stand over me for 10-15 minutes while I was working, as if he

14   was looking for something to nit-pick. He did this a few times per week. For instance,

15   he ridiculed me in front of customers for not knowing one produce code among

16   hundreds of codes. All employees would need to occasionally look up produce codes.

17   He also told me that I was failing in my job duties because I did not answer the phone

18   fast enough, and said that I "would be replaced." But in reality my voice was the only

19   voice on the intercom regularly heard announcing phone calls.

20        On November 14, 2016, Safeway gave me a written Employee Warning Notice for

21   "being rude and short with customers and not providing them with basic customer

22   service." This was on a day when an employee was out sick and during the time of the

23   incident, the following employees were in the File Maintenance room: John Clatworthy,

24   courtesy clerk, Elaina Chavez, front end manager, Darion Hickey, person-in-charge. I

25   was working at self-check and helping to cover the service counter (the bookkeeper was

26   on lunch and normally the front end manager or the person-in-charge would cover it but

27   they were unavailable) and helping customers with bagging (normally John Clatworthy

28   would have helped with bagging but he was unavailable). When a customer tried to ring

up alcohol at the self-check stand, I told him I could help him after I helped the 3

customers who were ahead of him.  He said 'forget it' and walked out of the store leaving

all of his items behind.

On November 24, 2016, I slipped on fell on melted ice at work and in spite of

telling Safeway managers in person and over the phone that same day and on following

days, I was not treated until 5 days later:

11. On November 24, 2016 after slipping and falling, I had to be helped to the
break room to ice my knees where I reported the injury to Assistant
Manager Jerry Hunt.  After icing my knees, I went to the manager's office
to fill out an accident report.  Jerry Hunt and Bookkeeper Kelli Snow
questioned my fall and I had them view it on the video recording.  I could
not get treatment without first getting a claim number.  Mr. Hunt called
the reporting line to get a number and told me there was no answer.

12. On November 25, 2016, at approximately 7:30 a.m., I called Assistant
Manager Jessica Taylor, and told her I could not come in to work due to
my injuries.  I also asked her to call the reporting line.  At 4:30 p.m. Ms.
Taylor called me to say that the reporting line had never called her back.

13. On November 26, 2016, I was scheduled to be off work.  I did not receive
any calls about my injury or claim number.

14. On November 27, 2016, I asked Mr. Hunt if anybody had called with a
claim number yet and he said no.  About 30 minutes later, he said he had
someone on the line to report my injury to, so I told her what happened
and then she asked to speak to Mr. Hunt again.  After this, Mr. Hunt told
me he did not know where I could go to get treated.  I looked in the break
room for information about the facility to go to in case of accident or injury
but nothing was posted.

15. On November 28, 2016, Store Manager Michael Vasquez told me that I
was being suspended for poor performance.  When I asked him where I

1    could go for my injuries he said he had no clue and gave me a phone

2    number.  I called the number he gave me but it was for a medical facility

3    that does not have a contract to see Safeway employees.  Finally, five days

4    after my workplace injury, I was able to Kaiser in Livermore to be

5    diagnosed and treated.

6        The suspension Mr. Vasquez gave me on November 28, 2016 was dated

7    November 23, 2016, and I was suspended for 3 days without pay because a customer

8    said that I was "rude and unfriendly at the SCO."  This was the day before Thanksgiving

9    and I had been helping customers at all 4 self-check stands pretty much non-stop.  This

10   customer was angry about the way that the self-check system works as often happens for

11   any employee who helps at the self-check stands.

12       On March 1, 2017, Safeway did not grant my vacations according to union

13   contract even though I turned my Vacation Request Form in a timely manner to Elaina

14   Chavez, front-end manager, who signed that she received it.

15       On March 12, 2017, I requested March 19-20, 2017 off to attend my

16   grandmother's funeral.  My grandmother was very special to me.  My union contract

17   allows me 3 days off for bereavement and more if needed.  On March 16, 2017, I saw on

18   the schedule that I had not been given days off for my grandmother's funeral and asked

19   Assistant Manager Jerry Hunt, about it.  He began harassing me claiming that I can't

20   have time off for my grandmother's funeral.  He followed me to the customer service

21   counter as he continued harassing me.  Bookkeeper Tabatha Jacobi told him to leave me

22   alone and told him that I was entitled to the time off, and that he would know that if he

23   had read the union contract.  She also said it was not something he should be addressing

24   on the sales floor in front of customers.  Hunt continued to insist that was not true.  This

25   went on for several minutes.  I left a second note asking for two days off for my

26   grandmother's funeral on the same day.

27       On March 17, 2017, I called Store Manager Michael Vasquez about time off to

28   attend my grandmother's funeral and he refused to speak to me about it, saying "we will

1   discuss it when you work."

2       On March 19, 2017, I called Bookkeeper Kelli Snow to let her know to pay me for

3   the days off for the funeral and she harassed me, asking who died and asking if

4   management knew about it.  She did not pay me and I had to ask to be paid again a week

5   later.  This whole situation made me feel very anxious about my job during a time I

6   needed to be with my family to grieve.

7       On April 26 2017, Safeway suspended me from my job without pay and without

8   giving me a reason.  I did not learn the supposed reason for my suspension —violation of

9   a shoplifting policy—until July 6, 2017.

10      On or around April 27, 2017, I faxed a note from my doctor saying that I needed

11  time off for medical illness (severe anxiety) so that I would have medical and sick leave

12  pay.  Store Manager Michael Vasquez refused to sign it so that I would be paid, even

13  though Safeway's benefits department told me that he was not allowed to refuse to sign

14  it.  Mr. Vasquez denied me my benefits.

15      On May 1, 2017, my union representative Jamie Moore personally brought my

16  disability form in to Store Manager Michael Vasquez so that I could receive my benefits.

17  He refused to sign, again denying me my benefits, and did not give her a reason.

18      On May 16, 2017, Safeway attempted to revise its pre-existing shoplifting policy

19  to prohibit employees other than the store manager or the person in charge from calling

20  the police regarding suspected shoplifters.  I believe Safeway did so in an attempt to

21  retroactively hold me in violation of the policy because Safeway had no legitimate reason

22  to discipline me.

23      On June 7, 2017, Safeway Security Manager Celia Kettle falsely claimed that I had

24  signed off on Safeway's newly revised shoplifting policy.  In reality, I had never seen nor

25  heard of it.

26      Also on June 7, 2017, Safeway Security Manager Celia Kettle also falsely claimed

27  that Safeway had given me a written warning in 2016 regarding Safeway's shoplifting

28  policy.  When Safeway was unable to substantiate that claim, Safeway then claimed it

1  had instead given me a verbal warning.  I had received no such verbal warning regarding

2  the shoplifting policy either.

3        On June 28, 2017, Safeway terminated me from my job with no explanation other

4  than "violation of company policy."  I finally learned the supposed reason on July 6,

5  2017, more than a week after the termination and over two months after the suspension

6  without pay.  The delay in notifying me of Safeway's reason is a separate retaliatory,

7  adverse employment action.  Safeway had never made me aware of a policy prohibiting

8  me from calling the police when there are suspected shoplifters, nor had I done so on

9  the occasion in question.  Cynthia Cornejo did call the police on that occasion, yet

10  Safeway did not suspend her without pay, deny her medical benefits, terminate her

11  employment, or to my knowledge discipline her at all for her actions.

12  **I.   Witnesses**

13        While I do not know all people who have knowledge of any facts relating to my

14  contention, I believe the following people do have such knowledge:

15
16      1.  Able, David, 530-510-0491

17      2.  Ables, Lori, 530-510-0491

18      3.  Allen, Stephanie, 209-612-5263

19      4.  Bailey, Kenneth, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

20      5.  Balbuena, Alphonso, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

21      6.  Barregan, Alley, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

22      7.  Beede, Ben, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

23      8.  Bottarini, Robert, 510-917-8654

24      9.  Braganza, Dirk, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

25      10. Burks, Yulanda, Address unknown.  925-404-3049

26      11. Cadell, Zaine, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

27      12. Casey, Robin, 8263 Boulder Field Dr., Sacramento, CA 95829, 707-267-
28         0286

13. Castro, Rachel, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

14. Chavarria, Larry, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

15. Chavez, Elaina, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

16. Chenault, Nicole, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

17. Churches, Ginger, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

18. Clark, Dean, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

19. Cole, Sophie, M.D., 11010 White Rock Road, Suite 120, Rancho Cordova, CA 96570, 800-458-1261

20. Cook, Nina, 925-586-0700

21. Cooper, Jason, 8263 Boulder Field Dr., Sacramento, CA 95829, 916-831-9655

22. Cornejo, Cynthia, Address and phone number unknown

23. Curtis, Nancy, 309 Farm View Trail, Keller, Texas 76248, 469-371-1238

24. Darden, Maniya, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

25. Dhillon, Ranjit, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

26. Dickey, Darion, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

27. Donati, Marla, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

28. England, Cindy Douglas, 1201 Scottsdale Way, Modesto, CA, 209-602-3145

29. Felix, Esther, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

30. Ford, Lorna, 530-526-1127

31. Frost, James, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

32. Gravelle, Michael, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

33. Gray, Kristen, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

34. Hickey, Darion, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

35. Higgs, Mark, 2836 Samantha Court, Tracy, CA 95377, 925-785-1760

36. Hill, Robin, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

37. Hood, Oksana, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

38. Horn, John, 7434 Larkdale Ave, Dublin, CA 94568, 925-548-0568

39. Horn, Nick, 7434 Larkdale Ave, Dublin, CA 94568, 925-413-8587

40. Hunt, Jerry, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

41. Jacoby, Tabatha, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

42. Javaid, Nasir, Address and phone number unknown

43. Jimenez, Selena, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

44. Johnson, Dianne, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

45. Joseph, Dejauna, Address and phone number unknown

46. Kamat, Leena, M.D., 5401 Norris Canyon Rd., Suite 201, San Ramon, CA 94583, 925-905-8970

47. Kaur, Harbans, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

48. Kehl, Carol, 925-382-2503

49. Kettle, Celia, Address and phone number unknown

50. Kinnard, Angie, 7017 West Melinda Lane, Glendale, AZ 85308, 925-785-2208

51. Layton, James, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

52. Ledesma, Lynette, Address and phone number unknown

53. Lee, Lacy, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

54. Lee, Rong, M.D., 3000 Las Positas Road, Livermore, CA 94551, 925-243-4882

55. Lovell, Kevin, Address and phone number unknown

56. Lua, Noe, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

57. Machado, Melissa, 45717 White Rock Ave., Denair CA 05316, 209-620-0094

58. Manansala, Manny, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

59. Marengo, Tina, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

60. Martinovsky, Gary, M.D., 24301 Southland Drive, Suite 508, Hayward, CA

94545

61. Masoodian, Elizabeth, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

62. Moore, Jami, 28870 Mission Boulevard, Hayward, CA 94544, 510-583-8421

63. Moxley, Medrith, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

64. Nunes, John, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

65. Nyswonger, Maryann, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

66. Olivera, Armadea, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

67. Pang, David, M.D., 5720 Stoneridge Mall Rd., Suite 130, Pleasanton, CA 94588, 925-425-0791

68. Papke, Mitchell, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

69. Pedraza, Carlos, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

70. Peled, Ziv, M.D., 2100 Webster Street, Suite #109, San Francisco, CA 94115, 415-751-0583

71. Raymore, Travis, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

72. Riopelle, Jeffrey, M.D., 5401 Norris Canyon Rd., Suite 201, San Ramon, CA 94583, 925-905-8970

73. Rivas, Joey, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

74. Rodriguez, Diego, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

75. Rood, Oksana, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

76. Roth, Alan, M.D., 5401 Norris Canyon Rd., Suite 320, San Ramon, CA 94583, 925-275-1712

77. Sajo, Shiela, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

78. Sansen, Vicki, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

79. Schnitzer, Goldie, 510-381-4757

80. Schwartz, Ted, M.D., 3315 Broadway, Oakland, CA 94611, 510-238-1200

81. Scott, Cheryl, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

82. Scott, Erick, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

83. Snow, Kelli, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

84. Sokoloff, Howard, M.D., 1320 El Capitan Drive, Suite 410, Danville, CA 94526, 925-830-2929

85. Souza, Valerie, LMFT, 1491 Cedarwood Lane, Suite A, Pleasanton, CA 94566, 925-202-5529

86. Spearman, Landon, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

87. Subotnick, Steven, M.D., 13690 E 14th St., Suite 220, San Leandro, CA 94578, 510-614-5633

88. Sullivan, Brian, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

89. Taylor, Jessica, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

90. Underwood, Gina, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

91. Vasquez, Michael, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

92. Venos, Kenneth, M.D., 5601 Norris Canyon Rd., Suite 130, San Ramon, CA 94583, 925-275-1133

93. Walker, Melissa, 2925 Burnap Ave.  #9, Chico, CA 95973, 530-774-8504

94. Walker, Teresa, 16160 Hedweway Dr., Parker, CO 80134, 530-588-4795

95. Weathers, MaryAnn, Address and phone number unknown

96. Winter, Wendy, 7499 Dublin Blvd., Dublin, CA, 925-556-4034

97. Woods, Dina, Address and phone number unknown

98. Zischka, Barbara Field, 925-570-8835

**INTERROGATORY NO.  3:**

State each and every fact supporting your contention that Defendant retaliated against you because Defendant suspected you would disclose violations of the law. Identify by name, last known address and telephone number all persons who you believe have knowledge of any facts relating to your contention.

**RESPONSE TO INTERROGATORY NO.  3:**

See response to Interrogatory No.  2, A.  Notification of Disabilities Requiring Accommodation.

1    See response to Interrogatory No. 2, B.  Failure to Properly Engage in the

2   Interactive Process.

3    See response to Interrogatory No. 2, C.  Failure to Reasonably Accommodate.

4    See response to Interrogatory No. 2, D.  Discrimination.

5    See response to Interrogatory No. 2, E.  Failure to Prevent Discrimination.

6    See response to Interrogatory No. 2, F.  Harassment.

7    See response to Interrogatory No. 2, G.  Aiding, Abetting, Inciting, Compelling,

8   or Coercing Harassment.

9    See response to Interrogatory No. 2, H.  Acts of Retaliation.

10    See response to Interrogatory No. 2, I.  Witnesses.

11   **INTERROGATORY NO. 4:**

12    State each and every fact supporting your contention that Defendant retaliated

13   against you because you complained about discrimination and harassment based on

14   your disability or perceived disability and the alleged failure to provide reasonable

15   accommodation.  Identify by name, last known address and telephone number all

16   persons who you believe have knowledge of any facts relating to your contention.

17   **RESPONSE TO INTERROGATORY NO. 4:**

18    See response to Interrogatory No. 2, A.  Notification of Disabilities Requiring

19   Accommodation.

20    See response to Interrogatory No. 2, B.  Failure to Properly Engage in the

21   Interactive Process.

22    See response to Interrogatory No. 2, C.  Failure to Reasonably Accommodate.

23    See response to Interrogatory No. 2, D.  Discrimination.

24    See response to Interrogatory No. 2, E.  Failure to Prevent Discrimination.

25    See response to Interrogatory No. 2, F.  Harassment.

26    See response to Interrogatory No. 2, G.  Aiding, Abetting, Inciting, Compelling,

27   or Coercing Harassment.

28    See response to Interrogatory No. 2, H.  Acts of Retaliation.

1  See response to Interrogatory No. 2, I. Witnesses.

2  **INTERROGATORY NO. 5:**

3  State each and every fact supporting your contention that Defendant you were

4  harassed [sic] based on your disability or perceived disability. Identify by name, last

5  known address and telephone number all persons who you believe have knowledge of

6  any facts relating to your contention.

7  **RESPONSE TO INTERROGATORY NO. 5:**

8  See response to Interrogatory No. 2, F. Harassment.

9  See response to Interrogatory No. 2, G. Aiding, Abetting, Inciting, Compelling,

10  or Coercing Harassment.

11  See response to Interrogatory No. 2, I. Witnesses.

12  **INTERROGATORY NO. 6:**

13  State each and every fact supporting your contention that Defendant aided,

14  abetted, incited, compelled or coerced others to harass you regarding your disability or

15  perceived disability. Identify by name, last known address and telephone number all

16  persons who you believe have knowledge of any facts relating to your contention.

17  **RESPONSE TO INTERROGATORY NO. 6:**

18  See response to Interrogatory No. 2, F. Harassment.

19  See response to Interrogatory No. 2, G. Aiding, Abetting, Inciting, Compelling,

20  or Coercing Harassment.

21  See response to Interrogatory No. 2, I. Witnesses.

22  **INTERROGATORY NO. 7:**

23  State each and every fact supporting your contention that Defendant

24  discriminated against you based on your disability or perceived disability. Identify by

25  name, last known address and telephone number all persons who you believe have

26  knowledge of any facts relating to your contention.

27  **RESPONSE TO INTERROGATORY NO. 7:**

28  See response to Interrogatory No. 2, A. Notification of Disabilities Requiring

1  Accommodation.

2      See response to Interrogatory No. 2, B.  Failure to Properly Engage in the

3  Interactive Process.

4      See response to Interrogatory No. 2, C.  Failure to Reasonably Accommodate.

5      See response to Interrogatory No. 2, D.  Discrimination.

6      See response to Interrogatory No. 2, F.  Harassment.

7      See response to Interrogatory No. 2, G.  Aiding, Abetting, Inciting, Compelling,

8  or Coercing Harassment.

9      See response to Interrogatory No. 2, I.  Witnesses.

10 **INTERROGATORY NO.  8:**

11     State each and every fact supporting your contention that Defendant failed to

12 take reasonable steps to prevent discrimination against you based on your disability or

13 perceived disability.  Identify by name, last known address and telephone number all

14 persons who you believe have knowledge of any facts relating to your contention.

15 **RESPONSE TO INTERROGATORY NO.  8:**

16     See response to Interrogatory No. 2, A.  Notification of Disabilities Requiring

17 Accommodation.

18     See response to Interrogatory No. 2, D.  Discrimination.

19     See response to Interrogatory No. 2, E.  Failure to Prevent Discrimination.

20     See response to Interrogatory No. 2, F.  Harassment.

21     See response to Interrogatory No. 2, G.  Aiding, Abetting, Inciting, Compelling,

22 or Coercing Harassment.

23     See response to Interrogatory No. 2, I.  Witnesses.

24 **INTERROGATORY NO.  9:**

25     State each and every fact supporting your contention that Defendant failed to

26 reasonably accommodate your disability or perceived disability.  Identify by name, last

27 known address and telephone number all persons who you believe have knowledge of

28 any facts relating to your contention.

1   **RESPONSE TO INTERROGATORY NO. 9:**

2       See response to Interrogatory No. 2, A. Notification of Disabilities Requiring

3   Accommodation.

4       See response to Interrogatory No. 2, B. Failure to Properly Engage in the

5   Interactive Process.

6       See response to Interrogatory No. 2, C. Failure to Reasonably Accommodate.

7       See response to Interrogatory No. 2, I. Witnesses.

8   **INTERROGATORY NO. 10:**

9       State each and every fact supporting your contention that Defendant failed to

10   properly engage in the interactive process in determining reasonable accommodation of

11   your disability or perceived disability. Identify by name, last known address and

12   telephone number all persons who you believe have knowledge of any facts relating to

13   your contention.

14   **RESPONSE TO INTERROGATORY NO. 10:**

15       See response to Interrogatory No. 2, A. Notification of Disabilities Requiring

16   Accommodation.

17       See response to Interrogatory No. 2, B. Failure to Properly Engage in the

18   Interactive Process.

19       See response to Interrogatory No. 2, C. Failure to Reasonably Accommodate.

20       See response to Interrogatory No. 2, I. Witnesses.

21   **INTERROGATORY NO. 11:**

22       Identify each discriminatory adverse employment action you contend you were

23   subjected to by Defendant, and separately identify for each such action, the date of the

24   action, the person who took the action and the reasons you believe the action was

25   discriminatory.

26   **RESPONSE TO INTERROGATORY NO. 11:**

27       On November 25, 2009, Brian Sullivan, the manager of my store, asked me to

28   again provide him with a restriction sheet. When I gave it to him, he threw it in my face

and told me to either do what I was told or get another job.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On April 9, 2009, I was given a written warning saying that I failed to ring up an item under a basket and that I did not accurately ring up organic produce.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On July 8, 2010, I told Nicole Chenault, acting manager (normally assistant manager), that I needed to file an Accident Report for Carpel Tunnel Syndrome in my left hand and she asked me to wait to see if it goes away.  In order to get my on the job injury treated, I needed to go to my personal physician, Dr. Riopelle.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On June 12, 2012 my job was day-stocker, along with 4 other employees.  Store Manager Brian Sullivan told me that I always must be the first person available to check at all times.  The result of this decision was that I would check for 6-8 hours of my 8 hour shift.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On June 21, 2012, Ron Shepard, person in charge, sent me home from work early, limping, after I was unable to work standing in the same place more than 2 hours in a 4 hour time period.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On or about August 6, 2012, I called ADA Manager MaryAnn Weathers and said that Mr. Beede was discriminating and retaliating against me by continuing to keep me from using a stool while checking.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On October 14, 2012, Store Manager Ben Beede gave me a written warning for

1   not fulfilling a scheduled shift, even though on October 11, 2012, I had told Person In

2   Charge Armando that I needed to attend a family wake on October 13, 2012.  This was

3   discriminatory because I do not believe it would have happened if I did not have

4   disabilities and need accommodations for my disabilities.

5       In Fall 2016 and Spring 2017 Store Manager Michael Vasquez harassed me on an

6   ongoing basis.  He would stand over me for 10-15 minutes while I was working, as if he

7   was looking for something to nit-pick.  He did this a few times per week.  For instance,

8   he ridiculed me in front of customers for not knowing one produce code among

9   hundreds of codes.  All employees would need to occasionally look up produce codes.

10   He also told me that I was failing in my job duties because I did not answer the phone

11   fast enough, and said that I "would be replaced."  But in reality my voice was the only

12   voice on the intercom regularly heard announcing phone calls.

13       On November 14, 2016, Safeway gave me a written Employee Warning Notice for

14   "being rude and short with customers and not providing them with basic customer

15   service."  This was on a day when an employee was out sick and during the time of the

16   incident, the following employees were in the File Maintenance room: John Clatworthy,

17   courtesy clerk, Elaina Chavez, front end manager, Darion Hickey, person-in-charge.  I

18   was working at self-check and helping to cover the service counter (the bookkeeper was

19   on lunch and normally the front end manager or the person-in-charge would cover it but

20   they were unavailable) and helping customers with bagging (normally John Clatworthy

21   would have helped with bagging but he was unavailable).  When a customer tried to ring

22   up alcohol at the self-check stand, I told him I could help him after I helped the 3

23   customers who were ahead of him.  He said 'forget it' and walked out of the store leaving

24   all of his items behind.  This was discriminatory because I do not believe it would have

25   happened if I did not have disabilities and need accommodations for my disabilities.

26       On November 24, 2016, I slipped on fell on melted ice at work and in spite of

27   telling Safeway managers in person and over the phone that same day and on following

28   days, I was not treated until 5 days later.  This was discriminatory because it would not

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 67

1  have happened if I did not have disabilities and need accommodations for my

2  disabilities:

     1.  On November 24, 2016 after slipping and falling, I had to be helped to the

        break room to ice my knees where I reported the injury to Assistant

        Manager Jerry Hunt. After icing my knees, I went to the manager's office

        to fill out an accident report. Jerry Hunt and Bookkeeper Kelli Snow

        questioned my fall and I had them view it on the video recording. I could

        not get treatment without first getting a claim number. Mr. Hunt called

        the reporting line to get a number and told me there was no answer.

     2.  On November 25, 2016, at approximately 7:30 a.m., I called Assistant

        Manager Jessica Taylor, and told her I could not come in to work due to

        my injuries. I also asked her to call the reporting line. At 4:30 p.m. Ms

        Taylor called me to say that the reporting line had never called her back.

     3.  On November 26, 2016, I was scheduled to be off work. I did not receive

        any calls about my injury or claim number.

     4.  On November 27, 2016, I asked Mr. Hunt if anybody had called with a

        claim number yet and he said no. About 30 minutes later, he said he had

        someone on the line to report my injury to, so I told her what happened

        and then she asked to speak to Mr. Hunt again. After this, Mr. Hunt told

        me he did not know where I could go to get treated. I looked in the break

        room for information about the facility to go to in case of accident or injury

        but nothing was posted.

     5.  On November 28, 2016, Store Manager Michael Vasquez, told me that I

        was being suspended for poor performance. When I asked him where I

        could go for my injuries he said he had no clue and gave me a phone

        number. I called the number that Mr. Vasquez gave me and it was for a

        medical facility that does not have a contract to see Safeway employees.

        Finally 5 days after my workplace injury, I was able to Kaiser in Livermore

1    to be diagnosed and treated.

2    The suspension Mr. Vasquez gave me on November 28, 2016 was dated

3    November 23, 2016, and I was suspended for 3 days without pay because a customer

4    said that I was "rude and unfriendly at the SCO." This was the day before Thanksgiving

5    and I had been helping customers at all 4 self-check stands pretty much non-stop. This

6    customer was angry about the way that the self-check system works as often happens for

7    any employee who helps at the self-check stands. This was discriminatory because I do

8    not believe it would have happened if I did not have disabilities and need

9    accommodations for my disabilities.

10    On March 1, 2017, Safeway did not grant my vacations according to union

11    contract even though I turned my Vacation Request Form in a timely manner to Elaina

12    Chavez, front-end manager, who signed that she received it. This was discriminatory

13    because I do not believe it would have happened if I did not have disabilities and need

14    accommodations for my disabilities.

15    On March 12, 2017, I requested March 19-20, 2017 off to attend my

16    grandmother's funeral. My grandmother was very special to me. My union contract

17    allows me 3 days off for bereavement and more if needed. On March 16, 2017, I saw on

18    the schedule that I had not been given days off for my grandmother's funeral and asked

19    Assistant Manager Jerry Hunt, about it. He began harassing me claiming that I can't

20    have time off for my grandmother's funeral. He followed me to the customer service

21    counter as he continued harassing me. Bookkeeper Tabatha Jacobi told him to leave me

22    alone and told him that I was entitled to the time off, and that he would know that if he

23    had read the union contract. She also said it was not something he should be addressing

24    on the sales floor in front of customers. Hunt continued to insist that was not true. This

25    went on for several minutes. I left a second note asking for two days off for my

26    grandmother's funeral on the same day. This was discriminatory because I do not

27    believe it would have happened if I did not have disabilities and need accommodations

28    for my disabilities.

On March 17, 2017, I called Store Manager Michael Vasquez about time off to attend my grandmother's funeral and he refused to speak to me about it, saying "we will discuss it when you work." This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On March 18, 2017, Assistant Manager Jessica Taylor texted me from her personal phone to ask if I was going to work on the days I had requested to take off for my grandmother's funeral. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On March 19, 2017, I called Bookkeeper Kelli Snow to let her know to pay me for the days off for a funeral I attended for my grandmother and she harassed me, asking who died and asking if management knew about it. She did not pay me and I had to ask to be paid again a week later. This whole situation made me feel very anxious about my job during a time I needed to be with my family to grieve. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On April 26 2017, Safeway suspended me from my job without pay and without giving me a reason. I did not learn the supposed reason for my suspension —violation of a shoplifting policy—until July 6, 2017. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On April 28, 2017, I faxed a note from my doctor saying that I needed time off for medical illness so that I would have medical and sick leave pay. Store Manager Michael Vasquez refused to sign it so that I would be paid, even though Safeway's benefits department told me that he was not allowed to refuse to sign it. Mr. Vasquez denied me my benefits. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On May 1, 2017, Jamie Moore, my union representative, personally brought my disability form into Store Manager Michael Vasquez so that I could receive my benefits. He refused to sign, again denying me my benefits, and did not give her a reason. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On May 16, 2017, Safeway attempted to revise its pre-existing shoplifting policy to prohibit employees other than the store manager or the person in charge from calling the police regarding suspected shoplifters. I believe Safeway did so in an attempt to retroactively hold me in violation of the policy because Safeway had no legitimate reason to discipline me. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On June 7, 2017, Safeway Security Manager Celia Kettle falsely claimed that I had signed off on Safeway's newly revised shoplifting policy. In reality, I had never seen nor heard of it. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

Also on June 7, 2017, Safeway Security Manager Celia Kettle also falsely claimed that Safeway had given me a written warning in 2016 regarding Safeway's shoplifting policy. When Safeway was unable to substantiate that claim, Safeway then claimed it had instead given me a verbal warning. I had received no such verbal warning regarding the shoplifting policy either. This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

On June 28, 2017, Safeway terminated me from my job with no explanation other than "violation of company policy." I finally learned the supposed reason on July 6, 2017, more than a week after the termination and over two months after the suspension without pay. The delay in notifying me of Safeway's reason is a separate retaliatory and discriminatory adverse employment action. Safeway had never made me aware of a policy prohibiting me from calling the police when there are suspected shoplifters, nor

had I done so on the occasion in question.  Cynthia Cornejo did call the police on that occasion, yet Safeway did not suspend her without pay, deny her medical benefits, terminate her employment, or to my knowledge discipline her at all for her actions.  This was discriminatory because I do not believe it would have happened if I did not have disabilities and need accommodations for my disabilities.

**INTERROGATORY NO.  12:**

Identify all complaints you made to Defendant regarding any of the unlawful conduct alleged in your Complaint, and separately identify for each such complaint the date you made the complaint, the name of the person you made the complaint to and the manner in which you made the complaint (e.g., in-person, by telephone, by email, etc.).

**RESPONSE TO INTERROGATORY NO.  12:**

See response to Interrogatory No.  2, B.  Failure to Properly Engage in the Interactive Process.

See response to Interrogatory No.  2, C.  Failure to Reasonably Accommodate.

See response to Interrogatory No.  2, D.  Discrimination.

See response to Interrogatory No.  2, E.  Failure to Prevent Discrimination.

See response to Interrogatory No.  2, F.  Harassment.

See response to Interrogatory No.  2, G.  Aiding, Abetting, Inciting, Compelling, or Coercing Harassment.

**INTERROGATORY NO.  13:**

State the total amount of economic loss you have incurred to date as a result of the termination of your employment with Defendant and how that amount was calculated.

**RESPONSE TO INTERROGATORY NO.  13:**

I lost wages for approximately 97 weeks while suspended without pay from April 27, 2017 to March 10, 2019.  If my wages for that time period were $21.734 per hour, and if I worked 40 hours per week, my lost wages for that time period would be

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 72

1  approximately $84,327.92, plus holiday pay and premium hourly rates for certain

2  holidays which I would have worked during that time period.  I earned $1,890.13 from

3  Instacart for work performed from January 28, 2019 to February 25, 2019.

4       I also suffered economic loss while suspended without pay from April 27, 2017 to

5  March 10, 2019 in the form of fringe benefits, including retirement, in an amount I

6  cannot yet determine.

7       I also suffered economic loss while suspended without pay from April 27, 2017 to

8  March 10, 2019 in the form of out of pocket medical and dental expenses, in an amount

9  I cannot yet determine.

10       Discovery is ongoing; I reserve the right to supplement my responses as needed.

11  I may retain an economic expert to assist in these calculations.

12  **INTERROGATORY NO.  14:**

13       Identify by name, last known address and telephone number all health care

14  providers, if any, from whom you have received treatment for any injuries that you

15  contend resulted from actions taken by Defendant.

16  **RESPONSE TO INTERROGATORY NO.  14:**

17       I was seen by the following health care providers for injuries that resulted from

18  actions taken by Safeway:

19
20     1.  Cole, Sophie, M.D., 11010 White Rock Road, Suite 120, Rancho Cordova, CA 96570, 800-458-1261

21
22     2.  Feezell, Sean, D.O, 915 San Ramon Valley Boulevard, Suite 100, Danville, CA 94526, (925) 875-3750

23     3.  Kamat, Leena, M.D., 5401 Norris Canyon Rd., Suite 201, San Ramon, CA 94583, 925-905-8970

24
25     4.  Lee, Rong, M.D., 3000 Las Positas Road, Livermore, CA 94551, 925-243-4882

26     5.  Martinovsky, Gary, M.D., 24301 Southland Drive, Suite 508, Hayward, CA 94545

27
28     6.  Pang, David, M.D., 5720 Stoneridge Mall Rd., Suite 130, Pleasanton, CA 94588, 925-425-0791

7. Peled, Ziv, M.D., 2100 Webster Street, Suite #109, San Francisco, CA 94115, 415-751-0583

8. Riopelle, Jeffrey, M.D., 5401 Norris Canyon Rd., Suite 201, San Ramon, CA 94583, 925-905-8970

9. Roth, Alan, M.D., 5401 Norris Canyon Rd., Suite 320, San Ramon, CA 94583, 925-275-1712

10. Schwartz, Ted, M.D., 3315 Broadway, Oakland, CA 94611, 510-238-1200

11. Sokoloff, Howard, M.D., 1320 El Capitan Drive, Suite 410, Danville, CA 94526, 925-830-2929

12. Souza, Valerie, LMFT, 1491 Cedarwood Lane, Suite A, Pleasanton, CA 94566, 925-202-5529

13. Subotnick, Steven, M.D., 13690 E 14th St., Suite 220, San Leandro, CA 94578, 510-614-5633

14. Venos, Kenneth, M.D., 5601 Norris Canyon Rd., Suite 130, San Ramon, CA 94583, 925-275-1133

Dated: August 12, 2019

SIEGEL, YEE, BRUNNER & MEHTA

By
Micah Clatterbaugh

Attorneys for Plaintiff
DEBRA HORN

**PROOF OF SERVICE**

I declare as follows:

I am over eighteen years of age and a citizen of the State of California. I am not a party to the within action. My business address of Siegel, Yee, Brunner & Mehta is 475 14th Street, Suite 500, Oakland, CA 94612.

On August 12, 2019, I served copies of the following documents:

    1.   PLAINTIFF'S RESPONSE TO DEFENDANT SAFEWAY INC.'S INTERROGATORIES TO PLAINTIFF, SET ONE

By transmitting a copy to:

Brian H. Chun
Lafayette & Kumagai LLP
1300 Clay Street, Suite 810
Oakland, CA 94612

I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document, which is in an envelope addressed as stated above, will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business.

    I declare under penalty of perjury that the foregoing is true and correct. Executed August 12, 2019, at Oakland, California.

                                  _____

                                     Gina White

**VERIFICATION**

I, DEBRA HORN, declare as follows:

I am the plaintiff in this action. I have read the foregoing Responses to Defendant's Interrogatories, Set One and know the contents thereof. The same is true of my personal knowledge except where stated on information and belief and, as to such matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August _12_, 2019, at _____Dublin_____, California.

_____
Debra Horn

*Horn v. Safeway Inc., et al.* Case No. 3:19-cv-02488-JCS
Plaintiff's Responses to Defendant's Interrogatories, Set One - 76